# APPENDIX

# TABLE OF CONTENTS

**<u>Page</u>**

District Court Order (Feb. 13, 2025),
    *AIDS Vaccine* Dkt. No. 17 .................................................................. App. 1

District Court Order (Feb. 20, 2025),
    *AIDS Vaccine* Dkt. No. 30 ................................................................ App. 16

District Court Order (Feb. 22, 2025),
    *AIDS Vaccine* Dkt. No. 34 ................................................................ App. 23

Hearing Transcript and Oral Ruling (Feb. 25, 2025) ............................ App. 29

Notice Related to February 12, 2025 Hearing (Feb. 12, 2025),
    *AIDS Vaccine* Dkt. No. 15 ................................................................ App. 89

Status Report Regarding Compliance (Feb. 18, 2025),
    *AIDS Vaccine* Dkt. No. 22 .............................................................. App. 179

Motion for Emergency Stay (Feb. 25, 2025),
    *AIDS Vaccine* Dkt. No. 37 .............................................................. App. 212

Docket Sheet, *AIDS Vaccine Advocacy Coalition v. Department of
    State*, No. 1:25-cv-400 (D.D.C.) ...................................................... App. 255

Docket Sheet, *Global Health Council v. Trump*,
    No. 1:25-cv-402 (D.D.C.) .................................................................. App. 263

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AIDS VACCINE ADVOCACY COALITION, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF STATE, *et al.*, <br><br> *Defendants*. | Civil Action No. 25-00400 (AHA) |
| GLOBAL HEALTH COUNCIL, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, *et al.*, <br><br> *Defendants*. | Civil Action No. 25-00402 (AHA) |

### Order

Plaintiffs in *Global Health Council v. Trump*, No. 25-cv-00402, are (or represent) small and large businesses, nonprofits, and other organizations across the United States. Plaintiffs in *AIDS Vaccine Advocacy Coalition v. United States Department of State*, No. 25-cv-00400, are health and journalistic nonprofits that receive federal grant money to perform foreign assistance work. In both cases, Plaintiffs have brought claims under the Administrative Procedure Act (APA) and federal Constitution challenging the issuance and implementation of Executive Order 14169, which immediately stopped all congressionally appropriated foreign assistance funding pending future review. *AIDS Vaccine*, ECF No. 1 ¶¶ 45–73; *Glob. Health*, ECF No. 1 ¶¶ 111–31. Plaintiffs

**App. 001**

in both cases have moved for a temporary restraining order, with evidence detailing the devastating effects on American businesses and nonprofits, which have been forced to shut down programs, to furlough or lay off employees, and in some instances to shutter altogether as a result of the challenged action. *See AIDS Vaccine*, ECF No. 13 at 7–8; *Glob. Health*, ECF No. 4 at 15–17. Plaintiffs' proposed temporary restraining orders originally sought to enjoin all Defendants, including the President, from enforcing the Executive Order in its entirety. *AIDS Vaccine*, ECF No. 13-6; *Glob. Health*, ECF No. 4-1. The Court held a prompt hearing, at which the Government rightly highlighted the importance of respecting the President's Article II power, while also recognizing that the harms Plaintiffs described may well be irreparable. During the hearing, the Court questioned the breadth of Plaintiffs' proposed relief, which Plaintiffs have since narrowed. For the reasons below, the Court grants Plaintiffs' motions for a temporary restraining order in part, on narrower terms than Plaintiffs originally and subsequently requested.

## I.    Background

Each year, Congress appropriates billions of dollars of funds for foreign assistance, which are then administered by the U.S. Agency for International Development (USAID) and the U.S. Department of State. *Glob. Health*, ECF No. 1 ¶ 3. USAID "is the lead international humanitarian and development arm of the U.S. government." Cong. Rsch. Serv., IF10261, *U.S. Agency for International Development: An Overview* 1 (Jan. 6, 2025). Among other things, it "provides assistance to strategically important countries and countries in conflict" and "leads U.S. efforts to alleviate poverty, disease, and humanitarian need." *Id.* Most USAID projects are administered through grants, cooperative agreements, or contracts with partner organizations. *Id.*

On January 20, 2025, the President issued an executive order entitled "Reevaluating and Realigning United States Foreign Aid." Exec. Order No. 14169, 90 Fed. Reg. 8619 (Jan. 20, 2025).

**App. 002**

The order directed an immediate pause in "United States foreign development assistance" and directed the Office of Management and Budget (OMB) to "enforce this pause through its apportionment authority." *Id.* § 3(a). The order further directs responsible department and agency heads to review each foreign assistance program and to determine within 90 days of the order "whether to continue, modify, or cease each foreign assistance program," in consultation with the Director of OMB and with the concurrence of the Secretary of State. *Id.* §§ 3(b), (c). The order provides that the Secretary of State has authority to waive the pause "for specific programs" and allows for new obligations or the resumption of disbursements during the 90-day review period, if a review is conducted sooner and the Secretary of State, in consultation with the Director of OMB, approves. *Id.* §§ 3(d), (e).

In the days that followed, agency officials took actions to institute an immediate suspension of all congressionally appropriated foreign aid. The Secretary of State issued a memorandum suspending all new funding obligations, pending a review, for foreign assistance programs funded by or through the State Department and USAID. *Glob. Health*, ECF No. 1 ¶ 42. USAID officials also issued instructions to pause new funding, immediately issue stop-work orders, and develop appropriate review standards. *Id.* ¶¶ 41, 44–45. The OMB's acting director issued a memorandum ordering a temporary pause of all federal financial assistance, including assistance for foreign aid and nongovernmental organizations." *Id.* ¶ 47. According to the *Global Health* complaint, Defendants have "halt[ed] the obligation and disbursement of foreign-assistance funding wholesale." *Id.* ¶ 56. Plaintiffs have adduced evidence of numerous letters terminating programs and contracts received as a result of these actions. *See, e.g.*, *Glob. Health*, ECF No. 7-4 at 2, 5, 7, 13. A list Defendants provided to the Court shows that roughly 230 contracts and grants were terminated in just the two days after they were sued, and Defendants say that list does not include

3

**App. 003**

the contracts and grants cancelled by the State Department and may not reflect all the contracts cancelled by USAID in those two days. *Glob. Health*, ECF Nos. 20, 20-1.

Plaintiffs claim that they have suffered and will continue to suffer enormous and concrete harm to their businesses, and that their core missions and existence are in jeopardy as a result of Defendants' actions. Among other things, Plaintiffs have provided evidence that they have been and will continue to be forced to shut down program offices, to furlough or terminate staff, and in some cases to shutter their businesses entirely. *See Glob. Health*, ECF No. 4 at 20–23. They have also provided supporting evidence that Defendants' actions have had and will continue to have a catastrophic effect on the humanitarian missions of several plaintiffs. *See id.* at 15–19.

Plaintiffs seek a temporary restraining order enjoining Defendants from implementing, enforcing, or otherwise giving effect to Executive Order 14169 and subsequent instructions and clarifications issued by the State Department and USAID. The Court held a hearing in both cases on February 12, 2025. Following the hearing, Plaintiffs submitted revised proposed orders that narrowed the scope of their requested relief. *AIDS Vaccine*, ECF No. 16-1; *Glob. Health*, ECF No. 18.

## II. Legal Standard

The grant of temporary injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a temporary restraining order must make the same showing as he would if seeking a preliminary injunction: he must establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of

**App. 004**

preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011).[1]

## III.    Discussion

At least at this early stage, the Court finds Plaintiffs have met their burden for temporary, emergency relief, although not with the breadth they initially or subsequently proposed.

The Court begins with irreparable harm, given the scale of the disruption Plaintiffs have described. Plaintiffs attest Defendants' blanket suspension of congressionally appropriated funds has caused them immense financial harm and has, in many cases, forced them to significantly cut down on staff or otherwise reduce core operations. Plaintiffs do not assert this harm based upon expectations of receiving future grants or aid; they do so upon expectations set in existing contracts with the respective agencies. To give just a few examples from the record:

- One plaintiff, a large investigative journalism organization, has agreements with USAID and the State Department that constitute 38% of its budget, which supports investigations into corruption, sanction violations, and other wrongdoing. *AIDS Vaccine*, ECF No. 13-4 ¶¶ 2, 6–7, 9. Due to the suspension of appropriated funding and stop-work orders received as a result, the organization has been forced to cut 43 of 199 staff members, with most remaining being moved to a shorter work week. *Id.* ¶ 12. The organization has had to cancel events, cut travel for reporting, and freeze new equipment purchases. *Id.* The organization attests that the disruption will continue absent relief. *Id.* ¶ 13.

- A nonprofit plaintiff focused on protecting refugees and asylum seekers has had to lay off 535 staff members since receiving termination notices for multiple grants. *Glob. Health*, ECF No. 7-3 ¶¶ 3–4, 13. It has been forced to shutter program offices and defer payments to vendors. *Id.* ¶ 21.

---

[1] At the hearing on these motions, Plaintiffs noted that courts in this Circuit have sometimes employed a "sliding scale" approach to these factors, which was particularly common before the Supreme Court's decision in *Winter*. *See Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, __ F. Supp. 3d __, No. 25-cv-239, 2025 WL 368852, at *9 (D.D.C. Feb. 3, 2025) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)). However, the Court's resolution of these motions does not depend on a sliding scale method and arrives at the same place when each prong is evaluated as "an independent, free-standing requirement." *Sherley*, 644 F.3d at 393 (citation omitted).

**App. 005**

- Another plaintiff representing small businesses across all sectors attests that the suspension included USAID failing to pay its member organizations for months of unpaid invoices. *Glob. Health*, ECF No. 7-2 ¶ 8. This has forced small businesses to furlough "most U.S. national staff in home offices and on contracts, and terminate foreign national staff or risk keeping them and being uncertain of payments under stop work orders." *Id.* ¶ 10.

- Another plaintiff focused on addressing the global HIV/AIDS epidemic has already been forced to lay off seven employees and will lay off ten more over the next month if the suspension of appropriated foreign aid continues. *AIDS Vaccine*, ECF No. 13-2 ¶ 12.

Other plaintiffs have described how the blanket suspension of funds has undermined their

core missions and jeopardized vital services to vulnerable populations. For example:

- One plaintiff asserts that the suspension of appropriated foreign aid has disrupted critical health programs, including maternal and child health programs and infectious disease prevention efforts administered by its member organizations. *Glob. Health*, ECF No. 7-1 ¶ 8. One of those member organizations reports that a $20 million project to support the development of hospital accreditation in Cambodia has been suspended. *Id.* Another reports that a stop-work order has disrupted a total of $4 million in funding for American Schools and Hospitals Abroad grants in Nepal and Vietnam. *Id.* The plaintiff organization attests that the suspension of appropriated foreign aid funding "is an existential threat to [its] members and their life-saving work." *Id.* ¶ 11.

- Another plaintiff reports that it can no longer fund shelters for minors in Central America trying to escape recruitment into criminal gangs. *Glob. Health*, ECF No. 7-7 ¶ 10.

- A different plaintiff explains that it has abruptly stopped providing medical services for hundreds of adolescents and young students in need in Bangladesh. *Glob. Health*, ECF No. 7-8 ¶ 12(a).

- An additional plaintiff attests that the freeze has delayed several time-sensitive antimalaria campaigns that are expected to benefit millions of people in Kenya, Uganda, Ghana, Ethiopia, and Zimbabwe. *Glob. Health*, ECF No. 7-1 ¶ 8(d).

- Another plaintiff that supports HIV prevention research and the rollout of HIV prevention medication to high-risk communities in various African countries asserts that the funding freeze has disrupted clinical trials and the rollout of life-saving medication. *AIDS Vaccine*, ECF No. 13-2 ¶¶ 3–4, 11.

**App. 006**

At the Court's hearing, Defendants acknowledged that the types of harms above affecting Plaintiffs' businesses, as well as the availability of food and medicine, are types of harm that are appropriately considered in the irreparable harm inquiry. Defendants offered that some of the contracts terminated might have included clauses that allowed them to be terminated in certain circumstances, but also acknowledged that the approach taken was blanket and not limited to such contracts.[2]

Plaintiffs have further adduced evidence that this harm has taken place and is likely to continue despite the Secretary of State's authority to waive the suspension of appropriated funds for specific programs. *See Glob. Health*, ECF No. 17-1 at 21. They have proffered specific facts that this has not meaningfully mitigated the harm they have described. One plaintiff, for example, attests to a meeting with the State Department to discuss what activities would qualify for a waiver and thus be exempted from suspension. *Glob. Health*, ECF No. 7-3 ¶ 11. The officer contacted stated that he could not provide any information regarding the application of the waiver. *Id.* ¶¶ 11– 12. The plaintiff further attests that even in the event of a waiver, no funds could be disbursed because federal government payout portals are no longer functioning. *Id.* ¶ 11. Another plaintiff

---

[2] While not necessary to the Court's analysis given the extensive and, at least to date, unrebutted evidence of other types of irreparable harm, Plaintiffs have also offered evidence that they will suffer harm to "goodwill, reputation, and relationships with employees, partners, subcontractors, foreign governments, and other stakeholders." *Glob. Health*, ECF No. 4 at 23. This includes concrete examples such as having to violate contractual duties by deferring payments to suppliers, vendors, and landlords, *Glob. Health*, ECF No. 7-6 ¶¶ 10, 15; disruptions to relationships with longstanding partners whose trust had been cultivated over decades, *id.*; and having to go back on previous assurances made to clients and partners in reliance on the agreements that have now been cancelled, *Glob. Health*, ECF No. 7-9 ¶ 21. *See Armour & Co. v. Freeman*, 304 F.2d 404, 406 (D.C. Cir. 1962) (holding that irreparable harm was apparent where defendant's conduct "could not fail to damage [plaintiff's] good name"); *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 280 F. Supp. 3d 59, 103 (D.D.C. 2017) ("Injury to reputation can, at least at times, rise to the level necessary to support the issuance of an injunction."); *Xiaomi Corp. v. Dep't of Def.*, No. CV 21-280, 2021 WL 950144, at *9 (D.D.C. Mar. 12, 2021) (collecting cases).

**App. 007**

attests that it received a waiver, but was told that the waiver lasted only for a thirty-day period. *Glob. Health*, ECF No. 7-6 ¶ 6. The plaintiff explains that such waivers do not address the problem because a business cannot halt global supply chains midstream and then resume operations with uncertainty as to whether it will have to halt again in thirty days. *Id.* At the hearing, Defendants pointed to the waiver process but did not rebut this evidence, acknowledging that the waiver process may have had "hiccups." At this stage, the record before the Court does not suggest that the waiver process in place has mitigated the irreparable harms Plaintiffs face.

Plaintiffs have made a sufficient preliminary showing that the loss of funding at issue in this litigation "threatens the very existence of [their] business." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). And they have likewise shown that the "obstacles" created by Defendants' conduct "make it more difficult for the [plaintiffs] to accomplish their primary mission." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016). The *Global Health* Plaintiffs have also adduced evidence indicating that terminations and resulting harms have continued, and possibly increased, in the two days since this lawsuit was filed. Since the filing of their motion for a temporary restraining order, multiple plaintiffs that had not previously received terminations or stop-work orders have started to receive them. *See Glob. Health*, ECF No. 19 at 3. At the request of the Court, Defendants submitted documentation showing that just in the two days after they were sued, they have cancelled roughly 230 additional contracts, which Defendants say do not include the contracts cancelled by the State Department and may not reflect all the contracts cancelled by USAID in those days. *Glob. Health*, ECF Nos. 20, 20-1. Absent temporary injunctive relief, therefore, the scale of the enormous harm that has already occurred will almost certainly increase. Plaintiffs have made a strong preliminary showing of irreparable harm.

**App. 008**

It also appears, at least at this early stage, that Plaintiffs are likely to succeed on the merits. Between the two cases, Plaintiffs challenge the actions at issue as (1) arbitrary and capricious in violation of the APA; (2) contrary to law in violation of the APA; (3) in violation of the separation of powers; (4) in violation of the Constitution's Take Care Clause; and (5) *ultra vires*. *AIDS Vaccine*, ECF No. 1 ¶¶ 45–73; *Glob. Health*, ECF No. 1 ¶¶ 111–31. The Court need only find that Plaintiffs are likely to succeed on one of these claims for this factor to weigh in favor of a temporary restraining order. That said, as the Court emphasized at the hearing and Plaintiffs acknowledged, any relief should also be tailored accordingly.[3]

The APA permits judicial review of "final agency action" and requires a court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 704, 706(2)(A). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Rather, the court "must confirm that the agency has fulfilled its duty to examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Ark Initiative v. Tidwell*, 816 F.3d 119, 127 (D.C. Cir. 2016) (quotation marks omitted) (quoting *State Farm*, 463 U.S. at 43). "[A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency,

---

[3] Both parties will, of course, have the opportunity to develop their claims further at the preliminary injunction phase, where the record and therefore the appropriate relief may well evolve, and to develop them further as the case continues.

**App. 009**

or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (alteration in original) (quoting *State Farm*, 463 U.S. at 43).

Here, the stated purpose in implementing the suspension of all foreign aid is to provide the opportunity to review programs for their efficiency and consistency with priorities. However, at least to date, Defendants have not offered any explanation for why a blanket suspension of all congressionally appropriated foreign aid, which set off a shockwave and upended reliance interests for thousands of agreements with businesses, nonprofits, and organizations around the country, was a rational precursor to reviewing programs. The most Defendants offer is the possibility that some of the abruptly terminated contracts might have had clauses which allowed termination in certain circumstances; however, as noted, Defendants have acknowledged that they implemented a blanket suspension that was not based on the presence or consideration of such contractual terms. To be sure, there is nothing arbitrary and capricious about executive agencies conducting a review of programs. But there has been no explanation offered in the record, let alone a "satisfactory explanation . . . including a rational connection between the facts found and the choice made," as to why reviewing programs—many longstanding and taking place pursuant to contractual terms—required an immediate and wholesale suspension of appropriated foreign aid.

Plaintiffs have also shown that implementation of the blanket suspension is likely arbitrary and capricious given the apparent failure to consider immense reliance interests, including among businesses and other organizations across the country. No aspect of the implemented policies or submissions offered by Defendants at the hearing suggests they considered and had a rational reason for disregarding the massive reliance interests of the countless small and large businesses that would have to shutter programs or shutter their businesses altogether and furlough or lay off swaths of Americans in the process. In their implementation of the blanket suspension of foreign

10

**App. 010**

aid, Defendants accordingly appear to have "entirely failed to consider an important aspect of the problem."

At the Court's hearing, Defendants' principal argument was that the State Department's and USAID's actions taken to implement a blanket suspension of appropriated foreign aid funds should not be considered "agency action" within the meaning of the APA. Defendants observe that the President's own actions are not reviewable under the APA because the President is not an "agency." *See Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992). It follows, they say, that an agency's actions implementing Presidential directives should not be considered agency action. At least at this juncture, that argument does not appear persuasive. Defendants do not ground their argument in the text of the APA, which specifically defines "agency" to include "each authority of the Government of the United States." 5 U.S.C. § 551(1). While it is true that implementation of the blanket suspension of appropriated funds took place in accordance with Presidential policy and priorities, as agency action routinely does, the relevant directive of the Secretary of State and subsequent determinations of agency heads have immediate effect and constitute the action under review, without any further action by the President. And Defendants' argument, at least as it has been articulated to date, proves too much—it would allow the President and agencies to simply reframe agency action as orders or directives originating from the President to avoid APA review.[4] Defendants will, of course, have an opportunity to more fully develop this argument as it relates

---

[4] Defendants' argument also presupposes that this is an area where the President has exclusive authority and runs into Plaintiffs' contention that the President was acting in violation of the separation of powers because he "does not have unilateral authority to refuse to spend the funds" Congress appropriates. *In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013). As Plaintiffs point out, even just a 90-day review period would extend past the date that relevant appropriations are due to expire and therefore funds would literally be unspent. The Court expects Defendants will give further shape to this argument as this litigation continues to the preliminary injunction phase.

**App. 011**

to the particular actions in this case at the preliminary injunction stage. For now, however, Plaintiffs have shown that they are likely to succeed in their argument that the implementation of the suspension of congressionally appropriated foreign aid violated the APA.

The final two factors—balancing the equities and the public interest—often overlap in the context of an action to enjoin the government. *See Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016); *D.A.M. v. Barr*, 474 F. Supp. 3d 45, 67 (D.D.C. 2020). Here, there are important interests on both sides, but the factors, at least at this stage, again favor Plaintiffs. Defendants have repeatedly, and rightly, emphasized the importance of respecting the President's Article II power as it relates to foreign policy. Plaintiffs, for their part, have emphasized the Constitution's separation of powers, which also demands respect for Congress's Article I role in legislating, including Congress's choice to allow judicial review through the APA and other statutes constraining the Executive Branch, as well as Congress's important role in appropriating funds. Ultimately, Plaintiffs have adduced, and Defendants have not (yet) meaningfully contested, detailed and credible evidence of harm to countless American businesses, ranging from shutting down programs, to furloughing and laying off employees, to shuttering altogether. Plaintiffs also detailed the existential consequence to their missions, which may endanger the health and safety of children and other vulnerable populations. At the Court's hearing, Defendants did not dispute the likelihood of those consequences, although they looked forward to having more time to develop a record in response as the proceedings continue. And on the other side, Defendants did not argue or adduce evidence that any concrete, real-world harm will take place in the event temporary relief is granted. Notwithstanding the important principles on both sides, which will continue to be given careful consideration, Plaintiffs' credible and unrebutted evidence of harm, and the absence of any

**App. 012**

such evidence on the other side, tilts both the balance of equities and the public interest in their favor.

## IV.    Conclusion

For the foregoing reasons, Plaintiffs' motions for a temporary restraining order are denied in part and granted in part.

Plaintiffs' initial proposed relief asked the Court to enjoin the President and enforcement or implementation of Executive Order 14169. The Court does not find it appropriate or necessary to enjoin the President or the Executive Order itself. Given the breadth of the relief initially sought by Plaintiffs, the Court also makes clear that it does not enjoin the President's or Secretary of State's statements of purpose or policy, nor does the Court enjoin any aspect of the Government's ability to conduct a comprehensive internal review of government programs. While Plaintiffs have made the showing required for a temporary injunction, such relief would not be adequately tailored to the showing made at this stage.

The Court finds Plaintiffs have satisfied their burden for a narrower injunction concerning the implementation of the blanket suspension of foreign aid funding, as specified below. However, the Court also finds Plaintiffs' proposed injunctions overbroad by including specific directives regarding USAID personnel decisions or operational details. *See Glob. Health*, ECF No. 4-1 (proposed language enjoining Defendants from "terminating, furloughing, or placing personnel on administrative leave" and ordering Defendants to clear "any administrative, operational, human resource, or technical hurdles"); *Glob. Health*, ECF No. 18 (revised proposal, including the same language). Plaintiffs appear to be including such language to ensure meaningful compliance with the Court's order; however, directives as to such specific operational details are overbroad in the

**App. 013**

absence of evidence of non-compliance. As specified below, it is sufficient to order Defendants to take all necessary steps to carry out the Court's order.

Finally, at the hearing, Defendants noted that some contracts at issue may include terms that allow them to be modified or terminated in certain circumstances. The Court finds on this record that it would be overbroad to enjoin Defendants from taking action to enforce the terms of particular contracts, including with respect to expirations, modifications, or terminations pursuant to contractual provisions.

Consistent with the reasoning above, it is hereby **ORDERED** that Defendants Marco Rubio, Peter Marocco, Russell Vought, the U.S. Department of State, the U.S. Agency for International Development, and the Office of Management and Budget (the "Restrained Defendants") and their agents are temporarily enjoined from enforcing or giving effect to Sections 1, 5, 7, 8, and 9 of Dep't of State, Memorandum, 25 STATE 6828 (Jan. 24, 2025) and any other directives that implement Sections 3(a) and 3(c) of Executive Order Number 14169, "Reevaluating and Realigning United States Foreign Aid" (Jan. 20, 2025), including by:

- suspending, pausing, or otherwise preventing the obligation or disbursement of appropriated foreign-assistance funds in connection with any contracts, grants, cooperative agreements, loans, or other federal foreign assistance award that was in existence as of January 19, 2025; or

- issuing, implementing, enforcing, or otherwise giving effect to terminations, suspensions, or stop-work orders in connection with any contracts, grants, cooperative agreements, loans, or other federal foreign assistance award that was in existence as of January 19, 2025.

**App. 014**

It is further hereby **ORDERED** that nothing in this order shall prohibit the Restrained Defendants from enforcing the terms of contracts or grants.

It is further hereby **ORDERED** that the Restrained Defendants shall take all steps necessary to effectuate this order and shall provide written notice of this order to all recipients of existing contracts, grants, and cooperative agreements for foreign assistance.

It is further hereby **ORDERED** that the Restrained Defendants shall file a status report by February 18, 2025, apprising the Court of the status of their compliance with this order, including by providing a copy of the written notice described above.

The parties shall meet and confer and file a joint status report by February 14, 2025, at 5:00 p.m. proposing an expedited preliminary injunction briefing schedule.

_____

AMIR H. ALI
United States District Judge

Date:    February 13, 2025

15

**App. 015**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AIDS VACCINE ADVOCACY COALITION, *et al.*, <br><br>     *Plaintiffs*, <br><br>   v. <br><br> UNITED STATES DEPARTMENT OF STATE, *et al.*, <br><br>     *Defendants*. | Civil Action No. 25-00400 (AHA) |
| GLOBAL HEALTH COUNCIL, *et al.*, <br><br>     *Plaintiffs*, <br><br>   v. <br><br> DONALD J. TRUMP, *et al.*, <br><br>     *Defendants*. | Civil Action No. 25-00402 (AHA) |

## Order

The Court granted in part Plaintiffs' motions for a temporary restraining order ("TRO") in these two related cases on February 13, 2025. *AIDS Vaccine*, ECF No. 17; *see AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. 25-cv-00400, 2025 WL 485324 (D.D.C. Feb. 13, 2025). Defendants have filed a status report in both cases concerning their compliance with the Court's order and have asked the Court to confirm their understanding that the TRO does not restrain Defendants' "exercise of authorities under statutes, regulations, and other legal authorities." *AIDS Vaccine*, ECF No. 22 ¶¶ 14–18; *Glob. Health*, ECF No. 25 ¶¶ 14–18. As discussed below, the TRO is clear, and Defendants are correct that it does not restrain the agencies' exercise of authorities

**App. 016**

under law. At the same time, of course, the TRO does not permit Defendants to simply search for and invoke new legal authorities as a post-hoc rationalization for the enjoined agency action. This is particularly so given that Defendants do not contend that any of the authorities bear on the justifications for granting the TRO—the authorities do not, for instance, have any effect on the Court's finding of irreparable harm or whether the blanket suspension of congressionally appropriated funds pending review was arbitrary or capricious for failing to even consider the immense reliance interests at stake. The *AIDS Vaccine* Plaintiffs have moved to enforce the TRO and to hold Defendants in contempt. *AIDS Vaccine*, ECF No. 26. Defendants oppose the motion, arguing that they have been making good faith efforts to comply with the TRO in limited time. *AIDS Vaccine*, ECF No. 28. As discussed below, Plaintiffs' motion is granted in part, insofar as Defendants have continued their blanket suspension of funds pending review of agreements, the very action that the TRO enjoined pending the parties' requested briefing schedule and the Court's prompt resolution of whether to issue a preliminary injunction. But the Court finds that contempt is not warranted on the current record and given Defendants' explicit recognition that "prompt compliance with the order" is required. *Id.* at 8.

The Court's TRO was clear. It found that Plaintiffs had satisfied their demanding burden for temporary injunctive relief, including by showing that Defendants' blanket suspension of congressionally appropriated foreign aid pending a review had and would continue to cause irreparable harm and that the blanket suspension was likely arbitrary and capricious under the Administrative Procedure Act (APA) for failing to consider the immense reliance interests of businesses and organizations around the country. *AIDS Vaccine*, ECF No. 17 at 5–13. The Court ordered that Defendants and their agents are:

**App. 017**

temporarily enjoined from enforcing or giving effect to [certain sections of the Secretary of State's January 24, 2025, memorandum] and any other directives that implement Sections 3(a) and 3(c) of Executive Order Number 14169 . . . , including by:

- suspending, pausing, or otherwise preventing the obligation or disbursement of appropriated foreign-assistance funds in connection with any contracts, grants, cooperative agreements, loans, or other federal foreign assistance award that was in existence as of January 19, 2025; or

- issuing, implementing, enforcing, or otherwise giving effect to terminations, suspensions, or stop-work orders in connection with any contracts, grants, cooperative agreements, loans, or other federal foreign assistance award that was in existence as of January 19, 2025.

*Id.* at 14. The Court explained, however, that while it was enjoining directives to suspend aid, it "would be overbroad to enjoin Defendants from taking action to enforce the terms of particular contracts, including with respect to expirations, modifications, or terminations pursuant to contractual provisions." *Id.* It accordingly ordered that "nothing in this order shall prohibit the Restrained Defendants from enforcing the terms of contracts or grants." *Id.* at 15.[1]

In their status report, Defendants state that they "have begun an analysis of the thousands of contracts, grants, and cooperative agreements on which action was taken" pursuant to the Executive Order and other agency directives. *AIDS Vaccine*, ECF No. 22 ¶ 8. They state that "at least substantially all" of USAID's actions and "a large share" of the State Department's actions to terminate or suspend foreign aid contracts and grants could have been "allowed by the terms of those instruments or terms implicitly incorporated into those instruments." *Id.* ¶¶ 9–10. Defendants also ask the Court to confirm their understanding that the TRO does not enjoin Defendants from

---

[1] The Court also narrowed the scope of the relief granted by declining to enjoin the President or the Executive Order itself; by temporarily enjoining enforcement only of specific sections of the Executive Order, the January 24 memorandum, and other directives concerning the blanket pause of congressionally appropriated funds; and by declining to issue any specific commands to Defendants regarding personnel decisions or operational details. *AIDS Vaccine*, ECF No. 17 at 13–14.

**App. 018**

taking actions with respect to agreements based on "exercise of authorities under statutes, regulations, and other legal authorities," consistent with the court's order in *New York v. Trump*, No. 25-cv-00039, ECF No. 107, at 3 (D.R.I. Feb. 12, 2025) (confirming that the court's temporary restraining order did not prevent the defendants from terminating funding "based on actual authority in the applicable statutory, regulatory, or grant terms" (emphasis omitted)). *AIDS Vaccine*, ECF No. 22 ¶ 14. They ask the Court to modify the TRO if necessary or, if the TRO restrains them from making grant decisions based on other legal authorities, to convert the TRO into a preliminary injunction to permit an immediate appeal. *Id.* ¶ 18.

As in the case Defendants point to, *New York v. Trump*, the Court's TRO in this case does not restrain Defendants from taking action with respect to agreements based on their "exercise of authorities under statutes, regulations, and other legal authorities." While the Court made clear that the agencies may take action on particular contracts pursuant to their contractual terms, it did so because Defendants had specifically raised that as a concern and in the interest of ensuring its temporary injunction was as tailored as possible to the irreparable harm and reliance interests that had been shown. However, nothing in the TRO limits the agencies from conducting an individualized review of agreements and taking action as to a particular agreement where the agency determines that it has lawful authority to do so. Having confirmed that the TRO does not restrain the agencies in this respect, the Court denies Defendants' request to convert the TRO into a preliminary injunction as moot.[2]

---

[2] As in *New York v. Trump*, the Court emphasizes that Defendants are not required "to seek 'preclearance' from the Court before acting to terminate funding when that decision is based on actual authority in the applicable statutory, regulatory, or grant terms." *New York*, ECF No. 107, at 3 (emphasis omitted). In that case, for example, the court saw no need for clarification of its order where the defendants represented that they "intend[ed] to provide notice to [a funding recipient] regarding the funding pause and will provide the information and process required by

At the same time, of course, the Court's TRO does not permit Defendants to simply continue their blanket suspension of congressionally appropriated foreign aid pending a review of the agreements for whether they should be continued or terminated. That is the very action that the Court temporarily enjoined because Plaintiffs had shown that blanket suspension pending review would cause irreparable harm and was likely arbitrary and capricious under the APA for failing to consider the massive reliance interests. *AIDS Vaccine*, ECF No. 17 at 5–13. By doing so, and by enjoining Defendants and their agents from implementing any directives to undertake such blanket suspension, the Court was not inviting Defendants to continue the suspension while they reviewed contracts and legal authorities to come up with a new, post-hoc rationalization for the *en masse* suspension. The Court notes that Defendants do not make any argument that the authorities they are examining bear on the Court's analysis of the TRO factors. To date, Defendants have not offered any evidence to rebut the showing of irreparable harm or that Defendants failed to consider the immense reliance interests in undertaking the blanket suspension. The Court stands prepared to consider such arguments and evidence at the preliminary injunction stage, on the briefing schedule the parties requested. In the meantime, however, to the extent Defendants have continued the blanket suspension, they are ordered to immediately cease it and to take all necessary steps to honor the terms of contracts, grants, cooperative agreements, loans, and other federal foreign assistance awards that were in existence as of January 19, 2025, including but not limited to disbursing all funds payable under those terms.

As the TRO states and the Court reiterates, Defendants may not simply replace their earlier implementations with "other directives" to their agencies to "suspend[], paus[e], or otherwise

---

regulation and the terms and conditions of the award." *Id.* (internal quotation marks and citation omitted).

**App. 020**

prevent[] the obligation or disbursement of appropriated foreign-assistance funds" or "issu[e],

implement[], enforc[e], or otherwise giv[e] effect to terminations, suspensions, or stop-work

orders" as to programs in existence as of January 19, 2025. *Id.* at 14. The TRO does not preclude

Defendants from undertaking a good-faith, individualized assessment of a contract or grant and,

where the terms or authority under law allows, taking action with respect to that particular

agreement consistent with any procedures required (including, for example, notice to contracting

parties). But a new directive for the agencies to suspend or terminate contracts and grants is not

consistent with the terms of the TRO and is appropriately enjoined for all the same reasons stated

in the TRO.[3]

Plaintiffs' motion to enforce the TRO is therefore granted to the extent Defendants have

not complied with the terms of the TRO, as confirmed above. However, the Court finds contempt

is not warranted on the current record and given Defendants' explicit recognition that "prompt

compliance with the order" is required. *AIDS Vaccine*, ECF No. 28 at 8.

Understandably given the early, emergency posture of these cases, the record and the

parties' arguments have been evolving quickly. The Court held a hearing within one day of being

assigned to the cases and issued an order resolving the motions for a temporary restraining order

the next day. As the Court emphasized throughout its earlier order, the parties' arguments are still

developing, and Defendants in particular have not yet offered refutations of Plaintiffs' evidence or

fully developed their arguments at this early stage. *See, e.g.*, *AIDS Vaccine*, ECF No. 17 at 9 n.3,

---

[3] The Court notes that while case-by-case action taken as to particular agreements based on their
terms or other authorities might not give rise to the same problems under the APA because it would
better account for reliance interests, it may have implications for Plaintiffs' constitutional
arguments, such as the failure to spend congressionally appropriated funds. As the Court explained
in its TRO order, it expects those arguments to be developed further in the parties' forthcoming
preliminary injunction briefing. *AIDS Vaccine*, ECF No. 17 at 11 n.4.

**App. 021**

11 n.4. The Court adopted in large part the parties' proposed briefing schedule for the preliminary

injunction motions, giving Defendants until February 21, 2025, to brief those motions as they had

requested, and shortening Plaintiffs' proposed reply deadline to noon on February 27, 2025, in the

interest of proceeding as expeditiously as possible. The Court is prepared to hold a hearing on the

preliminary injunction motions in both cases by March 4, 2025, and issue an opinion considering

the full record and arguments before it with full dispatch. To facilitate this expedited schedule, and

for the reasons stated in the Court's TRO order, the Court will set the expiration date for the TRO

at 11:59 p.m. on March 10, 2025, or the date the Court resolves the preliminary injunction motions,

whichever is sooner.

      **SO ORDERED.**

_____
AMIR H. ALI
United States District Judge

Date:   February 20, 2025

**App. 022**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AIDS VACCINE ADVOCACY COALITION, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF STATE, *et al.*, <br><br> *Defendants*. | Civil Action No. 25-00400 (AHA) |
| GLOBAL HEALTH COUNCIL, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, *et al.*, <br><br> *Defendants*. | Civil Action No. 25-00402 (AHA) |

## <u>Order</u>

Defendants have moved for clarification or a stay pending emergency appellate relief of the Court's orders dated February 13 (granting in part Plaintiffs' motion for a temporary restraining order) and February 20, 2025 (granting in part the *AIDS Vaccine* Plaintiffs' motion to enforce that order). *AIDS Vaccine*, ECF No. 32; *Glob. Health*, ECF No. 33. Specifically, Defendants state that they require clarification as to whether the Court's orders "(1) prohibit Defendants from relying on existing statutory or contractual bases for suspending or terminating contracts or grants, under the terms of the award or under other authorities, (2) treat all contractual and grant terms as enforceable by contempt, and/or (3) prohibit Defendants from conducting a payment integrity

review process (including pursuant to statutorily or contractually conferred authority to suspend or terminate contracts or grants)." *Glob. Health*, ECF No. 33 at 1–2.

To begin with, and as the Court has already reiterated once, "to the extent Defendants have continued the blanket suspension [of funds], they are ordered to immediately cease it and to take all necessary steps to honor the terms of contracts, grants, cooperative agreements, loans, and other federal foreign assistance awards that were in existence as of January 19, 2025, including but not limited to disbursing all funds payable under those terms." *Glob. Health*, ECF No. 28 at 5. That temporary emergency relief was to restore the status quo as it existed before Defendants' blanket suspension of congressionally appropriated funds pending a comprehensive review, given Plaintiffs' strong showing of irreparable harm and that Defendants' blanket suspension of funds was likely arbitrary and capricious under the Administrative Procedure Act (APA). *See id.* at 2; *Glob. Health*, ECF No. 21 at 5–13. Defendants' instant motion does not contest or rebut Plaintiffs' irreparable harm showing and does not contest or rebut the Court's finding that the agency action here was arbitrary and capricious under the APA.[1]

The Court has also already reiterated that while "of course, the TRO does not permit Defendants to simply search for and invoke new legal authorities as a post-hoc rationalization for the enjoined agency action," it "does not preclude Defendants from undertaking a good-faith, individualized assessment of a contract or grant and, where the terms or authority under law allows, taking action with respect to that particular agreement consistent with any procedures required." *Glob. Health*, ECF No. 28 at 2, 6. The line here is unambiguous. Defendants cannot continue to

---

[1] Defendants have now filed their brief opposing a preliminary injunction, which appears to offer more developed arguments relating to the issues before the Court. *Glob. Health*, ECF No. 34. As the Court has noted, it has agreed to consider those arguments on the briefing schedule proposed by the parties and will hold a hearing by March 4, 2025, and rule with dispatch thereafter. *See Glob. Health*, ECF No. 28 at 7 (setting forth a schedule).

2

**App. 024**

suspend programs or disbursements based on the blanket suspension that was temporarily enjoined. And Defendants cannot simply come up with a new post-hoc rationalization in an attempt to justify the action that was temporarily enjoined as likely arbitrary and capricious for what it failed to consider. However, if since January 19, 2025, Defendants have suspended or terminated an agreement based on wholly independent legal authority and justification, rather than deriving from a general directive to suspend aid, then they are not acting in violation of the TRO. Under the terms of the TRO, any such agreement that was in effect as of January 19, 2025, must be given effect and promptly receive disbursements only up until a suspension or termination taken pursuant to independent legal authority and justification. If, on the other hand, suspensions or terminations since January 19, 2025, stemmed from a general directive to suspend all aid—the very agency action temporarily enjoined—those terminations would violate the TRO and cannot be given effect. The line here is one that is well-worn and should be familiar in litigation—the line between good faith and pretext to justify otherwise unlawful conduct. *See Dep't of Com. v. New York*, 588 U.S. 752, 780 (2019).

Contrary to Defendants' instant motion, the Court has been clear the TRO does not mean that "all contractual and grant terms [are] enforceable by contempt" or that Defendants must "litigate every arguable breach of contract in a contempt posture." *Glob. Health*, ECF No. 33 at 2, 6. The Court has been explicit that the TRO does not place this Court in the position of supervising Defendants' determinations as to whether to continue or terminate individual grants based on their terms. *See Glob. Health*, ECF No. 28 at 4 & n.2. While agency determinations based on wholly independent legal authority and justification such as the terms of particular agreements or sets of agreements, rather than deriving from a general directive to suspend aid, may be subject to some

3

**App. 025**

other legal challenge, whether it be under the APA, separation of powers, individual breach of contract cases, or otherwise, such determinations do not violate the present TRO.

Defendants' remaining arguments in the instant motion show how quickly the ground is shifting in this matter and the importance of the Court having the opportunity to consider and expeditiously resolve the parties' arguments at the preliminary injunction phase. For example, Defendants assert that an injunction would raise "serious constitutional concerns" given "the Executive Branch's extensive foreign-relations powers." *Glob. Health*, ECF No. 33 at 2. However, they do not explain how this argument bears on likely violation of the APA, the authority on which the TRO was based and whose constitutional validity has not been challenged. Moreover, the argument seems to simply presume that Defendants will prevail on the separation of powers questions that Plaintiffs have raised, without nearly enough analytical depth. *See, e.g.*, *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015) ("The Executive is not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue."); *id.* at 62 (Roberts, C.J., dissenting) (recognizing that "[t]he Constitution allocates some foreign policy powers to the Executive, grants some to the Legislature, and enjoins the President to 'take Care that the Laws be faithfully executed'"). The parties requested a briefing schedule to develop these arguments for the preliminary injunction phase, which the Court has adopted and is still in progress.

Similarly, Defendants argue for the first time that disbursing congressionally appropriated aid pursuant to existing agreements could result in "waste, fraud, abuse, and even illegal payments" and cite the need to "protect the integrity of [their] payment systems." *Glob. Health*, ECF No. 33 at 5 (citation omitted). But the blanket suspension of congressionally appropriated funding that has been challenged and temporarily enjoined was the result of a categorical order, not any specific finding of possible waste, fraud, or abuse. In defending the challenged action at the Court's TRO

4

**App. 026**

hearing, Defendants did not even attempt to argue that the action was or could be justified based on waste, fraud, or abuse. And, to date, Defendants have not adduced any evidence of waste, fraud, or abuse aside from conclusory statements from a declarant who has "serious questions" about these topics. *Glob. Health*, ECF No. 25-1 at 2. Even in asserting the argument now, Defendants do not explain how it would bear on the reasons for granting the TRO, including Plaintiffs' showing of irreparable harm and their likelihood of success in showing that the blanket suspension violated the APA.[2]

For the foregoing reasons, to the extent Defendants' motion to clarify is not mooted by the above, it is denied, and Defendants' motion to stay the Court's TRO pending an emergency appeal is also denied.

The Court reiterates once more:

> [T]he Court's TRO does not permit Defendants to simply continue their blanket suspension of congressionally appropriated foreign aid pending a review of the agreements for whether they should be continued or terminated. That is the very action that the Court temporarily enjoined because Plaintiffs had shown that blanket suspension pending review would cause irreparable harm and was likely arbitrary and capricious under the APA for failing to consider the massive reliance interests. . . . [T]o the extent Defendants have continued the blanket suspension, they are ordered to immediately cease it and to take all necessary steps to honor the terms of contracts, grants, cooperative agreements, loans, and other federal foreign assistance awards that were in existence as of January 19, 2025, including but not limited to disbursing all funds payable under those terms.

*Glob. Health*, ECF No. 28 at 5.

---

[2] To demonstrate the degree to which the ground is shifting: within the past four days, Defendants submitted multiple filings addressing compliance with the TRO. While each filing cited the declaration for other points, none mentioned the statements about waste, fraud, or abuse or "payment integrity." *See Glob. Health*, ECF No. 25; *AIDS Vaccine*, ECF Nos. 22, 28. To the extent the assertion of possible fraud or payment integrity issues is intended to create grounds for an emergency appeal before the Court has had the opportunity to resolve the preliminary injunction motions, it is worth noting that Defendants' preliminary injunction briefing, filed alongside the instant motion, does not appear to even mention fraud or payment integrity in its APA or separation of powers merits analyses. *See Glob. Health*, ECF No. 34.

**App. 027**

The parties' joint status report addressing compliance is due on February 26, 2025, at 12:00 p.m. To the extent there is any dispute between the parties as to compliance, the parties shall identify:

1. Agency officials or employees who have personal knowledge to provide sworn, live testimony as to the relevant disputes as to compliance, such as what agency directives have been given and what funds have been disbursed in response to the Court's TRO and order enforcing it.

2. Any expedited discovery that would assist the parties and the Court in assessing compliance with the TRO and order enforcing it.

**SO ORDERED.**

_____
AMIR H. ALI
United States District Judge

Date:   February 22, 2025

6

**App. 028**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
AIDS VACCINE ADVOCACY          .
COALTION, et al.,              .
                              .
        Plaintiffs,            .
                              .  CA No. 25-0400 (AHA)
     v.                        .
                              .
UNITED STATES DEPARTMENT OF    .
STATE, et al.,                 .
                              .
        Defendants.            .
. . . . . . . . . . . . . . . .
                              .
GLOBAL HEALTH COUNCIL,         .
et al.,                        .
                              .
        Plaintiffs,            .  CA No. 25-0402 (AHA)
                              .
     v.                        .
                              .
DONALD J. TRUMP, et al.,       .  Washington, D.C.
                              .  Tuesday, February 25, 2025
        Defendants.            .  11:00 a.m.
. . . . . . . . . . . . . . . .
```

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE AMIR H. ALI
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES</u>:

For Plaintiffs              LAUREN BATEMAN, ESQ.
Case No. 25-0400:           Public Citizen Litigation Group
                            1600 20th Street NW
                            Washington, DC 20009

For Plaintiffs              STEPHEN K. WIRTH, ESQ.
Case No. 25-0402:           Arnold & Porter Kaye Scholer LLP
                            601 Massachusetts Ave. NW
                            Washington, DC 20001

For Defendants:             INDRANEEL SUR, ESQ.
                            U.S. Department of Justice
                            1100 L St. NW
                            Washington, DC 20530

Court Reporter:                    BRYAN A. WAYNE, RPR, CRR
                                   U.S. Courthouse, Room 4704-A
                                   333 Constitution Avenue NW
                                   Washington, DC 20001

Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

1           P R O C E E D I N G S

2                    (Via Telephone Conference)

3           THE DEPUTY CLERK:  We're here today for a motion

4     hearing in civil action 25-400, Aids Vaccine Advocacy

5     Coalition, et al., versus the United States Department of

6     State, et al., as well as civil action 25-402, Global Health

7     Council, et al., versus Donald Trump, et al.

8        Beginning with counsel for the plaintiff in case 25-400,

9     please state your name for the record.

10          MS. BATEMAN:  Hi.  My name is Lauren Bateman with

11    Public Citizen Litigation Group.  I represent plaintiffs in

12    case 400.

13          THE DEPUTY CLERK:  And defense?

14          MR. SUR:  Good morning.  This is Indraneel Sur at

15    the United States Department of Justice for the defendants.

16          THE DEPUTY CLERK:  Thank you.  And counsel for

17    plaintiffs in case 402?

18          MR. WIRTH:  Good morning.  This is Stephen Wirth

19    from Arnold & Porter on behalf of all plaintiffs in case 402.

20          THE DEPUTY CLERK:  And counsel for defense.

21          MR. SUR:  In case 402, this is Indraneel Sur for the

22    United States Department of Justice for the defendant.

23          THE DEPUTY CLERK:  Thank you all.

24          THE COURT:  All right.  Thanks, everyone.  Good

25    morning.  We've got two cases here called.  The Court has

**App. 031**

1    received the new emergency motion to enforce in the Global

2    Health Council case, No. 402.  Called this hearing quickly

3    in the interest of hearing from the parties on it.  And given

4    the overlap in the AIDS vaccine case, which is the 400 case,

5    I'll hear from plaintiffs in that case too.

6        I understand, Mr. Sur, you'll be representing the

7    defendants in both of those cases.

8        Couple of things at the outset.  In terms of protocol

9    today, I'm going to start by hearing from plaintiffs in the

10   Global Health 402 case, given they have the pending motion.

11       Counsel for plaintiffs in 400, the AIDS vaccine case, I do

12   anticipate hearing from you briefly only to the extent that

13   you have a difference with or something to supplement what

14   you've heard from counsel in 402 in the interest of not just

15   having repetitive argument.

16       I'll then hear from counsel for the defendant, Mr. Sur,

17   and if I have questions after that, I'll let you all know.

18       You know, probably clear, but my main interest here is

19   what's happening on the ground as it relates to the pending

20   motion to enforce my temporary restraining order.  This is not

21   an opportunity to relitigate the TRO itself, which remains in

22   effect, has not been stayed, and must be followed by the

23   parties.

24       If I can, I'll resolve the pending motion orally today

25   so that the parties in the case can move forward.  But the

1    parties do remain under the obligation to file the joint

2    status report I've asked for tomorrow.  And if there's more I

3    want included in that, at the end of this hearing I'll let you

4    know that too.

5        All right.  With that, counsel for plaintiffs in the Global

6    Health Council case, 402, you've got the floor.

7        MR. WIRTH:  Good morning, Your Honor.  Stephen Wirth

8    from Arnold & Porter.  To begin, I just want to thank the

9    Court for promptly convening this hearing.  As we said in our

10   motion, we don't make this request lightly, and we deeply

11   appreciate the Court's continued attention to this case.

12       I'd like to start briefly by addressing the harms at

13   issue here.  You have our briefing and the declarations that

14   we filed yesterday.  I think you can tell from those that the

15   harms here are extremely immediate and need to be remedied

16   within hours, days at the most, or else my clients will face

17   truly irreparable harms to their businesses.  They're in the

18   midst of shuttering -- they're about to sign usurious loan

19   documents.  This is truly an emergency, and that is why we

20   filed this motion.

21       But I also wanted to raise to the Court's attention the

22   fact that our named plaintiffs are not the only plaintiffs

23   here who are suffering.  We represent two associations and the

24   members of those associations are suffering very similar harms

25   as our named individual organizational plaintiffs.  I'll just

**App. 033**

 1    give one example for the Court's attention.

 2         I was recently given a message from one of the

 3    organizations who's a member of SBAIC, and this woman owns a

 4    small business.  She's owed almost a million dollars from the

 5    government.  And she wrote to me:  "The impact on me is that

 6    my business will not only close, but at 60 years old I will

 7    have to go and keep working into old age to make up for that

 8    $1 million loss which is backed by my personal wealth.  And I

 9    will have almost no assets on which to live."

10         These are real harms to real people, and they go very deep.

11    And so I want to make sure that the Court is aware of them.

12    Not to mention, though, the truly disastrous humanitarian

13    effects that are happening right now all around the world.

14    So unless the Court has specific questions about the harms,

15    I would like to turn to what we understand is happening on

16    the ground with respect to payments.

17         THE COURT:  This may connect, and you can feel free

18    to tell me you're going to explain it in the context of

19    discussing what's going on on the ground, that's fine, but I

20    do have a question.  Obviously, it does seem like these harms

21    are very much the same type of harms that were briefed and

22    evidence was provided at the TRO consideration phase.  So

23    it's concerning that they've continued.

24         I just want to clarify, the harms you referred to, whether

25    it be the example you just gave or really hopefully all of

**App. 034**

1    them, are you speaking specifically and exclusively as to

2    nonpayment for work that has already been completed or that

3    had already been completed before the TRO, for instance, or

4    are you speaking of money owed under, you know, agreements

5    projecting them into the future?

6         MR. WIRTH:  Yes, Your Honor.  Again, Stephen Wirth.

7    We are speaking about money owed for work that was completed

8    prior to the TRO.  There are also harms related to failure to

9    release money that is obligated going forward, and some of my

10   clients were unable to draw down money from funds that have

11   already been obligated.

12       But we're primarily talking today, the examples that we

13   gave in our declarations, for example, this is all for money

14   that is presently owed for past work and that our clients need

15   access to immediately in order to continue surviving as

16   ongoing concerns.  So we are talking about primarily past

17   work.

18         THE COURT:  Got it.  All right.  Why don't you go ahead

19   and continue where you were headed, and I'm sure I'll have

20   some clarification questions.

21         MR. WIRTH:  Absolutely.  So what we understand, and

22   what I know from my clients, is that they are not being paid

23   for all of this work that's already been done.  Since the

24   government has -- since the Court entered the TRO and

25   repeatedly reaffirmed it over the last few days, there have

1  been -- payments have essentially slowed to, from our

2  understanding, complete standstill.  The government said last

3  week in the -- in its status report that some $250 million had

4  been slated to be disbursed last week.  We've seen no evidence

5  of that.  Certainly, to the extent there have been any

6  payments at all, they've been a very, very, very small

7  fraction of that.

8      And it's our understanding that those payments are being

9  stopped by new procedures that these defendants have begun

10  imposing on the approval process at these agencies, at USAID

11  and at the State Department.

12      And our understanding is they're requiring new

13  justifications for invoices that have already been approved,

14  that have already gone through the entire approval process,

15  and that they have added a new level of approval at the very

16  top that requires the sign-off of a single person; and they're

17  at the point now where that person needs to individually approve

18  every single line item, and there are so many line items that

19  it's simply impossible.

20      I'll be very interested to hear what the government

21  represents as to what's happening on the ground, but these

22  representations that I'm making today are based on

23  conversations that I've had with numerous people at all levels

24  within both agencies, and my understanding is that this is a

25  policy choice that has been made at the highest levels, that

1    it is in furtherance of the same policy choices that were made

2    pursuant to the executive order that this Court has already

3    temporarily restrained.  And we believe that the government

4    has taken essentially no action to make prompt payments under

5    the TRO.

6         THE COURT:  Mr. Wirth, can I ask you, you referred to a

7    new level of approval at the top requiring the sign-off of a

8    single person.  Is that at one of the agencies in particular

9    that you're speaking or is that at both?

10         MR. WIRTH:  So my understanding, Your Honor, is that

11    the State Department has essentially subsumed many of the

12    functions of USAID, and several people are functioning in

13    roles at both agencies.

14      I'm sorry to sort of interrupt this colloquy, but I'm

15    getting word from my client that the public line is not --

16         THE DEPUTY CLERK:  Your Honor, this is the courtroom

17    deputy.

18      (Simultaneous speaking.)

19         THE DEPUTY CLERK:  Good morning.  This is the courtroom

20    deputy.  We are aware of the issues with the public line.

21    There is nothing that I can do about it at this moment, but

22    the IT staff is aware and they're about to come up here and

23    try to work on it.  But there is nothing that the Court can do

24    at this moment.  It's up to His Honor if he wants to continue

25    or wait until they can try to fix it.  Thank you.

1        THE COURT:  Okay.  Do you have an ETA on what the

2   timeline would be to fix it?

3        THE DEPUTY CLERK:  Your Honor, I do not.  I'm sorry.

4   I just called them about two minutes ago.

5        THE COURT:  Okay.  Do the parties have a position on

6   whether they'd like to pause for a moment?

7        MR. WIRTH:  Your Honor, we're happy to proceed if the

8   Court is comfortable proceeding, but we're also happy to take

9   a brief recess if you would like.

10       THE COURT:  Mr. Sur?

11       MR. SUR:  Same for us, Your Honor.  At your discretion.

12   Thank you.

13       THE COURT:  Yeah.  Why don't we go ahead, then, if

14   both parties, at least on the instant motion, are comfortable

15   proceeding.  I appreciate you letting me know about the issue,

16   and I appreciate the work the courtroom deputy and the IT

17   staff are doing to get the public line up.

18     So can you continue your answer to my question.  You were

19   saying that the State Department under your understanding has

20   subsumed, but I guess I'm wondering -- it sounds like the

21   answer to my question is yes, that there is a single person as

22   to both the State Department and as to USAID?

23       MR. WIRTH:  I believe that's true.  I'm not a hundred

24   percent certain who that person is or whether it's the same

25   person.  But my understanding is -- and the government

1    obviously has far more visibility into the agency than I do.

2    But my understanding is that Ken Jackson at USAID is in charge

3    of all approvals coming up through the agency.  And I'm not

4    sure if he's also in charge of the approvals out of the State

5    Department, but that would potentially also be Pete Marocco,

6    who submitted the declaration in support of the government's

7    status report last week.

8         THE COURT:  All right.  Mr. Sur, I'll expect you to

9    clarify that, but for the moment, that's helpful.

10        Did you have more you wanted to offer before I get to my

11   questions, Mr. Wirth?

12        MR. WIRTH:  No, Your Honor.  Happy to answer any

13   questions that you have.

14        THE COURT:  Okay.  So I know at the past hearing

15   which took place just a day after the TRO motion itself, you,

16   and I think the government also, wasn't able to provide much

17   specificity on the details of how these payments actually

18   work.  I take it some time has passed, and based on the

19   motions, that you all maybe know a lot more about that.

20        So could you walk me through that?  I mean, your motion

21   refers to invoices, reimbursement requests, access to letter

22   of credit facilities and I think drawdowns of those, and then

23   other payment management systems for grants.  It would just be

24   helpful to hear your understanding of the differences between

25   these things and how they all apply to the pending motion you

1   filed and to the TRO.

2       MR. WIRTH:  Yes, Your Honor.  So the way that these

3   agencies operate is largely through two different -- two

4   different large sort of categories:  Their acquisition funds,

5   their acquisition contracts, which operate sort of like a

6   normal government contract.  These are essentially, you know,

7   payments for specific services.  That is generally done

8   through a contract and then the contractors submit vouchers

9   for payment for services rendered.

10   And that is submitted to lower-level agency staff who are

11   responsible for processing the vouchers, ensuring that the

12   work was in fact completed, that all other, you know, aspects

13   of the contract have been honored.  And then the -- that goes

14   into a payment management system at USAID, it's called

15   Phoenix.

16   Once all the approvals are taken care of and the agency

17   has assured itself that the payment is proper, then it is

18   processed and funds are disbursed from the Treasury.  That's

19   sort of the typical process.

20   The other type of general category is assistance

21   agreements.  And these are in the form of grants or

22   cooperative agreements.  And oftentimes these sorts of awards

23   are managed through a letter of credit facility.  And so the

24   funds are made available, and then the awardee can draw down

25   funds from the award to pay for expenses on an ongoing basis.

1  And it's generally important in a variety of circumstances,

2  but oftentimes these implementing partners need to have

3  immediate access to funds, so within certain parameters

4  they're able to access funds immediately.  And then those

5  drawdowns are subject to a variety of audits.

6      And so my understanding is that on sort of both sides of

7  the equation, things have been broken.  The Phoenix payment

8  system for vouchers, generally for past work, has been --

9  access to that by staff, by agency personnel, has been

10  severely limited, and so -- I'm sorry.  Am I still on the

11  line?

12          THE COURT:  I can still hear you.

13          MR. WIRTH:  Okay.  Good.  I'm sorry.  I heard a noise,

14  and I thought I might have been disconnected.

15      All right.  So as I was saying, my understanding is that

16  agency staff no longer have the access that they used to to

17  the system, which means that approvals are being done by only

18  a very small group of people, at sort of the lower and mid

19  levels, and then everything is being funneled up to a single

20  approver, and this has created a huge backlog for past

21  vouchers and the like.

22      On the other side of the equation, so letter of credit and

23  other payment management systems --

24          THE COURT:  I think we're getting the public line

25  connected, so let's pause and I'll ask the deputy to let us

**App. 041**

1    know when we should restart.

2         THE DEPUTY CLERK:  Apologies, Your Honor.  We're trying

3    to get it connected again now.

4      (Pause.)

5         THE DEPUTY CLERK:  Okay.  Your Honor, we're reconnected

6    again.  I'm going to have to test it out on my cell phone.  If

7    you guys can continue speaking.  You can hear me?  OIT says

8    they can hear me.  They're testing it out.  So hopefully now

9    it'll work.

10         THE COURT:  Okay, great.  Mr. Wirth, you were just in

11    the middle of discussing how in practice things have, on your

12    understanding, have been frozen in the context of both the

13    acquisition contracts and the assistance agreements.  So

14    please continue.

15         MR. WIRTH:  Absolutely, Your Honor.  So with respect to

16    the assistance agreements, my understanding is that access to

17    the payment management systems and letter of credit facilities

18    was shut off sometime the week of January 20, and it has not

19    been -- access has not been resumed since then.

20      Just a few days ago -- and this is in an attachment to the

21    Northrip declaration that we filed on Monday -- we had a email

22    from a government official that said USAID facilities -- or

23    payments are not going out from the agency.  And that's

24    consistent with our experience.  From what we can tell --

25         THE COURT:  Let me clarify that.  Mr. Wirth, when you

**App. 042**

1    say that access was shut off and has not been restored, is

2    that on the agency's side, meaning it's not been restored

3    to the people on the agency who would ordinarily access the

4    system?  Or is it in some way shut down on the receiver's

5    side?  Or tell me if that question doesn't make sense.

6         MR. WIRTH:  I think that question makes sense.

7    My understanding is that on the receiver side, everything has

8    been shut down and they're not able to access funds.  Normally

9    what happens is when a person wants to draw on one of these

10   letter of credit facilities, they go into the payment management

11   system or the facility that they use to make these types of

12   draws, they put in a request for a specific amount.  So long as

13   it meets parameters, it is disbursed generally within 24 hours.

14     And what my clients have been seeing on the ground is that

15   when they make these requests, the disbursement date -- it says

16   that the request has been processed but then the disbursement

17   date is set for almost a year from now, which makes no sense.

18     And so when they have inquired with agency personnel as to

19   what's happening, the answer is that no payments are going out

20   from the agency right now.

21     I'm not sure to what extent the agency personnel themselves

22   have lost access to these systems.  My understanding is that for

23   some time period potentially there was access to Phoenix that

24   was shut off.  I think that some personnel currently have access

25   to Phoenix, and in fact, have made all of the normal approvals

**App. 043**

1   through the system that is -- that they normally do, and that

2   right now the thing that is stopping the payments from going out

3   is this final level of approval.

4           THE COURT:  Okay.  Understood.  And just to make sure

5   I'm still clear on this, obviously the invoices that are being

6   submitted on the side of the acquisition contracts is for work

7   that has already been completed, and the focus right now is on

8   work that was completed prior to February 13, the date of the

9   Court's TRO.  And the same in the context of the assistance

10  agreements and the letter of credit facilities as you

11  described them.

12      In other words, the drawdown, when it comes to the letter

13  of credit, is not a drawdown for something that happened

14  yesterday or today, but at least the focus right now is a

15  drawdown for something that happened prior to February 13.

16  Is that right?

17          MR. WIRTH:  Yes.  That's the focus right now.

18          THE COURT:  Okay.  So I'm looking at your proposed

19  order.  Do you have that in front of you, counsel?

20          MR. WIRTH:  I do, Your Honor.

21          THE COURT:  Can you walk me through the first two

22  components of that and just connect it to what you were

23  saying?  It may be obvious, but I want to make sure I fully

24  understand --

25      (Simultaneous speaking.)

1          THE COURT:  -- pay all invoices, and then permit and

2     promptly pay.  I just want to understand exactly what those

3     two are getting at.

4          MR. WIRTH:  Absolutely, Your Honor.  I don't think

5     these are obvious.  These are complicated, and I will admit

6     I'm not a government contracts expert, so I've been learning

7     this very quickly over the last couple of weeks as well.

8          So my understanding is that currently my clients have

9     numerous invoices that they've already submitted and that

10    they believe have already been approved through the normal

11    processes at USAID and potentially also at the State

12    Department, though I think State Department normally operates

13    on grants, not on contracts, but I can't make any specific

14    representations as to that.

15         So take the first of these instances, the pay all invoices

16    and letter of credit drawdown request, this would be for

17    acquisition contracts and specifically mentions work completed

18    prior to the entry of the Court's TRO.  So this would be sort

19    of typical government contracts type payments.

20         I understand that in like a small number of cases these are

21    not done through invoices but they're done through letter of

22    credit drawdown requests, which I think is unusual, but my

23    clients say that both of them need to be represented.

24         With respect to the second prong, so this is for grants and

25    assistance agreements, and these agreements permit drawdowns

1    on an ongoing basis and also, you know, for both past work and

2    for future work.  And in order to continue to do work under

3    the contracts that are currently in operation, the grants and

4    agreements that are currently in operation, they need to make

5    drawdowns on an ongoing and regular basis.  And so this is to

6    ensure that they are permitted to access those letter of

7    credit facilities and other payment management systems.

8         THE DEPUTY CLERK:  Are the parties still here?

9    Testing one, two, three.  Can you hear us?

10        MR. WIRTH:  I'm here.

11        THE DEPUTY CLERK:  Okay.

12        MR. SUR:  This is counsel for the government.

13        THE DEPUTY CLERK:  I think we lost --

14        THE COURT:  My apologies.  Judge Ali is here, and I

15    was asking a question but I was on mute.

16        THE DEPUTY CLERK:  Oh, okay.  My apologies, Your Honor.

17    Thank you.

18        THE COURT:  Thank you.  Mr. Wirth, because we're here

19    on a motion to enforce the TRO, can you make the connection,

20    then -- connect the dots as you see it between the relief

21    you're asking for -- and I'm really focused on the first two

22    points for now because I think the other ones are self-

23    explanatory about just following the order -- connect those

24    first two to the TRO itself for me.

25        MR. WIRTH:  So the TRO specifically ordered the

1   government to not take any actions to pause the disbursement

2   of foreign assistance funds, and these two components of

3   the proposed order go directly to the government's -- to

4   the temporary restraining order insofar as it orders the

5   government to stop any pause of disbursement of foreign

6   assistance funds.

7        THE COURT:  Right.  And is one way to look at how you

8   drafted here the first point we were talking about that begins

9   "Pay out all invoices and letter of credit," that's looking at

10  funds from before February 13, before the date of the TRO, and

11  the second one is looking at drawdowns in the future?  Tell me

12  if I'm --

13        MR. WIRTH:  No, not necessarily --

14        THE COURT:  -- oversimplifying.

15        MR. WIRTH:  I'm sorry.  No, Your Honor, it's not that

16  simple.  So my understanding is that these drawdown requests

17  can also be for past work.  So it's not as simple as saying

18  that it's only for past or only for future.  It depends on the

19  specific language of the grants and the assistance agreements

20  and what those funds are going to be used for.

21        THE COURT:  Okay.  So try again.  Tell me again what

22  that second point adds that's not already in the first point.

23        MR. WIRTH:  Well, the first point is specific to

24  acquisition contracts, and the second point is with respect to

25  grants and assistance agreements.  These are all the -- these

1    are all the --

2         THE COURT:  I see.  I see.  Okay.  Thank you.  That's

3    helpful.  I'm sorry to interrupt you.  So the key difference

4    is later in the sentence where it says "on contracts for work"

5    in the first one, and in the second one it says "for

6    reimbursement on grants and assistance agreements."  That's

7    the focus?

8         MR. WIRTH:  Yes.  Exactly, Your Honor.  And I think the

9    distinction is important because, with respect to sort of

10   vouchers that are submitted for work on contracts, I think my

11   understanding is those are all sort of retrospective for past

12   work, but that on grants and assistance agreements, draw-down

13   requests can be both retrospective and prospective, and so

14   this covers the waterfront, so to speak.

15        THE COURT:  Understood.  When it came to the meaning of

16   the second one, at least again as to the focus of your motion

17   which is for, you know, I don't think a significant amount but

18   it's for work completed prior to the entry of the TRO, if the

19   second paragraph included that qualification at the end, in

20   other words that the focus is for work completed prior to the

21   entry of the Court's TRO?

22        MR. WIRTH:  I -- I do worry that that would

23   unnecessarily limit the scope of the Court's TRO which

24   specifically refers to all disbursements of foreign assistance

25   funds.  Some of my clients receive drawdowns on an ongoing

1     basis, and I do worry that this would cut them off from credit

2     in a way that would perpetuate the irreparable harms they are

3     currently facing.

4          THE COURT:  Understood.  Fair point.  I think that

5     would be narrower than the TRO itself.  I'm just trying to

6     understand exactly the narrow focus -- or at least the highest

7     priority if that makes sense, of what's been enjoined.

8        Let me ask you a different question:  Can you give me

9     plaintiffs' position on the main regulation that defendants

10    have cited as authorizing suspension and termination?  And I'm

11    not trying to get ahead and hear your argument on the PI

12    necessarily.  I know you all still have time to get your brief

13    on file under the briefing schedule that's been entered, but

14    specifically as it relates to the present motion to enforce

15    the TRO, what is the place that the regulation that -- I think

16    it's 2 C.F.R. § 700.14 -- how does that relate to the present

17    TRO and your motion to enforce?

18         MR. WIRTH:  So my answer to that is that the Court has

19    already ordered the government to make payments and to stop

20    pausing the disbursement of foreign assistance funds.  Whether

21    the government can terminate contracts really is not relevant

22    to that specific question that we are seeking the Court --

23    seeking to enforce right now.

24       As the Court is aware, we are preparing our reply brief

25    which directly deals with the sort of subject matter question,

1    subject matter jurisdiction question the government has

2    raised.  We believe that we have strong arguments that there

3    is jurisdiction under the APA and that we absolutely can bring

4    exactly these types of claims because they are based on --

5         THE COURT:  Understood.  I'm sorry, counsel, this is

6    probably my fault.  I don't want to push you ahead to your PI

7    arguments.  I think the first part of your answer does the

8    trick for me.

9      And then I guess -- again, jumping ahead a little bit, and

10   this may be jumping into the PI, might be jumping ahead to

11   beyond the PI, but not in terms of merits argument.  I guess

12   I'm just interested, Counsel, in, for lack of a better way to

13   put it, what do you see as the ultimate end game here

14   realistically?

15     And let's just posit that it seems like -- and this does

16   not go to necessarily the compliance with the TRO, which is

17   the question before the Court right now, but clearly the

18   administration is signalling that it does not want to contract

19   with your clients, and you all satisfied your burden to show

20   irreparable harm and a likelihood of success on the merits was

21   done, and the government needs to comply with the Court's

22   order -- and I'm going to talk to the government soon -- and

23   that includes unfreezing payments, as I've said and

24   reiterated, and I'll come to that, but I guess I'm just -- do

25   you see a path to this actually leading to the reinstatement

1        of long-term contracts with your clients?

2                MR. WIRTH:  Yes, Your Honor.  So first of all, just to

3        be very clear, what we're here today for is so that we can

4        even get to the PI hearing.  The clients need to get to the PI

5        hearing in order to then be able to craft an order that will

6        be able to protect them going forward, a preliminary

7        injunction that protects their rights.

8          But we do see a path forward here.  The government has said

9        that they have the authority to cancel all these contracts.

10       If that's in fact true, then they will have to go through the

11       proper processes to cancel contracts.  What they can't do is

12       do what they've done here.  So, you know, our understanding is

13       that many of these contracts do serve the national interest,

14       and if they were actually going through these contracts and

15       evaluating them, that they would not cancel these contracts,

16       even if they had the ultimate authority to do so.

17         And beyond that, I think there's a couple of other issues

18       at issue here.  We're not saying the government has to spend

19       these foreign assistance funds to operate specific contracts.

20       But we are saying that the government can't unlawfully impound

21       all of these funds and make no foreign assistance obligations

22       going forward.

23         So what we would want going forward is not necessarily that

24       our clients' specific contracts will be kept in perpetuity.

25       That may not be possible.  And in fact, the government may

**App. 051**

1    have the ability to cancel some of them.  But they can't do

2    this wholesale cancelation of all of their contracts all at

3    once.  They have to actually follow the law when canceling or

4    terminating agreements or grants.  And they actually have to

5    spend these foreign assistance funds that have been

6    appropriated by Congress, that have specific statements as to

7    how they are to be spent.  And the Executive Branch --

8         THE COURT:  Thank you.  I think that answers my

9    question.  I promised I wouldn't force you to argue the PI on

10   the spot.  That's helpful enough as you've answered it.  I

11   appreciate that.

12     So why don't I hear from counsel for the plaintiffs in the

13   AIDS vaccine case, 400.  Again, my interest would be anything

14   in your position based on your clients that differs from what

15   I've just heard from Mr. Wirth, or anything you can offer that

16   would supplement that, what I've just heard.

17        MS. BATEMAN:  Thank you so much, Your Honor.  This is

18   Lauren Bateman for plaintiffs in 25-cv-400.  I'm grateful for

19   the opportunity to speak and will remain mindful of this

20   Court's direction to only note areas where plaintiffs'

21   positions are different and to provide only additive

22   information.

23     We agree entirely with plaintiffs in 25-cv-402 about the

24   extent of noncompliance, but as we see it, the question before

25   the Court is not whether to enforce one part of the TRO; the

1    question is whether defendants are complying or violating the

2    TRO.  And they appear to be violating it in all respects.

3        So plaintiffs in 25-cv-400 would renew their motion to

4    enforce and motion for civil contempt, seeking enforcement of

5    the entire TRO, and we urge the Court not to enter relief that

6    would narrow the relief that the Court has already now thrice

7    granted.

8        I have a couple of factual additions that I'd like to add

9    to supplement Mr. Wirth's portrayal of the situation:  First,

10   we know that defendants have initiated new terminations in the

11   last couple of days explicitly on the bases forbidden by the

12   TRO.  On February 23 --

13           THE DEPUTY CLERK:  Counsel, the court reporter needs

14   you to slow down a moment.  And also, Your Honor, we're going

15   to attempt to reconnect the system one more time.

16           THE COURT:  Okay.  Apologies, Ms. Bateman.  We'll go

17   ahead and pause until the deputy confirms that we're

18   reconnected.

19           MS. BATEMAN:  Thank you, Your Honor.  My apologies.

20           THE DEPUTY CLERK:  Okay.  Pause for one moment.  We're

21   going to try this again.

22        Okay, Your Honor.  Back on the record.

23           THE COURT:  Okay.  Go ahead, Ms. Bateman.

24           MS. BATEMAN:  Thank you.  I was just indicating that

25   our understanding is that defendants have initiated new

terminations explicitly on the bases forbidden by the TRO in the last couple of days.  On February 23 a notice was issued to contracting officers to terminate a new tranche of awards. And that notice made clear that the authority to do so came from Secretary Rubio with the explicit instruction that those terminations were implementing the executive order.

And then subsequently, at approximately 4:30 p.m. yesterday, contracting officers received an email from Adam Cox, whose title is acting deputy director of foreign operations.  That email indicated that they were instructed by DOGE to terminate several awards that same night, and also indicated that many -- and "many" is capitalized in that email -- more terminations are coming and that Foreign Service officers were authorized for overtime to effectuate those terminations.

We understand that the government now says oh, it was a mistake for us to say that the executive order was the basis for those terminations, but -- and that emails with the agency claim that Secretary Rubio individually reviewed all of the terminations and decided on his own to terminate those awards, but that's frankly a fantastical claim.  Given the number and complexity of the awards at issue, it's implausible on its face, and it's also worth considering the implausibility of that claim given Secretary Rubio's travel schedule from February 13 to 19.  He was in Germany, then Israel, and then

1    Saudi Arabia and the United Arab Emirates.

2         So the key in plaintiffs' view is not whether defendants

3    can conjure some alternative pretextual basis for their

4    actions.  And the Supreme Court has been very clear about

5    this.  In *Department of Commerce v. New York*, that's the

6    census case before the Supreme Court, Chief Justice Roberts

7    wrote for the Court and said that when a court receives an

8    explanation for agency action that is incongruent with what

9    the record reveals about the agency's priorities and

10   decisionmaking process --

11        (Simultaneous speaking.)

12        THE DEPUTY CLERK:  Counsel, please watch your speed.

13   Counsel, please watch your speed for the benefit of the court

14   reporter.  Thank you.

15        MS. BATEMAN:  My apologies.  Thank you.

16        In closing on that point, courts are not required to

17   exhibit a naïveté from which ordinary --

18        THE COURT:  Understood.  Yeah, I certainly have that

19   point, and it's been something I've reiterated each time any

20   sort of clarification has been sought.  That this is not

21   about, you know, continuing to suspend funds while the

22   government can come up with post hoc rationalization or a

23   pretextual basis for the action that I think I deemed likely

24   to be arbitrary and capricious in the first place.

25        And I'm familiar with the *Department of Commerce* case,

1    which I think was cited in the Court's last order.

2         Tell me anything else that you would supplement the prior

3    argument on or differ from.

4         MS. BATEMAN:  Thank you, Your Honor.  Two other points,

5    and I'll make them briefly.  On the subject of personnel

6    access to payment processing systems, on February 23, USAID

7    began to implement reductions of force that likewise appeared

8    tailored to circumvent the Court's orders.  Our understanding

9    is that those RIFs include financial management staffers, so

10   those are the people who would actually do the disbursement of

11   awards to implementing partners.

12        Our understanding is that before February 23 defendants

13   blocked those staffers from access to payment systems, but

14   after February 23, there's hardly anyone at the agency who has

15   those jobs.  And without those people, the funds can't move,

16   so there can't be compliance with the Court's order.

17        Defendants either know that or they're acting with such

18   ignorance and haste that they don't know what they're breaking

19   as they're breaking it.

20        Also included in that RIF were employees who interact on a

21   day-to-day basis with recipients of foreign aid assistance.

22   Those are the people who would theoretically get these

23   programs back up and running after a suspension is lifted.

24   And those people likewise have largely been terminated or

25   placed on administrative leave.

1          One other point for Your Honor's consideration.  To add

2     supplemental information to Mr. Wirth's discussion of the

3     problem of bottleneck at individual approval -- for individual

4     approval of line items, I wanted to call this court's

5     attention to reporting in *The Washington Post* in the last

6     couple of days.  That reporting details how Elon Musk and two

7     DOGE employees took over the USAID payment processing system,

8     stopping payments entirely and making the supposed waivers

9     issued by Secretary Rubio completely ineffectual.

10         That reporting indicates that USAID managers prepared

11     packages of payments that should have ostensibly been covered

12     by waivers and got the agency's interim leaders to sign off on

13     those packages, but each time Musk and one or two other

14     employees of DOGE would veto the payments.

15         That reporting is consistent with what I've gleaned in

16     speaking to people from within the agency.  My understanding

17     is that bureaus have flagged that they don't have access to

18     payment systems to effectuate the TRO, but the agency just has

19     not responded to those requests.

20         Just to take one example, nobody in the entire Global

21     Health Bureau, which among other things drives PEFPAR

22     programs, has access to the payment systems at all.  It's just

23     two 20-somethings and Elon Musk.  So essentially no funds are

24     being distributed.

25              THE COURT:  Can you clarify that statement?  The

1    systems you're referring to, are those USAID systems to

2    approve and put the payments forward, or are they

3    Treasury-side systems?

4         MS. BATEMAN:  Our understanding is that Phoenix is a

5    USAID-side system through which USAID employees can actually

6    approve disbursement of payments.

7         THE COURT:  And that's the system you're saying DOGE is

8    now controlling?

9         MS. BATEMAN:  That's right.

10         THE COURT:  Okay.  Understood.

11         MS. BATEMAN:  Thank you, Your Honor.

12         THE COURT:  Anything else?

13         MS. BATEMAN:  Nothing else.  We'd just conclude by

14    reiterating that we seek enforcement of the TRO in its

15    entirety.  Thank you.

16         THE COURT:  Okay.  Mr. Sur, I'll hear from you on

17    behalf of the defendants in both cases now.

18         MR. SUR:  Good morning, Your Honor.  Indraneel Sur from

19    the Department of Justice for the defendants.

20      I guess I will begin by noting that the defendants have

21    been focusing their efforts on preparation of the submissions

22    for the compliance and joint status report, working under the

23    Court's order with the due date for tomorrow, and that has

24    been the focus of the significant energy.

25      So when the plaintiffs in No. 402 early yesterday morning

**App. 058**

1    raised this prospect of a renewed motion, there was failure of

2    time essentially for me to find anything.  I did -- and the

3    defendants do now have -- received plaintiffs' invoices and

4    are analyzing them.  But as for much of the assertions about

5    the facts, insofar as any of them are in the record at all,

6    we've not had the opportunity to respond to that.

7        And so at the outset, the Court noted the submissions for

8    tomorrow, and I think the Court also suggested that it might

9    provide guidance on what might be the appropriate content of

10   that submission.  So in that respect I might respectfully

11   submit that it would be appropriate to give the defendants an

12   opportunity to address some of what's been asserted here about

13   the facts.

14       But -- Mr. Wirth made certain assertions.  He did have the

15   benefit of pointing to the record on the previous motion, but

16   the dilemma is that the previous motion was denied, right,

17   albeit without prejudice for its renewal, but the renewal

18   papers didn't --

19           THE COURT:  Mr. Sur, let me maybe direct you to

20   something --

21           MR. SUR:  Sure.

22           THE COURT:  -- that would be helpful at this point.

23   I take your point that a motion was filed while the joint

24   status report was pending, but I'll remind you the government

25   also filed Friday, around midnight if I recall, its own

1    version of that after the joint status report was ordered as

2    well.

3        And so, you know, right now the Court has before it a

4    motion to enforce.  I've been clear that this is not going to

5    become -- well, certainly not intended to ever become a review

6    of individual contract determinations.  You're bringing it

7    down to that level right now, and I don't want to as the

8    court.

9        I think there are some basic questions that have been

10    posed here, and while you may not have reviewed those specific

11    invoices, the TRO has been in effect for now 12 days, since

12    February 13, and there are some just basic questions.

13        So let me just ask you, you know, the TRO was clear and the

14    Court has said it was clear that defendants could not continue

15    the blanket suspension of foreign aid funds pending a review.

16    And that was based on a finding that the plaintiffs had shown

17    irreparable harm.  It sounds like there's evidence right now

18    that it's deepened.

19        And to be honest -- obviously there's the PI motion pending

20    and briefing which the Court will consider, but at the TRO

21    phase I don't take the government really to have ever rebutted

22    that irreparable harm.  And there was a likelihood of success

23    that at least under the APA, for failing to consider that

24    irreparable harm, that the plaintiffs were likely to prevail.

25        And so the plaintiffs seem to be saying that the blanket

**App. 060**

1    pause was not lifted in any meaningful sense.  I'd like you

2    to tell me in simple terms what action you are aware of that

3    the agency has lifted the blanket pause.

4         MR. SUR:  So to begin with, I think that after the

5    TRO -- and this was provided in the February 18 status report,

6    that after the TRO, the agencies gave instructions about the

7    TRO and notice to the funding recipients and to the officers

8    who managed the grants.  And the Court heard this morning

9    assertions about subsequent terminations, but -- and actually,

10   we had an exchange with plaintiffs Sunday night about that.

11      But the subsequent terminations have been, as I understand

12   it, grounded in individualized review which was consistent

13   with clauses in the Court's TRO distinguishing the blanket

14   from the individualized review.

15        THE COURT:  Let's just break this down a little bit.

16   So why don't we focus on two different periods.  Let's focus

17   on before February 13, the date of my TRO, and after February

18   13 separately.  So let's just focus on the period before

19   February 13.

20      There were suspensions pursuant to the EO in the

21   implementing orders that were enjoined by my TRO, and there

22   may have even been a series of suspensions and terminations

23   communicated during that window between January 19 and

24   February 13.

25      Are you contending that those suspensions and terminations

1      that would have occurred during that period remain valid and

2      should be given effect?

3              MR. SUR:  No, we understand the TRO to foreclose those.

4      I think that's clear.

5              THE COURT:  So that's helpful.  I appreciate that.  And

6      I appreciate you being candid about that.

7         So then, are you aware of steps that the agencies here have

8      taken to actually unpause the disbursement of funds as to

9      agreements that fall within that category or work done before

10     February 13?

11             MR. SUR:  So let me focus on that last point, if I

12     might, about the work done before February 13.

13             THE COURT:  Well, I actually want to focus on my

14     question, which is -- you just said to me that you understand

15     that any of the suspensions and terminations that took place

16     before February 13 are invalid and can't be given effect under

17     the TRO.  I do want to hear your full answer, but has the

18     government began -- has the government unfrozen disbursements

19     as to those contracts or assistance agreements for those --

20     for at least that period?

21             MR. SUR:  So for the -- the period before the TRO --

22     this is going back to February 18 joint status report, the

23     plaintiffs' characterization of some of those decisions --

24     and there's a wide variety, right, of grants and foreign

25     assistance arrangements, contracts -- was that all of them

1   were under the same challenged authority, and the government

2   explained in the status report that there were

3   contract-specific categories.

4   So where there were contracts that resumed and they had

5   claims for work done, there actually was a process for that.

6   The Secretary of State's memorandum, which was published at

7   page 2586828 [sic] of paragraph 12(d) provided for legitimate

8   expenses incurred prior to the date of that -- it's called an

9   ALDAC -- under existing awards or legitimate expenses

10   associated with stop-work orders.

11   So there was a process -- the legitimate expense waivers.

12   And that hasn't been disputed in the complaint, that that is

13   there for the work that has been done.

14   THE COURT:  Hey.  I guess I'm not sure why I can't

15   get a straight answer from you on this.  Are you aware of an

16   unfreezing of the disbursement of funds for those contracts

17   and agreements that were frozen before February 13?  And

18   you've acknowledged that under the TRO any of the terminations

19   or suspensions that took place before February 13 are

20   foreclosed, they're invalid and shouldn't be given effect.

21   Are you aware of steps taken to actually release those funds?

22   MR. SUR:  I'm not in a position to answer that.  I

23   think we will be in a position to answer that in the joint

24   status report.

25   THE COURT:  Well, we're 12 days into the TRO, and

1      you're here representing the government.  You had represented

2      in the initial February -- it wasn't a joint status report,

3      to be clear, to correct you, it was a status report from the

4      government, from the defendant, and, you know, made issue of

5      that it had been five days and there had been a holiday

6      weekend, but we're now 12 days in and you can't answer me

7      whether any funds that you've kind of acknowledged are covered

8      by the Court's order have been unfrozen?

9           MR. SUR:  All I can do really is say that the

10     preparations are underway for the joint status report on

11     compliance due tomorrow, and --

12          THE COURT:  It's not really [indiscernible] to a joint

13     status report, right?  The joint status report was something

14     I asked for.  And I'm asking you right now what you are aware

15     of.  Sounds like the answer is no.  If the answer's no, you

16     can say no, that you're not aware of any actions to unfreeze.

17          MR. SUR:  As I said, there was a legitimate expense

18     waiver process that is in place.  Beyond its presence, I can't

19     really go beyond that.

20          THE COURT:  But that's not referred to the TRO.  You're

21     citing back to the implementing regulation that's a part of

22     it, of the same implementing regulation that the TRO enjoins.

23     But I'm asking you -- this hearing is about enforcing the TRO

24     and compliance with the TRO.

25          MR. SUR:  So I do understand that.  I do also

**App. 064**

1    understand the motion before the Court, the motion to enforce

2    to actually seek relief that is somewhat different in

3    character and is explicitly monetary.  And if the Court would

4    allow, I would appreciate the chance to elaborate a little bit

5    on that part of it.

6         THE COURT:  On which part of it?

7         MR. SUR:  That the relief before the Court as requested

8    in the present motion to enforce actually goes beyond the TRO

9    in that it is even more expressly of a monetary character and

10   therefore raises a serious problem of sovereign immunity.

11        THE COURT:  Well, yeah.  We can come to that.  I mean,

12   I don't understand the argument.  It seems like what you're

13   saying is instead of unfreezing or unpausing the funds, as the

14   TRO required, you just won't because of immunity.  If you want

15   to brief that at the PI stage, I suppose you can.  It's not an

16   argument that you all raised at the TRO phase.

17      Let me just ask you, though, here, because I think this is

18   important:  I have from you an acknowledgement that

19   suspensions or terminations from before February 13 are

20   invalid under the TRO.  And I appreciate that.  I just want to

21   be clear here --

22        MR. SUR:  I'm sorry --

23        THE COURT:  Let me just finish my question.  I just

24   want to be clear here.  So I understand that there is a review

25   of the agency's legal authorities and contractual terms, but I

**App. 065**

1    assume then that you understand that it's not enough to just

2    go ahead and come up with a legal authority or contractual

3    term that would have justified a termination before February

4    13.  So an agency could be free to do that with independent

5    justification and legal authority in the future, but that

6    wouldn't justify or give effect to the terminations that

7    actually were communicated before February 13.

8        I assume you would agree with that given that you agreed

9    that it would violate the TRO to give those effect.

10        MR. SUR:  Where I'm having difficulty is that I think

11   as the February 18 report explained, the authorities for the

12   terminations and suspensions were up -- as best as we know,

13   part of these various contracts, grants and cooperative

14   agreements all along.

15        THE COURT:  Yeah.  I mean, I think that's kind of the

16   point, Counsel, right?  The TRO didn't say that there's no

17   underlying authority; that the agency is, you know, not acting

18   pursuant to the scope of its typical authority.  The TRO very

19   clearly, and it now has been reiterated, that the plaintiffs

20   were likely to succeed, at least for now, under the APA.

21        And so it wasn't about whether there was an underlying

22   authority.  For example, the Court didn't get to the

23   separation of powers problem.  The question was about the

24   failure to consider the irreparable harm here and the massive

25   reliance interest.  And finding new authorities does nothing

1    to do that, to address that.

2        So, you know, I think that it's explicit in the TRO but

3    it's also just illogical to say, well, we found some

4    authorities.  Again, the government has its authorities going

5    forward, but I think the point I'm trying to make, and this is

6    the point about not just coming up with a pretextual basis for

7    what has been held to likely be arbitrary and capricious and

8    enjoined -- I guess I'm not understanding where there is any

9    confusion here.  It seems kind of clear as day to me.

10        MR. SUR:  So, Your Honor, I think I would only be

11    reiterating what we've said in our previous filings, which is

12    that the Court's TRO we think appropriately recognized that

13    there were authorities that were located in contracts and

14    grants, and that the enforcement of those agreements at the

15    agreement-specific level was appropriate.  So -- and that I --

16        (Simultaneous speaking.)

17        THE COURT:  I take your point -- I understand the

18    government's position that it was appropriate.  I'm sorry,

19    counsel.  You're saying that -- I guess I'm hearing you say

20    two things.  One, it sounds like you're saying that the

21    termination of grants was appropriate.  Clearly, you prefer

22    not to have been enjoined.  But I also heard you say that you

23    understand that terminations and suspensions prior to February

24    13 were in fact enjoined.  I think the language you used was

25    foreclosed by the Court's TRO.

1        MR. SUR: I think to that point insofar as -- I'm sorry

2    to interrupt. But as I understood it to be insofar as it was

3    a blanket, I thought I was responding -- I'm sorry if I wasn't

4    clear. I thought I was responding to the Court's question

5    about the concept of a blanket.

6        THE COURT: Well, before February 13, everything was

7    proceeding pursuant to the blanket directive to terminate and

8    suspend. That's what the directive was, implementing the

9    executive order.

10       MR. SUR: So this is in the February 18 status report

11   as well, that following the TRO the agencies reviewed and

12   concluded that those suspensions and terminations were

13   consistent with terms of the contracts or grants or

14   cooperative agreements. So maybe that's where I'm having

15   the -- in that --

16       THE COURT: How is that different from just being a

17   post hoc rationalization kind of piece by piece of the kind of

18   en masse suspension that was deemed arbitrary and capricious?

19   I guess I can't tell whether you're just restating a position

20   that you want to preserve because you disagree with the TRO,

21   or there's actually some degree of confusion to begin with.

22   It seems clear to me, plaintiffs have articulated here in a

23   clear way as well.

24     So to the extent it's just a policy disagreement in terms

25   of the outcome of the TRO, that's fine, but I'd appreciate you

1    just being candid about that.

2        MR. SUR:  Um, well, I'm not certain if I would use the

3    term "confusion" so much as that the Court we think in the

4    original TRO in some sense recognized that there are

5    contract-level authorities and didn't foreclose that.  So --

6    you know, the government's subsequent filings I think have

7    sought to explain how those contract-level authorities have

8    been working.

9        THE COURT:  Okay.  All right.  We're going to move on

10    from that.  Why don't we focus on -- I'm not sure I understand

11    that point insofar as it deals with anything before February

12    13, because at that time, and I made clear that it's not just

13    about finding a contract term or a legal authority that

14    applies, but it cannot be taking place pursuant to the same

15    action here, which was a general directive to pause.  And so

16    everything before February 13 clearly was under that general

17    directive.

18        Let me turn you to the other period I mentioned, post

19    February 13, so after the TRO.  I want you to tell me again

20    what actions you understand have been taken -- aside from

21    mailing the notice, mailing a copy of the TRO and saying

22    further guidance would be provided, I want to know what

23    actions have been taken, including whether funds have been

24    unfrozen based on the TRO, and if so, what funds have and what

25    funds have not.

**App. 069**

1          MR. SUR:  These would be I think the logical subjects

2     of the joint status report that is underway.  I don't have the

3     ability to recite those particular facts at this hearing.

4          THE COURT:  Twelve days into the TRO, you can't give me

5     any facts about funds being unfrozen based on the TRO?

6          MR. SUR:  I can -- I mean, there is this waiver

7     process.  And --

8          THE COURT:  Which was part of -- my TRO didn't have a

9     waiver process in it.  I'm asking about in response to my TRO.

10          MR. SUR:  Right.  So the TRO didn't enjoin paragraph

11     12(d) of the memorandum we were talking about, so that process

12     for approval of waivers of the pause --

13          THE COURT:  Counsel, is your answer then that the only

14     funds that have been reinstated are the ones that could have

15     been reinstated under the initial implementation of the TRO,

16     meaning only if they went through the waiver process?  That

17     sounds to me like you're just operating under the procedures

18     of the implementation.

19          MR. SUR:  So I'm offering that as one example.

20          THE COURT:  Can you give me other examples?

21          MR. SUR:  So in the joint status report -- I'm sorry.

22     I have incorrectly referred to it as the joint status report.

23     This is actually the February 18th status report -- there are

24     additional examples in that report and the supporting

25     declaration.

1          THE COURT:  Of funds being unfrozen in response to the

2     TRO?

3          MR. SUR:  I can only give you what the description here

4     is, authorization and requested disbursement of foreign

5     assistance funding.

6          THE COURT:  Okay.  All right.  Can you tell me -- look,

7     I'm interested in what the general directives have been since

8     the TRO.  So your clients, the heads of these agencies, issued

9     directives before the TRO.  These are the ones that were

10    restrained by the TRO that implemented the blanket suspension

11    of funds pending their review.  So that was enjoined.  After

12    the TRO, did they issue new directives walking that back?

13         MR. SUR:  Some of -- my understanding is we described

14    that in the February 18th status report.

15         THE COURT:  Can you describe it for me now, because I

16    didn't see that.

17       (Pause.)

18       Are you aware of directives from your clients or other

19    senior officials at the agencies that walked back the initial

20    general directive to suspend and terminate funds?

21         MR. SUR:  When you say "walked back," I think there

22    were notices of the TRO.  This is -- they stated -- if I

23    may --

24         THE COURT:  Go ahead.

25         MR. SUR:  -- for example, in the declaration that

1      supported the February 18th status report, paragraph 5, the

2      notice to the acquisition and assistance staff at USAID stated

3      that until further notice the contracting and agreement

4      officers should not enforce any agency directive issued under

5      Executive Order 14169 and the Secretary's implementing

6      memorandum that requires the generalized stop-work, suspension

7      or pause of agency contracts, grants or other federal

8      assistance awards.

9         That was exhibit -- sorry, this was paragraph 5 of the

10     declaration, and then it pointed to Exhibit C.

11        THE COURT:  Counsel, I hope you understand why this

12     is important as the attorney who's presumably advising your

13     clients and you're here representing them.  The Court's been

14     clear and, you know, as recent as when the government came on

15     Friday night and asked for further clarification, the Court

16     said that the qualification about when there are terms in the

17     contract or other legal authorities which allow termination

18     applies, but not when the terminations are still deriving from

19     a general directive to suspend aid.  That's repeated

20     throughout the document we filed.  I haven't seen the

21     emergency appeal you had referred to in that document be

22     filed, and the TRO is still in effect.

23        So if I were you, you know, I would think it would be

24     very important to point to some sort of directive that --

25     or something that indicates that the suspensions that are

1    happening under lawful authority, whether it be a regulation
2    or the terms of the contract or otherwise, is not still just
3    deriving from a general direction to suspend aid from the
4    agency, because that, again, is the very action that was held
5    to be likely arbitrary and capricious, that general directive.
6    And I don't even take the defendants to have ever disputed
7    that at the TRO stage.  Maybe I'll -- you know, I'll look
8    closely at your PI briefing.
9        So I'll leave it at that, but I would think it would be
10   important for you to be able to explain that to your clients
11   and to point to that.
12       MR. SUR:  I realize I've said this before, but if I may
13   say it one more time, I do think that the submissions that are
14   underway now offered for tomorrow will help.
15       THE COURT:  Okay.  I appreciate that.  I'm going to
16   take that to mean that you're still in conversations with your
17   clients, and that's what your inability to give a clear answer
18   to the Court is today.  You can correct me if I'm wrong on
19   that.
20       MR. SUR:  Yeah, I would have to go back to the clients.
21       THE COURT:  Yeah.  Understood.  Okay.
22       So let me just see if I have any other questions for you,
23   Mr. Sur.
24       MR. SUR:  May I ask, would the Court permit me to
25   briefly address some of the points that are specific to the

1    monetary character of the relief sought on this particular

2    motion?

3         THE COURT:  Well, maybe.  Yes, but to this extent:

4    I said at the outset that the purpose of this hearing is to

5    understand and to hear arguments on the motion to enforce the

6    TRO.  It is not an opportunity to relitigate the TRO.  So if

7    there are arguments that you want to make that limit the scope

8    of injunctive relief, the place for that would have been in

9    your PI briefing.

10    So I hope any argument you're going to make about that is

11    in your PI briefing.  But if you want to make arguments about

12    what the scope of the TRO actually was, then those arguments

13    are welcome.

14         MR. SUR:  Right.  So I mean, again, I'll try to be very

15    brief.  But the sovereign immunity question is brought into

16    particular focus by the proposed order, including the clauses

17    that the Court discussed with counsel for plaintiffs in

18    No. 402 earlier this morning, because they have an explicitly

19    monetary character, demanding compensation for past work and

20    including relief that addresses the letters of credit.

21    As the Court notes, in the PI briefing we did address this

22    question of sovereign immunity, and the APA sovereign immunity

23    waiver not covering monetary claims premised on contracts.

24    But I do think it's helpful to understand in the particular

25    context of this morning's discussion that the particular

1   motion by the GHC plaintiffs is again framed in terms of

2   compensation for past work under contract and letters of

3   credit, very explicitly of a monetary character, the nature of

4   that relief.  And sort of an even sharper focus than some of

5   the other elements of the preliminary injunction bringing this

6   question.

7        So here again, there would be, for contract by the

8   government, remedies that are described in our PI motion under

9   the Contract Dispute Act that would proceed maybe in the Court

10  of Federal Claims but not as part of the APA's waiver of

11  sovereign immunity which is for nonmonetary relief.

12       THE COURT:  Understood.  I appreciate that.  I do have

13  that argument.  I have it in your preliminary injunction

14  briefing.  It's not something that's come up in your TRO

15  briefing until today, or TRO arguments or submissions until

16  today.  And as I said, this is not an opportunity to

17  relitigate the TRO.  The TRO is in effect, it hasn't been

18  stayed or overturned in any sort of way.  I do want to make

19  that clear.

20       So let me ask you about some particular things in the

21  record following the TRO that stood out to me.  I'm going to

22  give you one example.  I'm looking at ECF 29-1.  This is an

23  attachment to -- I'm sorry.  I should clarify.  This is in the

24  Global Health Council case, No. 402, the same case that has

25  the pending motion to enforce.

1     And as I understand it, ECF 29-1 is a declaration from
2     someone who describes an email from a State Department
3     official on February 18.  So this is five days after the
4     Court's TRO.  And the email apparently said, "Secretary Rubio
5     has implemented a 15-day disbursement pause on all 15.9
6     billion worth of grants at the State Department."
7         And apparently the same email directed personnel in a
8     particular bureau to undertake an assessment of all grants at
9     the post and then still said, "Review the President's
10    executive orders and recommend termination of grants that do
11    not comply with those orders."
12        So this is five days after the TRO.  I understand that
13    Ms. Bateman, counsel in the 400 case, AIDS vaccine, referred
14    to other instances in which guidance sent after February 13,
15    after the emergency relief, also are referring to review
16    pauses of disbursements and reviews pursuant to the
17    implementation that's been enjoined by the Court.
18        Can you provide any context for me on that that might be
19    helpful?
20        MR. SUR:  If I may just go back one step.  So this is
21    in case No. 402, this is document 29-1, just to catch up to
22    where you were.
23        THE COURT:  Yes.
24        MR. SUR:  And was it a particular exhibit, or was it a
25    declaration matter?

1          THE COURT:  Dunn-Georgiou declaration.  It is paragraph

2     3 where it starts to --

3          MR. SUR:  Okay.  I might briefly be able to address

4     this point about the executive orders.  And if I understand

5     that correctly -- I apologize for not seeing the quote here as

6     I'm scrolling through the PDF.  But the reference to executive

7     orders I think does not encompass the order that is challenged

8     in this action.  If there were a number of other executive

9     orders that announced various policies of the administration

10    including as to foreign assistance -- so I take the reference

11    to executive orders to be -- to those other, unchallenged for

12    purposes of this case, policies.  But again, because I'm not

13    seeing the quote, I'm not able to put that in the proper

14    context.

15         THE COURT:  Okay.  I can tell you exactly where it is.

16    It's document 29-1.  It's the first page.

17         MR. SUR:  Uh-huh.

18         THE COURT:  And you can see in paragraph 3 it quotes

19    the email from the State Department official that says

20    "Colleagues, Secretary Rubio has implemented" -- I won't read

21    it all again, but it should be right there in front of you.

22         MR. SUR:  I'm sorry, yes.  So I take the discussion to

23    be about the executive orders that I was talking about earlier

24    that are not the executive order that's challenged here.  But

25    that is pointing out that some grants are not, you know,

**App. 077**

1    consistent with some of the other executive orders.

2        THE COURT:  Well, can you clarify the color on that

3    first sentence, that's again five days after the TRO, says

4    there's the implementation of a 15-day disbursement pause on

5    all 15 billion worth of grants at the State Department?

6        MR. SUR:  I don't actually have anything further beyond

7    what's on the text here.  I don't know the underlying --

8        THE COURT:  Okay.  Mr. Sur, I appreciate it.  Is there

9    any other thing you'd like to clarify, particularly if you

10    have any information about the kind of on-the-ground how these

11    grants work?  Mr. Wirth provided I think a helpful explanation

12    of the two categories, the contracts versus the assistance

13    agreements and the differences between invoices and lines of

14    credit.

15    No worries if that's clear, but I wanted to give you the

16    opportunity to clarify anything that he might have gotten

17    wrong about how that works.

18        MR. SUR:  Beyond understanding the lines of credit to

19    be a particularly sharp instance of the monetary character of

20    the relief sought, I don't actually have a further

21    understanding of those.  So I wouldn't be able to comment on

22    that.

23    I do in that respect just want to go back to another point,

24    which was that the legitimate expense provisions that we were

25    talking about earlier, they remain open, including to the

1    plaintiffs who are before the Court today.  So there has been

2    no, you know, final decision on these particular plaintiffs'

3    claims as to those, you know, expenses.  And I don't think it

4    would be arbitrary to make a determination on legitimate

5    expenses.

6       So again, just focusing on the particular motion that's

7    before the Court with that proposed order, the availability

8    of the legitimate expense provision, where it has not yet been

9    determined to be applied, I don't think would be --

10          THE COURT:  Can you clarify what you mean by

11   "legitimate expense"?  Is it kind of a repackaging of the

12   fraud argument that was raised in the Friday filing?

13          MR. SUR:  I don't think so.  I think it's a distinct

14   process that was built into the Secretary of State's

15   memorandum.

16          THE COURT:  Okay.  And is -- just a moment.

17      Okay.  Actually, I don't have any more questions for you,

18   Mr. Sur.

19      Mr. Wirth, I'll give you the chance to respond briefly to

20   anything critical here.

21          MR. WIRTH:  Yes, Your Honor.  I'll be brief.  I think

22   what the Court's colloquy with the government has revealed is

23   that the government has done nothing to make the flow of

24   payments happen, or at least that government counsel's is

25   aware of nothing the government has done, and certainly can't

1      contradict my clients' experiences that they've received no

2      payments that they are owed.

3          As far as we're aware, there's been zero directives from

4      the agency with respect to the unfreezing of funds.  There

5      have been, you know, some statements with respect to

6      suspensions and terminations, which is a separate question

7      entirely.  With respect to the unfreezing of funds, we're

8      aware of no directives from leadership whatsoever since the

9      Court's TRO over -- almost two weeks ago.

10         The government refers to the legitimate expense waiver, but

11     that was a waiver that was included in the -- a waiver to the

12     provisions that this court has already enjoined.  And even if

13     the invoices at issue here were subject to that waiver, no

14     payments have been made.  So the waiver is illusory.  So the

15     government's invocation of the waiver makes no sense two times

16     over.

17         And I just want to be very clear, there was some discussion

18     of terminations.  Terminations are a separate question.  But

19     the key point here is that even on contracts that have been

20     terminated, whether or not those terminations remain in effect

21     or not or have been re-upped or not, the government still has

22     to make payments that are owed regardless of whether the

23     government decides to terminate contracts.

24         The government referred to contract-level authorities.

25     They've cited no contract-level authorities for the

1    proposition that the government can refuse to pay its debts,

2    much less refuse to give meaning to the Court's TRO.  I do

3    want to focus very carefully on the language of the TRO here,

4    which specifically directed the government to stop suspending,

5    pausing or otherwise preventing the obligation or disbursement

6    of appropriated foreign assistance funds.

7        And I think what's crucial here and what's been

8    demonstrated by the government in this colloquy is that

9    they've done absolutely nothing to give meaning to that

10   provision of the TRO.

11       The government briefly mentioned the monetary nature of the

12   relief here.  I want to be very clear, the order that we put

13   forward sets out relief that is necessary to give effect to

14   the TRO.  We are going to fully brief the APA issues in our

15   reply brief.  But to be clear, the APA permits injunctive

16   relief that has the effect of causing the government to make

17   out payments.  There's case after case after case for that

18   proposition.  There's nothing stopping the Court from ordering

19   the relief that we've requested.  And to be clear, this is

20   relief that is necessary to give meaning to the TRO.  This is

21   not separate relief.

22       Finally, I do want to correct some either misunderstandings

23   or misstatements from the government with respect to the

24   terminations here.  The government has said that the

25   terminations prior to February 13 are currently invalid.  Our

**App. 081**

1    understanding is that the government has decided that every

2    single termination that it effected prior to the Court's TRO

3    remains in effect.  They were never rescinded, they were never

4    taken off the books, they simply added a post hoc

5    rationalization for every single one of those.  That includes

6    all four tranches of the terminations that occurred in the

7    days around when we filed our complaint.

8        But we're here right now primarily discussing the failure

9    of the government to do anything whatsoever with respect to

10   the freeze of foreign assistance funds.  They still have done

11   nothing to stop the pause.  And to be clear, they still owe

12   that money even on terminated contracts, even if those

13   terminations are ultimately deemed to be valid, which we do

14   not believe they are.

15       So that's all I have to say.  Thank you.

16           THE COURT:  Thanks, Mr. Wirth.

17       Okay.  So the Court's going to take about a 15-minute

18   recess.  And I'll honor that.  If folks need to get up for 15

19   minutes and return to the phone in about 15 minutes, you have

20   my word I won't come back before that.  I also don't

21   anticipate coming back much after that.  But I do want to take

22   some time to consider the arguments and see what clarity I can

23   offer here orally.

24       So I will be back.  Appreciate it.

25           THE DEPUTY CLERK:  This honorable court is in a brief

1      recess.

2          (Recess from 12:31 p.m. to 1:01 p.m.)

3          THE DEPUTY CLERK:  Good afternoon.  Counsel for

4      plaintiffs in the 400 case, are you present?

5          MS. BATEMAN:  Yes.  Lauren Bateman for the plaintiffs

6      is present.

7          THE DEPUTY CLERK:  Thank you.  And defense?

8          MR. SUR:  Yes, I am.  This is Indraneel Sur for the

9      Department of Justice for the defendants.

10          THE DEPUTY CLERK.  Thank you.  And plaintiffs in the

11      402 case, are you present?

12          MR. WIRTH:  Yes.  This is Stephen Wirth on behalf of

13      plaintiffs.

14          THE DEPUTY CLERK:  All right.  Your Honor, we're ready.

15          THE COURT:  All right.  Thanks, everyone.  I appreciate

16      your patience.  And I wish I could say I'll give you that 15

17      minutes back, but I don't have a way of doing that.

18      The Court is prepared to rule on plaintiffs' written motion

19      to enforce in 402 and plaintiffs' oral motion to enforce in

20      400.

21      The Court makes clear at the outset that this ruling is

22      taking place in the context of enforcing specific aspects of

23      the Court's TRO, those that have been the focus of today's

24      hearing.  And accordingly, I'm making clear that in enforcing

25      specific components of the TRO, the Court is in no way

1    limiting the scope of the TRO or modifying its terms.

2        In granting the temporary restraining order, the Court

3    made clear that the restrained defendants were enjoined from

4    "suspending, pausing, or otherwise preventing the obligation

5    or disbursement of appropriated foreign assistance funds in

6    connection with any contracts, grants, cooperative agreements,

7    loans, or other federal foreign assistance award that was in

8    existence as of January 19, 2025."

9        And in granting the subsequent motion to enforce, the Court

10   made clear that, "To the extent defendants have continued the

11   blanket suspension, they are ordered to immediately cease it

12   and to take all necessary steps to honor the terms of

13   contracts, grants, cooperative agreements, loans, and other

14   federal foreign assistance awards that were in existence as of

15   January 19, 2025, including but not limited to disbursing all

16   funds payable under those terms."  That's the Court's February

17   20th order.

18       Counsel for defendants today have acknowledged that the

19   Court's TRO forecloses giving effect at least to any

20   suspension or termination which took place before the Court's

21   temporary restraining order on February 13, 2025.

22       Plaintiffs have submitted evidence that defendants have not

23   lifted the suspension or freeze of funds as the TRO required.

24   Defendants have not rebutted that evidence, and when asked

25   today, defendants were not able to provide any specific

**App. 084**

1    examples of unfreezing funds pursuant to the Court's TRO.

2    At the hearing today, defendants did for the first time, at

3    least as it relates to the TRO, argue that monetary relief

4    cannot be a consequence of the TRO under the APA due to

5    sovereign immunity.  The Court notes this is a further example

6    of the shifting ground that's taken place at the TRO phase and

7    that the argument's not sufficiently developed to be

8    considered today.

9    I do understand that defendants have included this argument

10    in their briefing at the preliminary injunction stage, and the

11    Court will of course give it due consideration at that stage.

12    And as the Court has noted several times, once the parties

13    complete their briefing schedule at the preliminary injunction

14    phase, the Court stands prepared to hold a hearing and resolve

15    the preliminary injunction as expeditiously as possible.

16    In the meantime, the motion to enforce the TRO is the issue

17    before the Court.  And the very point of a TRO is to prevent

18    irreparable harms in the course of considering a preliminary

19    injunction.

20    So, for these reasons, the Court is going to grant

21    plaintiffs' motion to enforce and finds that the relief

22    requested by plaintiffs in their proposed order is

23    appropriate.  So to be clear and to give effect to the Court's

24    TRO, the Court orders as follows:

25    By 11:59 p.m. on February 26, 2025, the restrained

1    defendants shall pay all invoices and letter of credit

2    drawdown requests on all contracts for work completed prior to

3    the entry of the Court's TRO on February 13.

4         They shall permit and promptly pay letter of credit

5    drawdown requests and requests for reimbursements on grants

6    and assistance agreements -- this is also for the purpose of

7    this motion to enforce, for work completed prior to the entry

8    of the Court's TRO on February 13.

9         And defendants shall take no actions to impede the prompt

10   payment of appropriated foreign assistance funds and shall

11   take all necessary action to ensure the prompt payment of

12   appropriated foreign assistance funds.

13        I'm reiterating that this relief takes place in the context

14   of a specific request to enforce the TRO.  This in no way

15   narrows the scope of the TRO itself.

16        That's the Court's ruling.

17        I do want to turn to the joint status report on compliance

18   that -- I'll be clear that the parties remain under an order

19   to file that joint status report by noon tomorrow.

20        Obviously, the required disbursements pursuant to this

21   motion to enforce that the Court has granted may still be

22   underway when the status report is filed; however, the report

23   shall confirm what steps have been taken by that time and that

24   such disbursements will be made by 11:59 p.m. tomorrow.

25        And in the interest of ensuring compliance with the Court's

1    order, as I previously ordered, to the extent there remain any

2    disputes as to compliance -- and here I'm speaking of the

3    whole TRO, not just the present motion to enforce.  To the

4    extent there remain disputes as to compliance, the parties

5    shall identify agency officials, employees, or other witnesses

6    who can testify under oath as to those disputes.

7        Finally, based on the discussion at today's hearing, I'm

8    also ordering defendants to provide the Court and plaintiffs

9    any directives or guidance that defendants or their agents

10   have sent since the Court's TRO on February 13 which pertain

11   to the implementation of the TRO or the suspension or

12   termination of agreement, and any directive or guidance after

13   the Court's TRO on February 13 which pertain to the

14   implementation of the TRO or the suspension or termination

15   of agreement.  And I want those by noon tomorrow as well.

16       And just in the interest of being clear, that would include

17   any directives or guidance that defendants or their agents

18   send through tomorrow, up until -- so even if it follows the

19   discussions we've had at the hearing today.  And I want those

20   documents by noon tomorrow.

21       With that, we can adjourn for the day.  I appreciate

22   everyone's time.

23           THE DEPUTY CLERK:  All right.  Thank you all.  This

24   honorable court is adjourned.

25           (Proceedings adjourned at 1:09 p.m.)

* * * * * *

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.


/s/ Bryan A. Wayne
Bryan A. Wayne

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

AIDS VACCINE ADVOCACY
COALITION, *et al.*,

      Plaintiffs,

v.

DEPARTMENT OF STATE, *et al.*,

      Defendants.

Civil Action No. 1:25-cv-00400

---

**DEFENDANTS' NOTICE RELATED TO FEBRUARY 12, 2025 HEARING**

On the morning of February 12, 2025, Plaintiffs filed a motion for a temporary restraining order ("TRO"), attaching multiple declarations.  ECF No. 13.  The Court scheduled a telephonic hearing for approximately three hours thereafter.  During that hearing, counsel for the Government referenced a declaration of Peter Marocco, Deputy Administrator of U.S. Agency for International Development ("USAID"), which it had already filed in opposition to a motion for preliminary relief already filed in the related case of *American Foreign Service Association et al. v. Trump et al.*, 1:25-cv-352.  The Court ordered the Government to file that declaration in this case within an hour of the conclusion of the hearing, and it is attached to this notice as Exhibit A.  The Court further ordered the Government to file a list of the authorities on which it most directly relied in *American Foreign Service Association* in support of its arguments there, which is attached as Exhibit B.

Additionally, to further assist the Court's evaluation of the Plaintiffs' TRO motions to which Defendants have not yet had an opportunity to respond in writing, the Government also

1

**App. 089**

attaches to this notice as Exhibit C the full memorandum in opposition to the plaintiffs' motion for

a temporary restraining order that it filed in *American Foreign Service Association*.  While there

is not perfect overlap on all issues or parties, the Government respectfully requests that this Court

consider the Government's arguments contained therein as they relate to the pending motion for a

temporary restraining order in this case.

Finally, the Government submits a proposed order, as requested by the Court, attached as

Exhibit D.

Dated: February 12, 2025                              Respectfully submitted,

                                                     BRETT A. SHUMATE
                                                     Acting Assistant Attorney General
                                                     Civil Division

                                                     ERIC J. HAMILTON
                                                     Deputy Assistant Attorney General
                                                     Federal Programs Branch

                                                     ALEXANDER K. HAAS
                                                     Director
                                                     Federal Programs Branch

                                                     LAUREN A. WETZLER
                                                     Deputy Director
                                                     Federal Programs Branch

                                                     CHRISTOPHER R. HALL
                                                     Assistant Branch Director

                                                     */s/ Christopher D. Edelman*
                                                     CHRISTOPHER D. EDELMAN
                                                     Trial Attorney
                                                     United States Department of Justice
                                                     Civil Division, Federal Programs Branch
                                                     1100 L St. NW
                                                     Washington, DC 20005
                                                     Phone: (202) 305-8659
                                                     Email: christopher.edelman@usdoj.gov

                                                     *Counsel for Defendants*

2

**App. 090**

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| AMERICAN FOREIGN SERVICE ASSOCIATION, *et al.*, |  |
| Plaintiffs, |  |
| v. | Civil Action No. 1:25-cv-00352-CJN |
| PRESIDENT DONALD TRUMP, *et al.*, |  |
| Defendants. |  |

**DECLARATION OF PETE MAROCCO**

I, Pete Marocco, pursuant to 28 U.S.C. 1746, hereby declare as follows:

1.　　I am over 18 years of age, of sound mind, and otherwise competent to make this declaration. This declaration is based on my personal knowledge and information provided to me in my official capacity by others.

2.　　Since Thursday, January 30, 2025, I have performed the duties and functions of both Deputy Administrators of the United States Agency for International Development ("USAID" or the "Agency"). I manage the day-to-day operations at USAID including personnel matters and operations. Since January 20, 2025, I have also served as the Director of Foreign Assistance at the Department of State. Previously, I served as a United States Marine and as a Deputy Assistant Secretary at both the Department of State and the Department of Defense. Additionally, I served on a special assignment as the Senior Advisor for Intelligence and Security to the Secretary of Commerce and served as the Assistant to the Administrator at USAID, overseeing the Bureau for Conflict Prevention and Stabilization.

1

3.    On January 20, 2025, President Trump issued an Executive Order—"Reevaluating and Realigning United States Foreign Aid"—directing a 90-day pause in foreign development assistance, to allow for an "assessment of programmatic efficiencies and consistency with United States foreign policy." *See* Executive Order, *Reevaluating and Realigning United States Foreign Aid* (Jan. 20, 2025), attached as Exhibit A.  Further, on January 24, 2025, Secretary of State Rubio, consistent with that Executive Order, directed a "pause[]" on "all new obligations of funding, pending a review, for foreign assistance programs funded by or through the [State] Department and USAID." *See* Secretary of State ALDAC re *Executive Order on Review of Foreign Assistance Programs*, 25 STATE 6528 (Jan. 24, 2025), attached as Exhibit B.

4.    In both my role as the Director of Foreign Assistance, which oversees USAID's delivery of foreign aid, and now in my role managing USAID's operations, my primary focus has been to develop a tracking system to achieve greater accountability of USAID's human resources and capital outlays across its global footprint.  Accountability and effective controls are essential to ensuring that the aforementioned directives of the President and Secretary are fully and faithfully followed across USAID's operations and that USAID's programs further, rather than undermine, the foreign policy and national interests of the United States.

5.    To that end, beginning shortly after the President's Executive Order directed the 90-day foreign assistance pause on January 20, 2025, I made numerous requests for information about USAID's operations, programs, and compliance with the President's directives.  In both of my roles, I have consistently found USAID's senior staff were unwilling or unable to provide basic compliance and oversight information.  For example, senior professionals in the Agency's Bureaus and finance, legal, and human capital groups were not able to identify who, when, and why dozens of specific multi-million-dollar payments were approved or disbursed in the days following the

2

President's and Secretary's directives to pause most USAID disbursements and programs. Agency senior staff were not able to explain whether the Agency's payments system contained any controls to ensure compliance with these directives and, if so, how those processes worked. After the Secretary approved waivers to permit specific programs or activities to continue, Agency staff have been consistently unable to identify which specific payments were affected by the waivers and should be released for disbursement. Last week, it took more than two days for Agency senior staff to produce a list of overseas personnel and their physical location despite repeated and direct requests.

6.      This lack of clear or timely information sharing caused grave concern about whether USAID was faithfully following the President's and Secretary's directives. Those concerns were amplified when, in the days just before and following Secretary Rubio's directive, Agency leadership became aware that a group of USAID employees were not complying with the President's Executive Order and Secretary's order and continued to permit new funding obligations paused by those directives. In the days following the Secretary's order, USAID leadership conducted a review of Agency operations and identified certain employees who were responsible, directly or indirectly, for permitting the unauthorized flow of funds in violation of these Presidential and Secretarial directives.

7.      Moreover, the noncompliance identified by Agency leadership raised serious, systemic concerns about the management and processes governing USAID. As articulated by Secretary Rubio, and consistent with the views of the President, USAID's foreign assistance processes reflected signs of severe inefficiency, and a substantial number of the programs funded by USAID neither substantially benefited the American people, nor reflected the priorities of the President and Secretary. Many of USAID's programs substantially overlap, conflict, or duplicate

3

functions at the Department of State, which often leads to discord in the President's ability to carry out foreign relations with one voice. Furthermore, many of USAID's pre-existing programs were in conflict with the directives and priorities of the President and Secretary, and therefore were inconsistent with the public interest and foreign policy judgments of the Executive Branch. Given the scale of these programs, an *ad hoc* review of these conflicting programs would unduly burden the execution of the President's other foreign policy priorities. A blanket pause with a waive-in process was the more efficient and effective path.

8.      In light of these problems, on January 30, President Trump directed Secretary of State Rubio to perform the functions and duties of the Administrator of USAID in an acting capacity; the prior Acting Administrator returned to his prior position as Chief Information Officer. Several days later, Secretary Rubio sent a letter to Congress, formally notifying them consistent with applicable law, including sections 7063 and 7015 of the Department of State, Foreign Operations, and Related Programs Appropriations Act, 2024 (Div. K, P.L. 118-47), as carried forward by the Continuing Appropriations Act, 2025 (Div. A, P.L. 118-83), of "our intent to initiate consultations with you regarding the manner in which foreign aid is distributed around the world through [USAID]," including the review and potential reorganization of USAID and the potential absorption by the Department of State of certain bureaus, offices, and missions of USAID. *See* February 3, 2025 Letter to the Chairs and Ranking Members of the House Committee on Foreign Affairs, the Senate Committee on Foreign Relations, and the House and Senate Committees on Appropriations, attached at Exhibit C. The letter further stated that Secretary Rubio had delegated to me the duties of Deputy Administrator of USAID, "to begin the process of engaging in a review and potential reorganization of USAID's activities to maximize efficiency and align operations with the national interest." *Id.*

4

9.     The first step of this review, in essence, involved the majority of USAID pausing a substantial portion of its ongoing work—going "pencils down"—so that the Secretary and USAID leadership could gain control of an organization that included some employees who had refused to comply with lawful directives by the President and Secretary, directives designed to identify wasteful or fraudulent programs or those contrary to the foreign policy interests of the United States.  The pause of ongoing work and use of paid administrative leave have enabled Agency leadership to begin a thorough review of USAID's operations and align its functions to the President's and Secretary's priorities, without continued noncompliance by former Agency leadership and management undermining those priorities.  Pausing a majority of USAID's work was, and remains, necessary to continue this thorough review into the noncompliance issues first identified, as well as to continue to examine USAID's processes and the manner by which USAID funds its programs.  Only by engaging in this audit and review, could the Agency leadership and the Secretary ensure that USAID's funding decisions aligned with the foreign policy priorities of the United States.  This audit and review would have been ineffective and would have been inconsistent with the public interest if USAID's then extant operations remained unchecked. Indeed, our experience with widespread noncompliance with initial stop-work directives raised serious doubt about whether Agency leadership would have received necessary information in a timely manner and also whether directives of Agency leadership would be promptly and faithfully complied with.  Instead, the best course was an across-the-board pause, where Agency leadership could then determine on a more targeted basis which programs continued to make sense for the American people, and which did not.

10.     At the time the general pause on foreign aid was issued, Secretary Rubio issued four waivers for: foreign military financing for Israel and Egypt, emergency food assistance,

5

**App. 096**

related administrative expenses, and legitimate expenses incurred before the pause went into effect. In the days following the general pause on foreign aid, Secretary Rubio adopted a waiver process to ensure that important aid programs within the national interest would be able to continue during the period of review. For instance, on January 28, Secretary Rubio issued an emergency humanitarian waiver for life-saving humanitarian assistance programs. Along with this general waiver, the State Department is also issuing case-by-case waivers, based on specific programs. Consistent with this approach to foreign assistance administered by the State Department, a similar pause and waiver process applies to USAID's operations to ensure they too are aligned with the President's and Secretary's priorities. And the humanitarian waiver just noted (among others) applies in full measure to USAID programs.

11.     There are 4,765 direct hire full-time equivalent employees at USAID. The Agency identified an initial set of 58 employees who were placed on paid administrative leave on Monday, January 27, 2025. This group included senior staff who engaged in noncompliance vis-à-vis the funding pause and stop-work orders or other acts of insubordination or questionable contracting practices or who were charged with managing and administering initiatives no longer deemed to be in the national interest (*e.g.*, DEI programs). On Saturday, February 1, 2025, an additional 57 employees were placed on administrative leave, many of whom engaged in similar acts of insubordination, deceit, or non-compliance with Executive Orders or Agency leadership directives.

12.     Agency leadership ultimately determined that the placement of a substantial number of USAID personnel on paid administration leave was the only effective way to pause operations, faithfully implement the pause, and conduct a full and unimpeded audit of USAID's operations and programs, consistent with the President's and Secretary's directives. Accordingly, on Monday, February 3, 2025, USAID placed an additional 606 employees on paid administrative

6

leave; on Tuesday, February 4, 2025, another 1,416 employees were placed on paid administrative leave.  As of February 7, 2025, before this Court issued the temporary restraining order, approximately 2,140 total USAID U.S. direct hires were on paid administrative leave.  To the best of my knowledge, none of these employees were located in high-risk countries, such as Syria.

13.    Approximately 98% of the 2,140 employees on paid administrative leave as of February 7, 2025, were physically located within the Continental United States, with the remaining located in developed countries like the United Kingdom or Hungary where employees face little risk of physical danger and where USAID has little to no mandate. USAID did not intentionally place any employee in a high-risk location on paid administrative leave.  Upon being informed that several employees might have temporarily been in high-risk locations, USAID immediately removed these employees from administrative leave and fully restored their preexisting access to all USAID and other government systems.

14.    As is customary, each of the employees placed on administrative leave had their access restricted to USAID digital systems, including their Agency-sponsored email accounts. Given the sensitivity of government information systems, the need to protect sensitive government information, to avoid the risk of data breach, and to maintain the integrity of the ongoing pencils down review, Agency leadership thought it prudent to restrict access for those employees temporarily removed from their regular duties by being placed on paid administrative leave. As noted, these were employees physically located in the United States or other safe, developed nations where restricting their access to USAID systems posed minimal risk of danger.  I am unaware of any employee in a dangerous location such as Syria whose access was impacted.

15.    As part of this effort to pause work at USAID, Agency leadership also conducted a review of its employees to identify which employees were essential—*i.e.,* those who are

**App. 098**

responsible for mission-critical functions, core leadership, and those who work on specially designated programs—and who should not be placed on administrative leave.

16.     Over the course of the last week, Agency leadership initially determined that approximately 611 employees qualified as essential to perform USAID's required duties and to facilitate orderly contingency and audit operations.  For example, many employees in the travel office were deemed essential because they would be responsible for helping USAID employees abroad come home to the United States, if they wished to do so.  Essential personnel also included subject matter experts from most parts of the Agency such as the regional bureaus; a large contingent of personnel administering and overseeing emergency humanitarian, food, and medical assistance; information systems managers; security officers; legal counsel; the Chief Human Capital Officer and other human resources employees, contracting officers and others.  The process of selection included senior political and career leaders who carefully contemplated an essential staff level.

17.     As part of its efforts to pause work and facilitate an audit of USAID's operations, the Agency had planned to place another approximately 2,014 employees, excluding those it had deemed as essential, on paid administrative leave beginning 11:59 p.m. on Friday, February 7, 2025.

18.     Following this Court's February 7, 2025 Order, however, the Agency has not placed any additional employees on administrative leave, and it reinstated all employees previously placed on any form of administrative leave.  Moreover, the Agency has restored access to email, payment, and security notification systems to those employees whose access was previously limited or shut off. During the pendency of the Court's February 7 Order, should Plaintiffs' counsel

identify specific employees without access these systems, USAID will diligently work to rectify any such inadvertent technical access limitation. *But see infra* ¶ 20.

19.     Before this Court's February 7 Order, USAID's website indicated that all non-essential employees would be placed on administrative leave that evening. After this Court's Order, however, the Agency removed that message from its website. Moreover, the Agency sent an email notice of the Order to all USAID employees.

20.     On Sunday, February 9, 2025, the Agency separately placed four individuals on paid investigative leave pending further inquiry into specific and serious acts of deceit, insubordination, and refusal to follow direct and lawful orders. These acts appeared to be intentional and directly related to the Agency's critical operations. If permitted to return to active duty, these senior employees present a grave risk to the Agency's ongoing operations, missions, and chain of command.

21.     In order for USAID to conduct the requisite and thorough internal review of its operations, it is imperative that this Court lift its TRO and permit the Agency to go forward with its "pencils down" approach.

22.     USAID has a careful plan to implement a safe and orderly process of repatriating USAID workers stationed abroad, for those who wish to return.

23.     Those employees who are abroad, or "at Post," were given, and will be provided with, a choice to either stay at Post, or return to the United States. Leadership wanted to provide this option to these employees so that they would not fear being accused of abandoning their assignment by returning to the United States. But if an employee chooses to stay at Post, he or she will be entitled to all of the benefits previously available, so long as he or she remains on paid

**App. 100**

administrative leave.  If an employee chooses to return to the United States, the Agency will coordinate and financially cover that return for the employee and his or her family.

24.     As noted, I am not aware of any instance where any USAID employee in a high-risk country has been cut-off from their USAID digital systems while in the field, nor restricted in their access to any embassy or government safe space.  Nor have I, or any senior leader I am aware of, issued any type of "evacuation" order to force a USAID employee to leave their post because of the pause and review, as alleged by Plaintiffs.

25.     By requiring that employees make a voluntary decision about their desire to return to the United States within 30 days, that 30-day deadline balances the need to afford employees time to order their affairs and consider their needs, with the Agency's interest in coordinating and managing its staff as well as the Agency's duty to guard against waste, fraud, and abuse. Additionally, I carefully considered, along with the leadership of the Department of State and other USAID leaders, additional circumstances that might warrant special attention, time, resources, an exception, or an extension.  Consistent with the choice offered to these employees, there have been no forced or attempted evacuations of any USAID employee at Post related to the subject leave and no directive that they must return to the United States.  *See* USAID Website as of February 7, 2025, FAQ 1, attached as Exhibit D.

26.     The Agency also understands that certain employees may not be in a position to leave their Post within 30 days.  Accordingly, the Agency has also made clear that it will consider case-by-case exceptions and offer extensions based on personal or family hardship, mobility or safety concerns, or other reasons.  For example, the Agency will consider exceptions based on the timing of dependents' school term, personal or familial medical needs, pregnancy, and other reasons. Additionally, the Department of State has initiated a coordination support team (CST) of

at least 40 staff (and growing) to support travel, logistics or other requests inside the Department's operations center to be prepared and available in the event of a large voluntary movement.

27.      When an employee is placed on paid administrative leave, he or she may lose access to certain USAID systems—the rationale for which is to ensure the person is on bonafide leave, to maintain the security of internal systems, and to ensure that the "pause" on Agency operations can truly go into effect.  USAID presently has no plan or proposal that an employee would be shut out from access to overseas security resources at a high-risk post.   Allowing employees on administrative leave to continue accessing USAID systems would create serious security and foreign policy risks.

28.      As part of pausing existing activities, the Agency has generally paused all expenditures in connection with foreign aid, save for those programs with approved waivers or exceptions.  That is so for both new programs (as discussed in Secretary Rubio's directive) as well as existing ones (as later determined by Agency leadership).  As for the latter, the United States typically has the right under any grant or contract to terminate assistance in the event that such program is no longer in the national interest.  I am personally aware of no instances where an individual employee of USAID would be liable in a personal capacity for the United States terminating a grant, contract, or similar program—as alleged by Plaintiffs.

29.      USAID's pause on funding is also not categorical.  Rather, the Agency has engaged in a robust process to grant prompt and warranted clarifications of waivers and exceptions from this pause, where the national interest warrants.  For example, the leadership of the U.S. President's Emergency Plan for AIDS Relief (PEPFAR) requested a waiver to prevent a wide spread of HIV and continue life-saving care.  We quickly met with their team who thanked us for the pause and review, because as they described, the program suffered from serious lack of reform and oversight

11

**App. 102**

filled with programs that have nothing to do with HIV. We were able to quickly provide clarification of a limited waiver and per direct reports from the leadership, the necessary program has continued. In contrast to the Plaintiff's allegations regarding essential assistance in Gaza, we were able to identify and quickly clarify a waiver for an authorized program. That limited waiver, which was consistent with the Agency's priorities, is in contrast to an effort by one USAID employee who broke the chain of command, did not communicate with her immediate USAID supervisor, and attempted to obligate or authorize the expenditure of nearly a half a billion dollars in assistance in a manner that was inconsistent with the President's and Secretary's priorities. It is this sort of noncompliance and apparent evasion of Agency processes and policy direction that resulted in placing this employee on administrative leave to permit review of those and other actions.

30.    As noted above, on February 3, Secretary Rubio began a consultative process with the Congress regarding the future of USAID. *See* Exhibit C. Those discussions remain productive and ongoing.


I declare under penalty of perjury under the laws of the United States that the information in this declaration is true and correct.

Peter Marocco

Deputy Administrator, USAID

February 10, 2025

12

**App. 103**

# EXHIBIT A

# Presidential Documents

Executive Order 14169 of January 20, 2025

## Reevaluating and Realigning United States Foreign Aid

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1**. *Purpose.* The United States foreign aid industry and bureaucracy are not aligned with American interests and in many cases antithetical to American values. They serve to destabilize world peace by promoting ideas in foreign countries that are directly inverse to harmonious and stable relations internal to and among countries.

**Sec. 2**. *Policy.* It is the policy of United States that no further United States foreign assistance shall be disbursed in a manner that is not fully aligned with the foreign policy of the President of the United States.

**Sec. 3**. (a) *90-day pause in United States foreign development assistance for assessment of programmatic efficiencies and consistency with United States foreign policy.* All department and agency heads with responsibility for United States foreign development assistance programs shall immediately pause new obligations and disbursements of development assistance funds to foreign countries and implementing non-governmental organizations, international organizations, and contractors pending reviews of such programs for programmatic efficiency and consistency with United States foreign policy, to be conducted within 90 days of this order. The Office of Management and Budget (OMB) shall enforce this pause through its apportionment authority.

(b) *Reviews of United States foreign assistance programs.* Reviews of each foreign assistance program shall be ordered by the responsible department and agency heads under guidelines provided by the Secretary of State, in consultation with the Director of OMB.

(c) *Determinations.* The responsible department and agency heads, in consultation with the Director of OMB, will make determinations within 90 days of this order on whether to continue, modify, or cease each foreign assistance program based upon the review recommendations, with the concurrence of the Secretary of State.

(d) *Resumption of paused development assistance funding.* New obligations and disbursements of foreign development assistance funds may resume for a program prior to the end of the 90-day period if a review is conducted, and the Secretary of State or his designee, in consultation with the Director of OMB, decide to continue the program in the same or modified form. Additionally, any other new foreign assistance programs and obligations must be approved by the Secretary of State or his designee, in consultation with the Director of OMB.

(e) *Waiver.* The Secretary of State may waive the pause in Section 3(a) for specific programs.

**Sec. 4**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**8620**   **Federal Register** / Vol. 90, No. 19 / Thursday, January 30, 2025 / Presidential Documents

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02091
Filed 1–29–25; 11:15 am]
Billing code 3395–F4–P

**App. 106**

# EXHIBIT B

UNCLASSIFIED



| | |
|---|---|
| **MRN:** | 25 STATE 6828 |
| **Date/DTG:** | Jan 24, 2025 / 241600Z JAN 25 |
| **From:** | SECSTATE WASHDC |
| **Action:** | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *Immediate* |
| **E.O:** | 13526 |
| **TAGS:** | PREL, AID, EAID |
| **Subject:** | Executive Order on Review of Foreign Assistance Programs |

1. (U) Consistent with the President's Executive Order on Reevaluating and Realigning United States Foreign Aid, this ALDAC pauses all new obligations of funding, pending a review, for foreign assistance programs funded by or through the Department and USAID.

2. (U) Across the United States government, it is currently impossible to access sufficient information in one place to determine whether the foreign assistance policies and interests supported by appropriations are not duplicated, are effective, and are consistent with President Trump's foreign policy.  The Department needs a centralized repository from which senior Department, USAID officials, Ambassadors, missions and others can draw sufficiently detailed information from which the Secretary can make judgments.  Further guidance regarding a new or updated repository and mandatory bureau submissions to it will be forthcoming.

**ACTIONS TO BE TAKEN**

3. (U) Within thirty (30) days, the Director of the Policy Planning Staff (S/P) or its designate shall develop appropriate review standards and collaborate with the Director of the Office of Foreign Assistance (F), the Office of Budget and Planning (BP), the Office of Management and Budget (OMB), and/or other departments and agencies as appropriate to ensure that all foreign assistance is aligned with President Trump's foreign policy agenda and that data regarding all foreign assistance spending in the future is aggregated and inputted into a comprehensive internal Department repository.

4. (U) Within eighty-five (85) days of this ALDAC, the government-wide comprehensive review of all foreign assistance shall be completed, and a report shall be produced to the Secretary of State for his consideration and recommendation to the President.

5. (U) In keeping with one voice of American foreign policy, the United States government, through any department, agency or entity, shall not provide foreign assistance funded by or through the Department and USAID without the Secretary of State's authorization or the authorization of his designee.

6. (U) All U.S. foreign assistance shall be aligned under the Secretary of State's coordination, direction, and supervision, as appropriate, consistent with section 622(c) of the Foreign Assistance Act of 1961 and section 1523 of the Foreign Affairs Reform and Restructuring Act of 1998 (FARRA) within 180 days.

7. (U) Effective immediately, Assistant Secretaries and Senior Bureau Officials shall ensure that, to the maximum extent permitted by law, no new

obligations shall be made for foreign assistance until such time as the Secretary shall determine, following a review.  For existing foreign assistance awards, contracting officers and grant officers shall immediately issue stop-work orders, consistent with the terms of the relevant award, until such time as the Secretary shall determine, following a review.  Decisions whether to continue, modify, or terminate programs will be made following this review.

8. (U) Effective immediately, pending a review of foreign assistance programs:  no new requests for proposals (RFPs), requests for application (RFAs), notices of funding opportunities (NOFOs), or any other kind of solicitation or request for foreign assistance funding shall be published or processed by the Department, USAID, or other agencies implementing programs funded by the Department or USAID until each has been reviewed and approved by F as consistent with the President's policy; no further technical evaluation committees shall be convened; and there shall be no further funding obligated to awards and contracts or indefinite delivery /indefinite quantity (IDIQ) contracts.

9. (U) Effective immediately, I am suspending the review process for proposals for new foreign assistance grants, subgrants, contracts, or subcontracts.  No new funds shall be obligated for new awards or extensions of existing awards until each proposed new award or extension has been reviewed and approved by F as consistent with the President Trump's agenda.

10. (U) Within thirty (30) days of the issuance of the review standards in paragraph 4, every Bureau, agency office and entity providing any type of

foreign assistance shall produce to F for review a list of all active, pending, or proposed grants, subcontracts, contracts, or subcontracts, and provide a clear and concise statement explaining if and how the current or proposed use of obligated funds advances President Trump's policy.

11. (U) The spokesperson will also release a public statement to this effect.

12. (U) The Secretary of State has approved waivers of the pause under the Executive Order and this ALDAC, subject to further review, with respect to:

(a) foreign military financing for Israel and Egypt and administrative expenses, including salaries, necessary to administer foreign military financing;

(b) emergency food assistance and administrative expenses, including salaries, necessary to administer such assistance;

(c) on a temporary basis, salaries and related administrative expenses, including travel, for U.S. direct hire employees, personal services contractors, and locally employed staff;

(d) legitimate expenses incurred prior to the date of this ALDAC under existing awards or legitimate expenses associated with stop-work orders; and

(e) exceptions to the pause approved by the Director of Foreign Assistance.

DEFINITIONS

13. (U) Only for purposes of this ALDAC, foreign assistance means assistance funded from accounts in titles III and IV and from International

Organizations and Programs in the Department of State, Foreign Operations, and Related Programs Appropriations Acts.

| | |
|---|---|
| **Signature:** | RUBIO |

| | |
|---|---|
| **Drafted By:** | S/TT:Marocco, Peter |
| **Cleared By:** | S/TT:Holler, Daniel |
| | L:Visek, Richard |
| | L:Dorosin, Joshua |
| | S/TT:Anton, Michael |
| | C:Needham, Michael |
| **Approved By:** | S: Rubio, Marco |
| **Released By:** | POEMS_P:Acker, Vanessa G |
| **Info:** | IO COLLECTIVE *Immediate* |
| **XMT:** | BASRAH, AMCONSUL; CARACAS, AMEMBASSY; CHENGDU, AMCONSUL; KABUL, AMEMBASSY; MINSK, AMEMBASSY; SANAA, AMEMBASSY; ST PETERSBURG, AMCONSUL; VLADIVOSTOK, AMCONSUL; YEKATERINBURG, AMCONSUL |

**UNCLASSIFIED**

# EXHIBIT C



**THE SECRETARY OF STATE**

WASHINGTON

February 3, 2025

The Honorable James Risch, Chairman
Committee on Foreign Relations
United States Senate
Washington, DC 20510

The Honorable Jeanne Shaheen, Ranking Member
Committee on Foreign Relations
United States Senate
Washington, DC 20510

The Honorable Brian Mast, Chairman
Committee on Foreign Affairs
House of Representatives
Washington, DC 20515

The Honorable Gregory Meeks, Ranking Member
Committee on Foreign Affairs
House of Representatives
Washington, DC 20515

The Honorable Tom Cole, Chairman
Committee on Appropriations
House of Representatives
Washington, DC 20515

The Honorable Rosa DeLauro, Ranking Member
Committee on Appropriations
House of Representatives
Washington, DC 20515

The Honorable Susan Collins, Chairwoman
Committee on Appropriations
United States Senate
Washington, DC 20510

The Honorable Patty Murray, Vice Chairwoman
Committee on Appropriations
United States Senate
Washington, DC 20510

Dear Chairman Risch, Mast, Cole, Collins, Ranking Members
Shaheen, Meeks, DeLauro, and Vice Chairwoman Murray:

Consistent with applicable law, including sections 7063 and 7015 of the
Department of State, Foreign Operations, and Related Programs
Appropriations Act, 2024 (Div. K, P.L. 118-47), as carried forward by the
Continuing Appropriations Act, 2025 (Div. A, P.L. 118-83), this letter provides
notice and advises you of our intent to initiate consultations with you
regarding the manner in which foreign aid is distributed around the world
through the United States Agency for International Development ("USAID").
Current foreign assistance processes are severely inefficient and do not
substantially benefit the American people.  USAID has numerous conflicting,
overlapping, and duplicative functions that it shares with the Department of
State.  Additionally, USAID's systems and processes are not well synthesized,
integrated, or coordinated, and often result in discord in the foreign policy
and foreign relations of the United States.  This undermines the President's
ability to carry out foreign relations.

I have authorized Peter W. Marocco, the Director of Foreign Assistance, and the individual to whom I have delegated authority to perform the duties of the Deputy Administrator of USAID, to begin the process of engaging in a review and potential reorganization of USAID's activities to maximize efficiency and align operations with the national interest.  This review and potential reorganization will substantially further the foreign relations of the United States, and may include, among other things, the suspension or elimination of programs, projects, or activities; closing or suspending missions or posts; closing, reorganizing, downsizing, or renaming establishments, organizations, bureaus, centers, or offices; reducing the size of the workforce at such entities; and contracting out or privatizing functions or activities performed by Federal employees.

The Department of State and other pertinent entities will be consulting with Congress and the appropriate committees to reorganize and absorb certain bureaus, offices, and missions of USAID.  Such consultation shall occur on behalf of the heads of such entities, as directed by the President.
In consultation with Congress, USAID may move, reorganize, and integrate certain missions, bureaus, and offices into the Department of State, and the remainder of the Agency may be abolished consistent with applicable law.

Sincerely,

Marco Rubio
Secretary of State

USCA Case #25-5047 Document #2102746 Filed: 02/26/2025 Page 119 of 277

# EXHIBIT D



On Friday, February 7, 2025, at 11:59 pm (EST) all USAID direct hire personnel will be placed on administrative leave globally, with the exception of designated personnel responsible for mission-critical functions, core leadership and specially designated programs. Essential personnel expected to continue working will be informed by Agency leadership by Thursday, February 6, at 3:00pm (EST).

For USAID personnel currently posted outside the United States, the Agency, in coordination with missions and the Department of State, is currently preparing a plan, in accordance with all applicable requirements and laws, under which the Agency would arrange and pay for return travel to the United States within 30 days and provide for the termination of PSC and ISC contracts that are not determined to be essential. The Agency will consider case-by-case exceptions and return travel extensions based on personal or family hardship, mobility or safety concerns, or other reasons. For example, the Agency will consider exceptions based on the timing of dependents' school term, personal or familial medical needs, pregnancy, and other reasons. Further guidance on how to request an exception will be forthcoming.

Thank you for your service.

**FAQs**

**1. If I am posted overseas and placed on administrative leave, am I required to return to the United States within the next 30 days?**

No. While USAID and the Department of State are preparing a plan under which USAID personnel posted overseas would be offered optional and fully reimbursed return travel to the United States within 30 days, personnel are not required to accept Agency-sponsored travel or to return to the United States within any specific deadline. Overseas USAID personnel retain the option to remain at their posts, even while placed on administrative leave and not working. Beyond 30 days, however, Agency funded and arranged return travel may not be available unless an individualized exception is sought and granted.

**App. 118**

# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AIDS VACCINE ADVOCACY
COALITION, *et al.*,

      Plaintiffs,

v.

DEPARTMENT OF STATE, *et al.*,

      Defendants.

Civil Action No. 1:25-cv-00400

---

**Defendants' Selected Authorities On Which Their Opposition To Temporary Restraining Order Relies Relating To Court's Conference Of February 12, 2025**

## CASES

- *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump, (AFGE)*, 929 F.3d 748 (D.C. Cir. 2019)

- *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) (the "historical gloss on the 'executive Power' vested in Article II of the Constitution has recognized the President's 'vast share of responsibility for the conduct of our foreign relations'" (citation omitted))

- *Ancient Coin Collectors Guild v. CBP*, 801 F. Supp. 2d 383, 402 (D. Md. 2011) (concluding that where the Department of State was acting on behalf of the President, their actions were not reviewable under the APA), *aff'd*, 698 F.3d 171 (4th Cir. 2012)

- *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (D.C. Cir. 2006) (holding that to obtain a preliminary injunction, a plaintiff must demonstrate a "clear showing" that they are entitled to relief)

- *Dalton v. Specter*, 511 U.S. 462, 472-73 (1994) (holding that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review . . . ." respecting the long tradition of "distinguish[ing] between claims of constitutional violations and claims that an official has acted in excess of his statutory authority")

- *Detroit Int'l Bridge Co v. Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016) ("several cases have concluded that an agency's action on behalf of the President, involving discretionary authority committed to the President, is 'presidential' and unreviewable under the APA" and concluding that the action by the Department of State on behalf of the President was unreviewable under the APA)

1

**App. 120**

- *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992) (It is "well-settled" that Presidential action is not subject to review under the APA.)
- *Gulf Oil Corp. v. Brock*, 778 F.2d 834, 842 (D.C. Cir. 1985) (holding that "an injunction must be narrowly tailored to remedy the harm shown")
- *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994)
- *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936) (The President's power in the field of international relations "does not require as a basis for its exercise an act of Congress.")

## CONSTITUTIONAL PROVISION

- Article II

## STATUTES

- Foreign Assistance Act of 1961 (FAA) (allowing for the provision of assistance "on such terms and conditions as [the President] may determine," including at:
  - 22 U.S.C. § 2151b(c)(1) (health assistance)
  - 22 U.S.C. § 2291(a)(4) (counternarcotics and anti-crime assistance)
  - 22 U.S.C. § 2346 (assistance to promote economic or political stability)
  - 22 U.S.C. § 2347 (International Military Education and Training assistance)
  - 22 U.S.C. § 2348 (Peacekeeping Operations)
  - 22 U.S.C. § 2349aa (anti-terrorism assistance)

- Foreign Assistance Act of 1961 (FAA), 22 U.S.C. § 2382(c) (providing that the Secretary of State, under the direction of the President, "shall be responsible for the continuous supervision and general direction of economic assistance, military assistance, and military education and training programs . . . to the end that such programs are effectively integrated both at home and abroad and the foreign policy of the United States is best served thereby.")

- Migration and Refugee Assistance Act of 1962, (MRAA), Pub. L. No. 87-510, 76 Stat. 121 (22 U.S.C. § 2601(c)(1))

- SEED Act of 1989, Pub. L. No. 101-179, 103 Stat. 1298 (amending the FAA by inserting, inter alia, § 498b(i))

**App. 121**

Dated: February 12, 2025

Respectfully submitted,

BRETT A. SHUMATE
Acting Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Federal Programs Branch

ALEXANDER K. HAAS
Director
Federal Programs Branch

LAUREN A. WETZLER
Deputy Director
Federal Programs Branch

CHRISTOPHER R. HALL
Assistant Branch Director

*/s/ Christopher D. Edelman*
CHRISTOPHER D. EDELMAN
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Phone: (202) 305-8659
Email: christopher.edelman@usdoj.gov

*Counsel for Defendants*

**App. 122**

# EXHIBIT C

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN FOREIGN SERVICE
ASSOCIATION, *et al.*,

      Plaintiffs,

v.

PRESIDENT DONALD TRUMP, *et al.*,

      Defendants.

Civil Action No. 1:25-cv-00352-CJN

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY RELIEF

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

BACKGROUND ...................................................................................................3

I.      STATUTORY BACKGROUND ...............................................................3

        A.      The Executive's Authority and Discretion to Set Foreign Aid..................3

II.     FACTUAL BACKGROUND ....................................................................5

III.    PROCEDURAL HISTORY......................................................................7

LEGAL STANDARD ............................................................................................9

ARGUMENT ......................................................................................................10

I.      PLAINTIFFS ARE NOT LIKELY TO PREVAIL ON THE MERITS OF THEIR
        CLAIMS. ..............................................................................................10

        A.      The Court Lacks Jurisdiction Over Plaintiffs' Claims.........................11

                1.      Plaintiffs Must Pursue Their Claims Through the Statutory Scheme
                        Congress Established. ...............................................................11

                        a.      The FSL-MRS and CSRA Preclude the Challenges Brought
                                by AFGE. .......................................................................12

                        b.      The FSA Precludes the Challenge Brought by AFSA. .................15

                2.      Plaintiffs Fail to Demonstrate Standing for the Broad Relief that
                        They Seek....................................................................................19

                        a.      Plaintiffs Fail to Demonstrate Associational Standing as to
                                Secretary Rubio's Order Because No Member is Injured by
                                the Pause on Funding. ..................................................20

                        b.      Plaintiffs Fail to Demonstrate Organizational Standing
                                Because the Organizations are Not Harmed by A Pause of
                                Foreign Assistance .......................................................21

        B.      Plaintiffs Are Not Likely to Prevail on Their Constitutional Claims
                (Counts I and II)..........................................................................22

                1.      Count I (Separation of Powers) Additionally Fails Because the
                        President's Powers in the Realm of Foreign Affairs are Vast and
                        Generally Unreviewable. .............................................................23

**App. 125**

2.    Count II (Take Care Clause Violation) Additionally Fails Because the Take Care Clause Cannot be Used to Obtain Affirmative Relief. ....................................................................................25

C.    Plaintiffs Are Not Likely to Prevail on Their Administrative Procedure Act Claims (Counts III and IV). ..........................................................28

    1.    Plaintiffs Do Not Allege Any Agency Action. ........................................29

    2.    Plaintiffs Do Not Allege Any Final Action. ............................................31

    3.    The APA Does Not Provide a Cause of Action Because an Alternative Adequate Remedy is Available to Plaintiffs........................32

    4.    Defendants Have Not Exceeded Their Statutory Authority. ....................33

    5.    Defendants Have Not Acted Contrary to Law. ........................................35

    6.    Defendants Have Not Acted Arbitrarily and Capriciously. ......................36

II.    PLAINTIFFS FAIL TO DEMONSTRATE THAT IRREPARABLE HARM WOULD RESULT IN THE ABSENCE OF A PRELIMINARY INJUNCTION............37

III.    THE BALANCE OF EQUITIES (INCLUDING THE PUBLIC INTEREST) DOES NOT FAVOR A PRELIMINARY INJUNCTION. .............................................40

IV.    ANY PRELIMINARY INJUNCTION SHOULD BE NARROWLY TAILORED.........41

CONCLUSION.....................................................................................................................42

**App. 126**

## <u>TABLE OF AUTHORITES</u>

### <u>Cases</u>

*Adams v. Vance,*
  570 F.2d 950 (D.C. Cir. 1978) ....................................................................... 10, 25

*Alabama-Coushatta Tribe of Tex. v. United States,*
  757 F.3d 484 (5th Cir. 2014) ................................................................................ 31

*Alexander v. Trump,*
  753 F. App'x 201 (5th Cir. 2018) ......................................................................... 29

*Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.,*
  121 F.4th 1314 (D.C. Cir. 2024) .......................................................................... 19

*\*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump, (AFGE),*
  929 F.3d 748 (D.C. Cir. 2019) ......................................................................*passim*

*Am. Ins. Ass'n v. Garamendi,*
  539 U.S. 396 (2003) .............................................................................................. 24

*Am. Soc'y for Prevention of Cruelty to Animals v. Feld Ent., Inc.,*
  659 F.3d 13 (D.C. Cir. 2011) ............................................................................... 22

*Am. Whitewater v. Tidwell,*
  770 F.3d 1108 (4th Cir. 2014) ............................................................................. 28

*Ancient Coin Collectors Guild v. CBP,*
  801 F. Supp. 2d 383 (D. Md. 2011), *aff'd,* 698 F.3d 171 (4th Cir. 2012) ...... 29, 30

*Angelus Milling Co. v. Commissioner,*
  325 U.S. 293 (1945) .............................................................................................. 26

*Arch Coal, Inc. v. Acosta,*
  888 F.3d 493 (D.C. Cir. 2018) ............................................................................. 13

*Axon Enter., Inc. v. Fed. Trade Comm'n,*
  598 U.S. 175 (2023) .............................................................................................. 18

*Ayele v. District of Columbia,*
  704 F. Supp. 3d 231 (D.D.C. 2023) ..................................................................... 37

*Baker v. Carr,*
  369 U.S. 186 (1962) .............................................................................................. 27

**App. 127**

*Bancoult v. McNamara,*
  445 F.3d 427 (D.C. Cir. 2006) ............................................................23

*Beacon Theatres, Inc. v. Westover,*
  359 U.S. 500 (1959) ...........................................................................34

*Bennett v. Spear,*
  520 U.S. 154 (1997) ...........................................................................29

*Bernstein v. Kerry,*
  962 F. Supp. 2d 122 (D.D.C. 2013), *aff'd* 584 F. App'x 7 (D.C. Cir. 2014)............19

*Bowen v. Massachusetts,*
  487 U.S. 879 (1988) ...........................................................................30

*Bowles v. Russell,*
  551 U.S. 205 (2007) ...........................................................................10

*Bureau of Alcohol, Tobacco & Firearms v. FLRA,*
  464 U.S. 89 (1983) .............................................................................13

*Califano v. Yamasaki,*
  442 U.S. 682 (1979) ...........................................................................39

*Changji Esquel Textile Co. v. Raimondo,*
  40 F.4th 716 (D.C. Cir. 2022) .............................................................8

*Chaplaincy of Full Gospel Churches v. England,*
  454 F.3d 290 (D.C. Cir. 2006) .......................................... 18, 35, 36, 37

*Chi. & S. Air Lines v. Waterman S.S. Corp.,*
  333 U.S. 103 (1948) .......................................................................23, 25

*Church v. Biden,*
  573 F. Supp. 3d 118 (D.D.C. 2021)......................................................36

*Clinton v. Jones,*
  520 U.S. 681 (1997) ...........................................................................25

*Cmty. Oncology All. v. Becerra,*
  No. 23-CV-2168 (CJN), 2023 WL 9692027 (D.D.C. Dec. 21, 2023) ........................8

*Dalton v. Specter,*
  511 U.S. 462 (1994) ...................................................................21, 24, 25

**App. 128**

*Davis v. Pension Benefit Guar. Corp.*,
   571 F.3d 1288 (D.C. Cir. 2009) ......................................................8, 37

*Detroit Int'l Bridge Co v. Canada*,
   189 F. Supp. 3d 85 (D.D.C. 2016) ..........................................................27

*Ehrman v. United States*,
   429 F. Supp. 2d 61 (D.D.C. 2006) ..........................................................17

*Elec. Priv. Info. Ctr. v. Presidential. Advisory Comm'n on Election Integrity*,
   878 F.3d 371 (D.C. Cir. 2017) ..........................................................20, 21

*Elgin v. Dep't of Treasury*,
   567 U.S. 1 (2012) ......................................................................12, 16

*Elm 3DS Innovations LLC v. Lee*,
   No. 1:16–cv–1036, 2016 WL 8732315 (E.D. Va. Dec. 2, 2016)...........................30

*Farris v. Rice*,
   453 F. Supp. 2d 76 (D.D.C. 2006) ..........................................................36

*FDA v. All. for Hippocratic Med.*,
   600 U.S. 367 (2024) ....................................................................20, 21

*Fornaro v. James*,
   416 F.3d 63 (D.C. Cir. 2005) ..............................................................12

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) ......................................................................27

*Free Enter. Fund v. Pub. Co. Acct. Bd.*,
   561 U.S. 477 (2010) ......................................................................25

*Friends of Animals v. Jewell*,
   828 F.3d 989 (D.C. Cir. 2016) ............................................................18

*FTC v. Standard Oil Co. of Cal.*,
   449 U.S. 232 (1980) ......................................................................17

*Garcia v. Vilsack*,
   563 F.3d 519 (D.C. Cir. 2009) ............................................................30

*Ghaly v. Dep't of Agric.*,
   228 F. Supp. 2d 283 (S.D.N.Y. 2002) ......................................................12

**App. 129**

*Graham v. Ashcroft*,
   358 F.3d 931 (D.C. Cir. 2004) ................................................................ 11, 13

*Gulf Oil Corp. v. Brock*,
   778 F.2d 834 (D.C. Cir. 1985) ....................................................................38

*Harisiades v. Shaughnessy*,
   342 U.S. 580 (1952) ....................................................................................23

*Holder v. Humanitarian L. Project*,
   561 U.S. 1 (2010) ........................................................................................38

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
   219 F. Supp. 2d 57 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003) ...............................38

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977) ....................................................................................18

*Hunter v. United States*,
   36 Fed. Cl. 257 (1996) ...........................................................................14, 15

*In re Navy Chaplaincy*,
   738 F.3d 425 (D.C. Cir. 2013) ......................................................................8

*Indigenous People of Biafra v. Blinken*,
   639 F. Supp.3d 79 (D.D.C. 2022) ...............................................................19

*Jarkesy v. SEC*,
   803 F.3d 9 (D.C. Cir. 2015) ....................................................................13, 16

*Johnson v. Eisentrager*,
   339 U.S. 763 (1950) ....................................................................................23

*Kim v. FINRA*,
   698 F. Supp. 3d 147 (D.D.C. 2023), *appeal dismissed*, 2025 WL 313965 (D.C. Cir. 2025)...37,
   38

*Louisiana v. Biden*,
   622 F. Supp. 3d 267 (W.D. La. 2022) ..........................................................27

*Louisiana v. United States*,
   948 F.3d 317 (5th Cir. 2020)........................................................................28

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ........................................................................18, 19, 25

vi

**App. 130**

*Lujan v. Nat'l Wildlife Fed'n.*,
 497 U.S. 871 (1990) ...........................................................................28

*Mahorner v. Bush*,
 224 F. Supp. 2d 48 (D.D.C. 2002), *aff'd* 2003 WL 349713 (D.C. Cir. 2003) ..........................19

*Marbury v. Madison*,
 5 U.S. (1 Cranch) 137 (1803) .................................................................. 1, 25

*Mississippi v. Johnson*,
 71 U.S. (4 Wall) 475 (1866) ..................................................................25

*Morrison v. Olson*,
 487 U.S. 654 (1988) .............................................................................25

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
 463 U.S. 29 (1983) ...............................................................................26

*Munaf v. Geren*,
 553 U.S. 674 (2008) ..............................................................................8

*Nken v. Holder*,
 556 U.S. 418 (2009) ...........................................................................8, 37

*Norton v. S. Utah Wilderness,*
 *All.*, 542 U.S. 55 (2004) ......................................................................28

*Ohio Valley Envt'l Coal. v. Aracoma Coal Co.*,
 556 F.3d 177 (4th Cir. 2009) ..................................................................26

*People for Ethical Treatment of Animals v. U.S. Dep't of Agric.,*
 *(PETA)*, 797 F.3d 1087 (D.C. Cir. 2015) ..................................................18, 20

*Perry Cap. LLC v. Mnuchin*,
 864 F.3d 591 (D.C. Cir. 2017) ................................................................30

*Printz v. United States*,
 521 U.S. 898 (1997) .............................................................................25

*Raines v. Byrd*,
 521 U.S. 811 (1997) .............................................................................18

*Sampson v. Murray*,
 415 U.S. 61 (1974) ...........................................................................34, 36

*Schneider v. Kissinger*,
 412 F.3d 190 (D.C. Cir. 2005) ................................................................22

**App. 131**

*Sherley v. Sebelius,*
  644 F.3d 388 (D.C. Cir. 2011) ...................................................................8

*Sierra Club v. Peterson,*
  228 F.3d 559 (5th Cir. 2000) .................................................................28

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009) ...............................................................................18

*Thompson v. Pope,*
  397 F. Supp. 2d 28 (D.D.C. 2005) ...................................................14, 15

*Thunder Basin Coal Co. v. Reich,*
  510 U.S. 200 (1994) ...............................................................................11

*Tulare Cnty. v. Bush,*
  306 F.3d 1138 (D.C. Cir. 2002) .............................................................27

*U.S. Info. Agency v. Krc,*
  989 F.2d 1211 (D.C. Cir. 1993) ......................................................14, 15

*United States v. Curtiss-Wright Exp. Corp.,*
  299 U.S. 304 (1936) .........................................................................22, 37

*United States v. Fausto,*
  484 U.S. 439 (1988) ...........................................................11, 12, 13, 14

*United States v. Paddack,*
  825 F.2d 504 (D.C. Cir. 1987) ...............................................................17

*Versata Dev. Corp. v. Rea,*
  959 F. Supp. 2d 912 (E.D. Va. 2013) .....................................................30

*Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs,*
  714 F.3d 186 (4th Cir. 2013) .................................................................28

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) .....................................................................................8

*Worthy v. Herter,*
  270 F.2d 905 (D.C. Cir. 1959) ...............................................................23

*Wyo. Outdoor Council v. U.S. Forest Serv.,*
  165 F.3d 43 (D.C. Cir. 1999) .................................................................36

**App. 132**

*Youngstown Sheet & Tube Co. v. Sawyer,*
  343 U.S. 579 (1952) ........................................................................22

*Zivotofsky ex rel. Zivotofsky v. Kerry,*
  576 U.S. 1 (2015) ...................................................... 22, 23, 32

**<u>Constitutional Provisions</u>**

U.S. Const. art. II ............................................................ 25, 26, 27

**<u>Statutes</u>**

5 U.S.C. § 104 ..................................................................... 3, 31

5 U.S.C. § 704 ............................................................... 27, 29, 30

5 U.S.C. § 706 ................................................................... 26, 31

5 U.S.C. § 6329a ...................................................................... 33

5 U.S.C. § 7703 ................................................................... 11, 13

22 U.S.C. § 2151 ........................................................................ 3

22 U.S.C. § 2291 ........................................................................ 3

22 U.S.C. § 2346 ..................................................................... 3, 4

22 U.S.C. § 2347 ........................................................................ 3

22 U.S.C. § 2348 ........................................................................ 3

22 U.S.C. § 2349aa ..................................................................... 3

22 U.S.C. § 2382 ........................................................................ 3

22 U.S.C. § 2601 ........................................................................ 3

22 U.S.C. § 4106 ....................................................................... 15

22 U.S.C. § 4107 ....................................................................... 15

22 U.S.C. § 4131 ....................................................................... 16

22 U.S.C. § 4135 ................................................................... 14, 17

22 U.S.C. § 4136 ................................................................... 14, 17

**App. 133**

22 U.S.C. § 4137 ................................................................ 14, 15, 16, 17

22 U.S.C. § 4138 ........................................................................ 14, 17

22 U.S.C. § 6563 ........................................................................ 3, 4, 31

22 U.S.C.A. § 6592 ............................................................................... 3

28 U.S.C. § 1331 ................................................................................ 11

31 U.S.C. § 3901 ................................................................................ 33

Pub. L. No. 87-510, 76 Stat. 121 (1962) ............................................... 3

Pub. L. No. 101-179, 103 Stat. 1298 (1989) ......................................... 3

Pub. L. No. 105-277, 112 Stat. 2681 (1998) ......................................... 3

Pub. L. No. 118-47 § 7063(a), 138 Stat. 460 (2024) ........................... 32

## Regulations

Exec. Order 10,973, 26 Fed. Reg. 10,469 (Nov. 3, 1961) ...................... 3

Exec. Order 14,169, 90 Fed. Reg. 8619 (Jan. 20, 2025) ................... *passim*

Exec. Order 14008 ............................................................................. 27

FAR 42.1303 ............................................................................ 19, 33, 34

## Other Authorities

Mem., Guidance on Probationary Periods, Admin. Leave Details, Jan. 20, 2025 (Guidance), https://chcoc.gov/sites/default/files/Guidance%20on%20Probationary%20Periods%2C%20Administrative%20Leave%20and%20Details%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%20FINAL.pdf .............. 5

S. Rep. No. 96–913 (1980), *reprinted in* 1980 U.S.C.C.A.N. 4419 ........................................... 14

Sec'y of State, Emergency Humanitarian Waiver to Foreign Assistance Pause (Jan. 28, 2025), http://state.gov/emergency-humanitarian-waiver-to-foreign-assistance-pause ......................... 4

**App. 134**

# INTRODUCTION

Plaintiffs, American Foreign Service Association (AFSA), a professional association that represents foreign service officers (FSOs), and American Federation of Government Employees (AFGE), a union that represents federal civilian employees, bring a scattershot attack against the policy decisions of the Executive Branch. *See generally Compl.*, ECF No. 1. They allege that Defendants President Donald J. Trump, the United States Department of State, the United States Agency for International Development (USAID), Department of Treasury, Secretary and Acting Administrator Marco Rubio, and Secretary Scott Bessent (collectively, Defendants) are "illegal[ly] and unconstitutional[ly] dismantling" USAID, by, *inter alia*, "laying off staff and contractors, halting foreign assistance funded by USAID, issuing stop work orders, closing down USAID headquarters, and taking down USAID's website." Pls.' Mot. for Temp. Restraining Order, ECF No. 9-1 (Pls.' Mot. for TRO) at 12. They seek to remedy these policy decisions through an overbroad injunction that would essentially place USAID in a receivership, superintended by the Court. *See*, *e.g.*., Proposed Order, ECF No. 9-14. This is not the proper role of the judiciary. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

Plaintiffs' motion for preliminary injunctions fails to establish a likelihood of success on the merits of their claims. As an initial matter, Plaintiffs' claims are not justiciable. Plaintiffs' claims, which, at bottom, challenge employment decisions made by the agency, are precluded pursuant to the Civil Service Reform Act of 1978 (CSRA), the Federal Service Labor-Management Relations Act (FSL-MRS), and the Foreign Service Act (FSA). Additionally, although Plaintiffs' members claim injury from the pause in foreign aid, none of the Plaintiffs have established a cognizable Article III injury-in-fact to demonstrate associational or organizational standing.

**App. 135**

Even if Plaintiffs' claims were proper in this Court, the claims are meritless on their own terms.  With respect to Plaintiffs' constitutional claims, Plaintiffs miss the mark because they raise purely statutory arguments.  And in any event, Plaintiffs' Separation of Powers claim fails because the President's powers in the realm of foreign affairs are vast and generally unreviewable, and their Take Care Clause argument fails as that clause cannot be used to obtain affirmative relief.

Plaintiffs' Administrative Procedure Act (APA) claims also do not establish a likelihood of success.  Principally, because Plaintiffs' claims do not challenge any *agency* action, much less any *final* agency action, they cannot be brought under the APA.  Further, Plaintiffs have another adequate remedy at law, and Plaintiffs cannot demonstrate that Defendants have acted contrary to law, arbitrarily and capriciously, or exceeded their statutory authority.

Finally, as the declaration of Peter Marocco makes clear, any finding of irreparable harm would be misplaced.  *See generally* Executive Order 14,169, *Reevaluating and Realigning United States Foreign Aid*, 90 Fed. Reg. 8619 (Jan. 20, 2025), Ex. A, Decl. of Peter Marocco (Marocco Decl).  Although Plaintiffs argue that its members will suffer irreparable harm from their placement on administrative leave, their recall to America, and their claimed lack of access to security features, these fears are belied by the record.  And because the public has an interest in the President taking decisive action in the realm of foreign affairs, the public interest and balance of the equities tip in Defendants' favor.  As such, Plaintiffs have not established the criteria necessary for this Court to enter the extraordinary remedy of a preliminary injunction.

**App. 136**

## BACKGROUND

### I.    STATUTORY BACKGROUND

#### A.  The Executive's Authority and Discretion to Set Foreign Aid

Under the statutory regime governing foreign assistance, and consistent with his responsibilities regarding the conduct of U.S. foreign affairs, the President has broad discretion to set the terms and conditions on which the United States provides such assistance.  Many of the authorities provided under the Foreign Assistance Act of 1961 (FAA), and similar statutes, explicitly allow for the provision of assistance "on such terms and conditions as [the President] may determine."  *See, e.g.,* section 104(c)(1) of the FAA (22 U.S.C. § 2151b(c)(1)) (health assistance); section 481(a)(4) of the FAA (22 U.S.C. § 2291(a)(4)) (counternarcotics and anti-crime assistance); section 531 of the FAA (22 U.S.C. § 2346) (assistance to promote economic or political stability); section 541(a) of the FAA (22 U.S.C. § 2347) (International Military Education and Training assistance); section 551 of the FAA (22 U.S.C. § 2348) (Peacekeeping Operations); section 571 of the FAA (22 U.S.C. § 2349aa) (anti-terrorism assistance); *see also* section 2(c)(1) of the Migration and Refugee Assistance Act of 1962, (MRAA), Pub. L. No. 87-510, 76 Stat. 121 (22 U.S.C. § 2601(c)(1)); section 201 of the SEED Act of 1989, Pub. L. No. 101-179, 103 Stat. 1298 (amending the FAA by inserting, inter alia, § 498b(i)).

The FAA delegates some of this authority.  For example, Section 622(c) of the FAA provides that the Secretary of State, under the direction of the President, "shall be responsible for the continuous supervision and general direction of economic assistance, military assistance, and military education and training programs . . .  to the end that such programs are effectively integrated both at home and abroad and the foreign policy of the United States is best served thereby." 22 U.S.C. § 2382(c).

3

**App. 137**

In 1961, President Kennedy issued Executive Order 10973, directing the Secretary of State to "establish an agency in the Department of State to be known as the Agency for International Development."  Exec. Order 10,973 § 102, 26 Fed. Reg. 10,469 (Nov. 3, 1961).  Section 1413 of the Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, 112 Stat. 2681 (1998), (FARRA) recognized USAID as an "independent establishment."  *See* 22 U.S.C. § 6563; 5 U.S.C. § 104 ("For the purpose of this title, 'independent establishment' means (a) an establishment in the executive branch . . . which is not an Executive department, military department, Government corporation, or part thereof, or part of an independent establishment…").  Under FARRA, the USAID Administrator is "under the direct authority and foreign policy guidance of the Secretary of State."  22 U.S.C.A. § 6592.  And several types of foreign assistance are jointly administered by the Department of State and USAID.  *See*, *e.g.*, 22 U.S.C. § 6563; *id.* § 2346(b) (economic support funds).

Consistent with this authority, President Trump promptly acted to ensure that the United States's provision of foreign aid is aligned with American interests.  Upon taking office on January 20, 2025, President Trump instituted a ninety-day pause in United States foreign development assistance to allow his administration to assess programmatic efficiencies, and to ensure that all foreign aid is consistent with United States foreign policy.  *See* Exec. Order 14,169, *Reevaluating and Realigning United States Foreign Aid*, 90 Fed. Reg. 8,619 (Jan. 20, 2025).  Secretary of State Marco Rubio implemented this Executive Order on January 24, 2025.  Marocco Decl., Ex. B., Dep't of State, Mem. 25 STATE 6828 (Jan. 24, 2025).  Secretary Rubio also approved waivers, including waivers for foreign military financing for Israel and Egypt, emergency food expenses, administrative expenses, and legitimate expenses incurred before the pause went into effect, Marocco Decl. ¶ 10, and a waiver on the pause for life-saving humanitarian assistance during the

4

review, *see* Sec'y of State, Emergency Humanitarian Waiver to Foreign Assistance Pause (Jan. 28, 2025), http://state.gov/emergency-humanitarian-waiver-to-foreign-assistance-pause.

Not only is the Trump Administration reviewing foreign aid for programmatic inefficiencies, but it is also taking steps to ensure there are no inefficiencies within the federal workforce.  On January 20, 2025, the Office of Personnel Management (OPM) issued a guidance memorandum as to probationary periods and administrative leave.  Mem., Guidance on Probationary Periods, Admin. Leave Details, Jan. 20, 2025 (Guidance), https://chcoc.gov/sites/default/files/Guidance%20on%20Probationary%20Periods%2C%20Admi nistrative%20Leave%20and%20Details%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%20FINAL.pdf.  The Guidance reinforced that federal agencies had the authority to place employees on paid administrative leave "when it is in their best interest to do so," including when (1) "the absence is directly related to the agency's mission," (2) "the absence is officially sponsored or sanctioned by the agency," (3) "the absence will clearly enhance the professional development or skills of the employee in the employee's current position," or (4) "the absence is in the interest of the agency or of the Government as a whole."  *Id.* at 2.  The Guidance further explained that administrative leave may "be an appropriate action where the agency component in which the employee works is being eliminated or restructured, or where the agency weighs changes to the individual's role at the agency as part of a workforce realignment."  *Id.*

## II.    FACTUAL BACKGROUND

On January 30, 2025, President Trump appointed Secretary Marco Rubio to act as the Acting Administrator of USAID.  Marocco Decl. ¶ 8.  Secretary Rubio, in line with the views of the President, concluded that USAID's foreign assistance processes reflected signs of severe inefficiency, and a substantial number of the programs funded by USAID neither substantially

**App. 139**

benefit the American people, nor reflect the priorities of the President and Secretary. *Id.* ¶ 7. Thus, Secretary Rubio sent a letter to Congress on February 3, stating that Peter Marocco was delegated the duties of Deputy Administrator of USAID and would "begin the process of engaging in a review and potential reorganization of USAID's activities to maximize efficiency and align operations with the national interest." *Id.* ¶ 8.

In line with those objectives, and to thoroughly review the operations of the agency and align its functions to the President's and Secretary's priorities, USAID leadership began placing employees on paid administrative leave. *Id.* ¶ 9. The use of paid administrative leave enabled agency leadership to begin a thorough review of USAID's operations and align its functions to the President's and Secretary's priorities, without continued noncompliance by former agency leadership and management undermining those priorities. *Id.* Of the total 4,765 employees at USAID, the agency initially put 58 on paid administrative leave. *Id.* ¶ 11. By February 7, 2025, approximately 2,140 employees were placed on, administrative leave. *Id.* ¶ 12. The agency also determined that approximately 611 employees were essential to perform USAID's statutory duties and had planned to place the remaining approximately 2,014 employees on paid administrative leave by 11:59 p.m. on Friday, February 7, 2025. *Id.* ¶¶ 16–17.

USAID has a careful plan for those employees currently stationed abroad placed on paid administrative leave. *Id.* ¶ 22. Those employees who are abroad, or "at Post," were given, and will be provided with, a choice to either stay at Post, or return to the United States. *Id.* ¶ 23; *see also* Marocco Decl. Ex. D, USAID Website (Feb. 7, 2025). But if an employee chooses to stay at Post, he or she will be entitled to all the benefits previously offered, so long as he or she remains on paid administrative leave. Marocco Decl. ¶ 23. If an employee chooses to return to the United States, the agency will coordinate and financially cover that return for the employee and his or her

**App. 140**

family.  Understanding that some employees may not be in a position to leave their Post within thirty days, *id.* ¶ 25, USAID has made clear that it will consider case-by-case exceptions and offer extensions based on personal or family hardship, mobility or safety concerns, or other reasons. *Id.* ¶ 26.  For example, the agency will consider exceptions based on the timing of dependents' school term, personal or familial medical needs, pregnancy, and other reasons.  *Id.*

Further, when employees are placed on paid administrative leave, they may lose access to certain USAID systems, including their USAID email.  *Id.* ¶¶ 14, 27.  The rationale for this is to ensure the security of internal systems, and that the "pause" on agency operations can truly go into effect.  *Id.* ¶ 27.  But USAID has no plan or proposal that an employee would be shut out from access to overseas security resources at a high-risk post and is committed to the personal security of all personnel and their families.  *Id.*

## III.    PROCEDURAL HISTORY

Plaintiffs AFSA and AFGE filed their Complaint on February 6, 2025, alleging that Defendants are violating the Constitution and Administrative Procedure Act (APA) by "dismantl[ing]" USAID.  Compl., ECF No. 1 ¶¶ 1–8, 34.  The following day, on February 7, Plaintiffs filed a motion for a temporary restraining order and asked the Court to enjoin "Defendants immediately from taking any further actions to shut down USAID operation."  Pls.' Mot. for TRO at 23.  The Court held a hearing a few hours later.  *See* Min. Order dated Feb. 7, 2025.

After argument, the Court entered a temporary restraining order (TRO) preventing Defendants from placing additional employees on administrative leave, requiring Defendants to reinstate employees who had already been placed on administrative leave, and mandating that no employee was to be evacuated from their host country before February 14, 2025.  Temporary

7

**App. 141**

Restraining Order, ECF No. 15 (TRO) at 7. The Court found that, although Plaintiffs frame their request for an injunction over the "illegal and unconstitutional dismantling of USAID," their alleged harms really stemmed from "(1) the placement of USAID employees on administrative leave; (2) the expedited evacuation of USAID employees from their host countries; and (3) Secretary Rubio's January 24, 2025 order pausing all new obligations of funding." *Id.* at 2 (cleaned up).

As to the placement on administrative leave, the Court concluded that it did not have "the opportunity to consider" the merits of Plaintiffs' argument "in detail," but that Plaintiffs had "at least a colorable argument." *Id.* at 3. The Court also determined that the loss of security apparatuses could constitute an irreparable injury, and that the equities favored the Plaintiffs. *Id.* at 3–4. Regarding expedited evacuations, the Court concluded that such evacuations could disrupt the "educational progress" of employees' families, along with the employees' "physical safety[] and family relations" constituting an irreparable injury, and that the "remaining TRO factors shake out in a similar way as they did with respect to the administrative leave question." *Id.* at 4–5. Finally, the Court concluded that Plaintiffs failed to establish an irreparable injury as to the funding pause because, although Plaintiffs claim that some of its members face financial exposure for contracts entered into by USAID, Plaintiffs had "not explained how or why contracting officers would be held personally liable for contracts entered into by USAID, nor have they explained why there would be no recourse after the fact if that did somehow happen." *Id.* at 6. And the Court concluded that Plaintiffs' members alleged emotional harm resulting from the pause was the "kind of hypothetical harm insufficient to warrant a TRO." *Id.*

The Court then ordered Defendants to file a response to Plaintiffs' motion by 5:00 p.m. on February 10, 2025 and set a preliminary injunction hearing for February 12, 2025. *Id.* at 7.

**App. 142**

## LEGAL STANDARD

A preliminary injunction is an "extraordinary and drastic remedy" that should "never [be] awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citation omitted). To warrant relief, the movant must satisfy a four-prong test, establishing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). The third and fourth factors of the analysis—harm to others and the public interest— "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Plaintiffs misleadingly claim that "[c]ourts in this Circuit continue to apply a 'sliding scale' approach, wherein 'a strong showing on one factor could make up for a weaker showing on another.'" Pls.' Mot. for TRO at 8 (quoting *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022)). Actually, *Changji* declined to opine on "whether the sliding-scale approach remains valid." *Id.* at 726. Subsequent case law confirms it is not. *See Cmty. Oncology All. v. Becerra*, No. 23-CV-2168 (CJN), 2023 WL 9692027, at *3 (D.D.C. Dec. 21, 2023) (Nichols, J.) ("Although the Court of Appeals has not yet expressly held that a plaintiff must make a clear showing on each of the four *Winter* factors, current caselaw in this jurisdiction favors that approach."); *see also In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir. 2013) (requiring proof on all four factors); *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring) (noting that, after *Winter*, "the old sliding-scale approach to preliminary injunctions—under which a very strong likelihood of success could make up for a failure to show a likelihood of irreparable harm, . . . is no longer . . . viable") (internal quotation and citation omitted). Indeed, injunctive relief that "deeply intrudes into the core concerns of the

executive branch"—including foreign affairs and national security—may be awarded only upon "an extraordinarily strong showing" as to each element. *Adams v. Vance*, 570 F.2d 950, 954–55 (D.C. Cir. 1978).

## ARGUMENT

Plaintiffs have failed to meet their burden to demonstrate any of the requirements to obtain preliminary injunctive relief because (1) they have not shown there is a likelihood of success on the merits on any of their constitutional or statutory claims because the Court lacks jurisdiction to hear them, and they are unlikely to succeed on the merits; (2) they have not demonstrated irreparable harm because all of Plaintiffs' alleged harms are redressable; and (3) the balance of equities and public interest tip in favor of Defendants because the public has an interest in ensuring that the executive is allowed to take decisive action in the realm of foreign affairs. For any one of these reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

## I. PLAINTIFFS ARE NOT LIKELY TO PREVAIL ON THE MERITS OF THEIR CLAIMS.

Plaintiffs' motion for preliminary injunctions fails to establish a likelihood of success on the merits of their claims. Plaintiffs' claims are not justiciable because (1) Plaintiffs' challenges to employment decisions are precluded by the CSRA and FSA and (2) Plaintiffs lack standing to challenge the pause in foreign aid. Even if Plaintiffs could get past these hurdles, their constitutional claims fail because (1) they raise purely statutory arguments, (2) the President's powers in the realm of foreign affairs are vast and generally unreviewable, and (3) the Take Care Clause cannot be used to obtain affirmative relief. Moreover, Plaintiffs' APA claims also do not establish a likelihood of success. Plaintiffs' claims do not challenge any *agency* action, much less any *final* agency action, and cannot be brought under the APA. Further, Plaintiffs have another adequate remedy at law, and Plaintiffs cannot demonstrate that Defendants have acted contrary to

10

**App. 144**

law or arbitrarily and capriciously or exceeded their statutory authority.  For these reasons, the Court should deny Plaintiffs' request for preliminary injunctive relief.

### A.  The Court Lacks Jurisdiction Over Plaintiffs' Claims.

As this Court has noted, Plaintiffs' harms stem from three actions: the placement of employees on administrative leave, the evacuation of USAID employees from their host countries, and the January 24, 2025, pause on foreign assistance funding.  *See* TRO at 2.  But the Court lacks jurisdiction over challenges to any of these decisions.  First, Congress has precluded district court jurisdiction over Plaintiffs' challenges to Defendants' decisions to place employees on paid administrative leave and evacuate employees under the Federal Service Labor–Management Relations Statute (FSL-MRS), the Civil Service Reform Act (CSRA), and the Foreign Service Act (FSA).  And second, Plaintiffs lack both associational and organizational standing to remedy any alleged injury flowing from the pause and review of foreign aid.  For these reasons, Plaintiffs cannot establish a likelihood of success on the merits, and the Court should deny Plaintiffs' request for preliminary injunctive relief.

#### 1.  Plaintiffs Must Pursue Their Claims Through the Statutory Scheme Congress Established.

At the outset, this case involves a challenge to policy decisions governing federal employees.  The Court lacks jurisdiction over these claims because Congress has established a detailed statutory scheme for adjudicating disputes related to federal employment, and Plaintiffs' claims must be adjudicated through this administrative process.

"Within constitutional bounds, Congress decides what cases the federal courts have jurisdiction to consider." *Bowles v. Russell*, 551 U.S. 205, 212 (2007).  Although district courts have jurisdiction over civil actions arising under federal law, *see* 28 U.S.C. § 1331, "Congress may preclude district court jurisdiction by establishing an alternative statutory scheme for

**App. 145**

administrative and judicial review." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump (AFGE)*, 929 F.3d 748, 754 (D.C. Cir. 2019). Here, as detailed below, Congress has precluded district court jurisdiction for the claims brought by Plaintiff AFGE on behalf of its members in the civil service under the FSL-MRS and CSRA, as well as the claims brought by AFSA for its members in the foreign service through the FSA.

### a.  The FSL-MRS and CSRA Preclude the Challenges Brought by AFGE.

Congress has established a detailed statutory scheme for adjudicating disputes that arise in the sphere of federal employment for civil servants. The FSL-MRS, and the CSRA, of which the FSL-MRS is a part, together provide a comprehensive "scheme of administrative and judicial review" for resolving both disputes between employees and their federal employers and disputes between unions representing those employees. *AFGE*, 929 F.3d at 752 (regarding FSL-MRS); *see Graham v. Ashcroft*, 358 F.3d 931, 933 (D.C. Cir. 2004) (regarding CSRA more broadly). In these statutes, Congress provided that most federal labor and employment disputes must first be administratively exhausted before the employing agency and the applicable administrative review board—either the Merit Systems Protection Board (MSPB) for employment disputes or the Federal Labor Relations Authority (FLRA) for labor disputes. Judicial review, if any, is generally available only following the exhaustion of administrative review. *See AFGE*, 929 F.3d at 752 (citing 5 U.S.C. §§ 7105, 7123(a), (c)); *Graham*, 358 F.3d at 934 (citing *United States v. Fausto*, 484 U.S. 439, 448–50 (1988)); *see also* 5 U.S.C. § 7703(b) (providing for judicial review in the Federal Circuit or other court of appeals).

Statutory schemes like these largely preclude jurisdiction in the district courts, either altogether or prior to the completion of jurisdictional administrative exhaustion requirements. *AFGE*, 929 F.3d at 754. In *AFGE*, the D.C. Circuit applied the "two-step framework set forth in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994)," to conclude that the union plaintiffs in

that case could not challenge in district court three executive orders related to federal employment. *AFGE*, 929 F.3d at 754.  Under that framework, district courts lack jurisdiction over suits like this one when the intent for exclusive review in the court of appeals is "(i) fairly discernible in the statutory scheme, and (ii) the litigant's claims are of the type Congress intended to be reviewed within [the] statutory structure." *See id.* at 755 (citations omitted).

Indeed, the Supreme Court has repeatedly held that the CSRA provides the exclusive means of redressing employment disputes involving federal employees. *See Elgin v. Dep't of Treasury*, 567 U.S. 1, 10–15 (2012); *Fausto*, 484 U.S. at 455.  Likewise, the D.C. Circuit has repeatedly recognized that the FSL-MRS and the CSRA readily satisfy the first prong of the *Thunder Basin* framework.  *See AFGE*, 929 F.3d at 755 (concluding that union plaintiffs could not challenge in district court three executive orders related to federal employment); *Fornaro v. James*, 416 F.3d 63, 66 (D.C. Cir. 2005).  In other words, Congress intended to make the FSL-MRS and CSRA the exclusive scheme, and they satisfy the first step of the two-step *Thunder Basin* framework.

Plaintiffs' claims are also the type to be challenged through this statutory structure.  In fact, "[c]laims 'will be found to fall outside of the scope of a special statutory scheme in only limited circumstances, when (1) a finding of preclusion might foreclose all meaningful judicial review; (2) the claims are wholly collateral to the statutory review provisions; and (3) the claims are beyond the expertise of the agency.'"  *AFGE*, 929 F.3d at 755 (quoting *Arch Coal, Inc. v. Acosta*, 888 F.3d 493, 500 (D.C. Cir. 2018)).

Here, all three factors point toward preclusion.  First, a finding of preclusion will not thwart meaningful judicial review.  In essence, Plaintiff AFGE is challenging the placement of its members on paid administrative leave, and perceived consequences or incidental effects that will

**App. 147**

flow from that placement, whether related to financial benefits or repatriation. But an employee's placement on administrative leave can be challenged under the CSRA or FSL-MRS. *Ghaly v. Dep't of Agric.*, 228 F. Supp. 2d 283 (S.D.N.Y. 2002) (plaintiff challenging his transfer to paid-administrative leave needed to exhaust administrative remedies). In particular, the Negotiated Collective Bargaining agreement between AFGE's USAID workers and the Agency has an established grievance procedure for determining whether the Agency violated, misinterpreted, or misapplied laws, rules, or regulations in setting conditions of employment. *See Negotiated Collective Bargaining Agreement Between USAID and AFGE Local 1534 (AFL-CIO)*, Art. 17, Art. 21, Dec. 22, 2016. If dissatisfied with the decision by the employing agency and the applicable administrative review board, Plaintiffs' members still have the opportunity for judicial review in a court of appeals. *See AFGE*, 929 F.3d at 752 (citing 5 U.S.C. §§ 7105, 7123(a), (c)); *Graham*, 358 F.3d at 934 (citing *Fausto*, 484 U.S. at 448–50); *see also* 5 U.S.C. § 7703(b) (providing for judicial review in the Federal Circuit or other court of appeals).

For similar reasons, Plaintiff AFGE's challenge—the placement of its members on administrative leave— is also not "wholly collateral" to the statutory review provisions. Rather, that claim may arise in the context of a specific labor dispute, as set forth above. *See AFGE*, 929 F.3d at 759–60 ("This consideration is 'related' to whether 'meaningful judicial review' is available, and the two considerations are sometimes analyzed together." (quoting *Jarkesy v. SEC*, 803 F.3d 9, 22 (D.C. Cir. 2015))).

Finally, Plaintiff AFGE's claims are precisely within the FLRA's expertise. The FLRA is—together with the MSPB—the federal authority on matters of federal employment and labor relations. *E.g., Bureau of Alcohol, Tobacco & Firearms v. FLRA*, 464 U.S. 89, 97 (1983). Even if clothed in constitutional or APA garb, Plaintiffs' claims are nonetheless subject to the CSRA

**App. 148**

and FSL-MRS.  On this point, *AFGE v. Trump* is instructive.  The district court characterized the claims there as involving "separation-of-powers issues" and "whether a statute or the Constitution has authorized the President to act in a particular way," 929 F.3d at 760, much as Plaintiffs have framed their claims in this case.  But the D.C. Circuit nonetheless concluded that the AFGE plaintiffs had to follow the statutory scheme, observing that, like here, the claims at issue could be adjudicated by resorting to the provisions of the relevant congressional legislation.  *Id.* at 760–61.  And even assuming the FLRA and MSPB have lesser expertise on questions of constitutional dimension, they may well be able to "offer an interpretation of the Statute[s] in the course of the proceeding that might alleviate or shed light on the constitutional concerns." *Id.* at 761 (cleaned up).  Plaintiff AFGE's claims on behalf of its members are not subject to judicial review unless and until they have been pursued through the comprehensive statutory scheme Congress devised.

### b.  The FSA Precludes the Challenge Brought by AFSA.

AFSA's claims asserted on behalf of its foreign service officer members are likewise precluded under the two-step *Thunder Basin* framework by a separate congressional enactment, the Foreign Service Act of 1980.  Congress passed the FSA as "a companion measure" to the CSRA, S. Rep. No. 96–913 (1980), *reprinted in* 1980 U.S.C.C.A.N. 4419.  And just as it held for the CSRA, the D.C. Circuit has long recognized that "the Foreign Service Act provides a comprehensive system for reviewing personnel action[s] taken against federal employees." *U.S. Info. Agency v. Krc*, 989 F.2d 1211, 1217 (D.C. Cir. 1993) (quoting *Fausto*, 484 U.S. at 455).

Chief among the FSA's many provisions for FSOs are "fundamental grievance procedures." *Thompson v. Pope*, 397 F. Supp. 2d 28, 34 (D.D.C. 2005).  Under the FSA, the Foreign Service Grievance Board is "authorized to hear grievances and, where appropriate, recommend remedial action to the Secretary of State." *Hunter v. United States*, 36 Fed. Cl. 257, 259 (1996); *see also* 22 U.S.C. §§ 4135–38.  Under authority provided by Congress, the Board has

established an extensive process for resolving grievances, including the right to a hearing, the right to a representative, and the right to examine and cross-examine witnesses. *Id.* § 4136; *see also* 22 C.F.R., ch. IX (Foreign Service Grievance Board). The Board's decision must be in writing and include findings of fact and a statement of reasons. 22 U.S.C. § 4137(a). And the FSA authorizes the Board, when it "finds that the grievance is meritorious," to, among other things, direct the Department to correct personnel records, reinstate the grievant, or recommend additional remedial action to the Secretary of State. *Id.* § 4137(b), (d). A grievant who is dissatisfied with final action by the Board or the Secretary, meanwhile, is entitled to judicial review "in the district courts of the United States in accordance with the standards set forth in chapter 7 of title 5 [the APA]." *Id.* § 4140(a).[1]

Congress defined a "grievance" broadly, to include "any act, omission, or condition subject to the control of the Secretary which is alleged to deprive a member of the [Foreign] Service who is a citizen of the United States (other than a United States citizen employed under section 3951 of this title who is not a family member) of a right or benefit authorized by law or regulation or which is otherwise a source of concern or dissatisfaction to the member." *Id.* § 4131(a)(1). A grievance expressly includes both (1) "separation of the member allegedly contrary to laws or regulations"; or (2) any "other alleged violation, misinterpretation, or misapplication of applicable laws, regulations, or published policy affecting the terms and conditions of the employment or career status of the member." *Id.* § 4131(a)(1)(A)–(B).

---

[1] The FSA also permits a labor organization such as AFSA to bring a complaint before the Foreign Service Labor Relations Board (FSLRB), established within the FLRA. 22 U.S.C. §§ 4106–07. Just as with a FSO's grievance, "any person aggrieved by a final order" of the FSLRB may seek and obtain judicial review. *Id.* § 4109(a). Congress conferred exclusive jurisdiction for such proceedings on the U.S. Court of Appeals for the District of Columbia. *Id.* Plaintiffs' claims are therefore precluded regardless of whether brought on behalf of Plaintiff AFSA or individual FSOs.

**App. 150**

Courts have consistently concluded that the FSA is "a comprehensive and exclusive administrative scheme for review of personnel actions affecting U.S. citizen members of the Foreign Service." *Hunter*, 36 Fed. Cl. at 259; *Pope*, 397 F. Supp. 2d at 35 ("The comprehensive nature of the FSA's grievance procedures provides the plaintiff with an avenue for some redress [which] forclose[s] [sic] judicial imposition of a new substantive liability." (cleaned up)); *cf. Krc*, 989 F.2d at 1217 ("In withholding an administrative remedy from a former FSO alleging reprisal, it appears that the Congress intended also to deny him a judicial remedy."). The first step of the *Thunder Basin* test is readily satisfied.

At the second step, as stated above, Plaintiffs must show that "(1) a finding of preclusion might foreclose all meaningful judicial review; (2) the claim[s] [are] wholly collateral to the statutory review provisions; and (3) the claims are beyond the expertise of the agency." *AFGE*, 929 F.3d at 755 (cleaned up). Plaintiffs cannot do so.

Meaningful judicial review for FSOs will not be foreclosed because, as explained above, they can resort to a federal district court in the event they are dissatisfied with a final action by the Board. This Court is "fully competent to adjudicate" the claims of AFSA's members, *Elgin*, 567 U.S. at 17, a point made evident by the fact that Plaintiffs chose to file this action (erroneously and prematurely) in this Court in the first instance. Notably, a grievance is defined to encompass "any act, omission, or condition subject to control of the Secretary which is . . . a source of concern or dissatisfaction to the [FSO]." 22 U.S.C. § 4131 (a)(1)(A)–(H) (listing examples of a grievance). Plaintiffs' concerns alleged here, whether related to administrative leave, financial benefits, repatriation, or even allegations that Defendants have caused FSOs' "immunity status [to be] revoked," all fall within this broad scope. Compl. ¶¶ 42–43. Even before getting to judicial review, the Board's remedial authority under the Act includes ordering previously denied

17

**App. 151**

compensation or "any other perquisite of employment," retention of any FSO "whose separation would be in consequence of the matter by which the member is aggrieved," and reinstatement. 22 U.S.C. § 4137(b). Even if such remedies were denied to an FSO, a reviewing court possesses the authority to order them.

Nor is Plaintiff AFSA's challenge "wholly collateral" to the FSA's comprehensive scheme. *AFGE*, 929 F.3d at 759. Plaintiffs "aim to obtain the same relief" that FSOs could seek in a Board proceeding, *Jarkesy*, 803 F.3d at 23, and the FSA "empower[s] the agency and the reviewing [district] court to provide the relief sought by the plaintiffs," *AFGE*, 929 F.3d at 760. A claim is not "wholly collateral" when it could be pursued through the mechanisms Congress established; indeed, it is not collateral at all.

And finally, Plaintiffs' claims are precisely within the Board's expertise to decide personnel matters affecting FSOs. *See United States v. Paddack*, 825 F.2d 504, 514 (D.C. Cir. 1987) ("[T]he prevailing customs and practices of the foreign service [are] a subject matter about which the Board has special expertise."); *Ehrman v. United States*, 429 F. Supp. 2d 61, 71 (D.D.C. 2006) (citing "[t]he FSGB's expertise in Foreign Service personnel matters"). Indeed, that is the Board's exclusive function. *See* 22 U.S.C. §§ 4135–38. Again, even though Plaintiffs' frame their claim as one under the Constitution, AFSA's claims are still subject to the statutory scheme. *AFGE*, 929 F.3d at 760, *see also supra* at Section I.A.1.a. Plaintiff AFSA's claims on behalf of FSOs are not subject to judicial review in this Court unless and until they have been pursued through the comprehensive statutory scheme Congress devised.[2]

---

[2] Plaintiffs may contend that they are subject to an immediate injury that cannot justify awaiting the administrative process called for by *Thunder Basin* and its progeny. But the only "'here-and-now' injury" that the Supreme Court has suggested permits bypassing a dedicated statutory scheme is an alleged "subjection to an unconstitutionally structured decisionmaking process," for example by an unaccountable ALJ. *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 192 (2023).

## 2. Plaintiffs Fail to Demonstrate Standing for the Broad Relief that They Seek

Additionally, Plaintiffs lack Article III standing to enjoin Secretary Rubio's January 24, 2025 order freezing funding to USAID's contractors. The standing requirement ensures "that there is a real need to exercise the power of judicial review in order to protect the interests of the complaining party." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (cleaned up). And the "standing inquiry [must be] especially rigorous when reaching the merits of the dispute would force [a court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines v. Byrd*, 521 U.S. 811, 819–20 (1997).

Under any theory of standing, "the irreducible constitutional minimum" requires that,

> (1) the plaintiff have suffered an "injury in fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) there must exist "a causal connection between the injury and the conduct complained of"; and (3) it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

*Friends of Animals v. Jewell*, 828 F.3d 989, 991–92 (D.C. Cir. 2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). Membership-based associations like Plaintiffs can establish standing in one of two ways: they can assert "associational standing" to sue on behalf of their members, *see Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977), or "organizational standing" to sue on behalf of themselves, *see People for Ethical Treatment of Animals v. U.S. Dep't of Agric. (PETA)*, 797 F.3d 1087, 1093 (D.C. Cir. 2015). In seeking to

---

Here, however, there is no adjudicatory process yet underway, let alone a claim that such a process has been "unconstitutionally structured." And in any event, the Supreme Court has "made clear . . . that 'the expense and disruption' of 'protracted adjudicatory proceedings' on a claim do not justify immediate review." *Id.* (quoting *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 244 (1980)). The D.C. Circuit more recently explained the *Axon* Court's holding in a way that, if it has any bearing here at all, cuts sharply against preliminary relief: "*Axon* at most says that, as a matter of statutory jurisdiction, a federal-court challenge to an unconstitutional *appointment* can begin before the agency acts. It does not say that every agency proceeding already underway must immediately be halted because of an asserted constitutional flaw." *Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1336 (D.C. Cir. 2024) (emphasis added).

**App. 153**

enjoin Secretary Rubio's January 24, 2025 Order, Plaintiffs fail to make the showing required for either associational standing or organizational standing.

### a. Plaintiffs Fail to Demonstrate Associational Standing as to Secretary Rubio's Order Because No Member is Injured by the Pause on Funding.

To meet the "constitutional minimum," a plaintiff must demonstrate that at least one of its members suffered an injury that is "concrete and particularized" as well as "actual or imminent." *Lujan*, 504 U.S. at 560 (citation omitted); *Summers*, 555 U.S. at 498. Plaintiffs assert that at least one of its members will be injured by this funding pause because they will be held personally liable for contracts entered into by USAID. But as the Court already correctly observed, Plaintiffs failed to demonstrate "how or why contracting officers would be held personally liable for contracts entered into by USAID." TRO at 6; *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (holding that to obtain a preliminary injunction, a plaintiff must demonstrate a "clear showing" that they are entitled to relief). Plaintiffs seemingly rely upon the Federal Acquisition Regulations (FAR 42.1303) for the notion that contracting officers can be personally liable for government contracts. Doe Decl., Exhibit E ¶ 14, ECF No. 9-6. But nothing in Section 42.1303 of the Federal Acquisition Regulations imposes personal liability on contracting officers. *See generally* FAR 42.1303. And indeed, Declarant Marocco is "aware of no instances where an individual employee of USAID would be liable in a personal capacity for the United States terminating a grant, contract, or similar program." Marocco Decl. ¶ 28. Having failed to demonstrate that they suffer any real, concrete harm from the pause in funding, Plaintiffs lack standing to enjoin it. *See Lujan*, 504 U.S. at 560–61.

Plaintiffs also maintain they suffer an emotional injury from "watching a slow speed train wreck as the agency reneges on its humanitarian commitments." TRO at 6. But to establish Article III standing, plaintiffs must show a "concrete" injury. *See Lujan*, 504 U.S. at 560–61. And courts

**App. 154**

in the D.C. Circuit have specifically recognized that "the specific fear arising from a foreign policy, no matter how severe a plaintiff's disagreement with that foreign policy may be, cannot constitute injury-in-fact without a concrete harm." *Bernstein v. Kerry*, 962 F. Supp. 2d 122, 127 (D.D.C. 2013), *aff'd* 584 F. App'x 7 (D.C. Cir. 2014).   Nor is Plaintiffs' emotional harm certainly impending.   Although Plaintiffs fear an emotional injury from a "global humanitarian crisis" caused by the funding pause, *see* Pls.' Mot. for TRO at 1, this "amounts to nothing more than speculation about future events that may or may not occur," especially given Defendants' waiver process for certain funds.   *Mahorner v. Bush*, 224 F. Supp. 2d 48, 50 (D.D.C. 2002) ("The plaintiff's allegation that he will suffer an increased chance of losing his life if President Bush initiates a military conflict with Iraq, amounts to nothing more than speculation about future events that may or may not occur."), *aff'd* 2003 WL 349713 (D.C. Cir. 2003); *Indigenous People of Biafra v. Blinken*, 639 F. Supp.3d 79, 85 (D.D.C. 2022) (concluding that the John Does who "reasonably fear[] injury at the hands of the Nigerian government"—after the United States's sale of aircrafts to the Nigerian government—failed to plead a sufficient injury-in-fact); *see also* Marocco Decl. ¶ 10.   Without injury, Plaintiffs fail to demonstrate associational standing to challenge the 90-day pause in foreign-aid funding.

### b. Plaintiffs Fail to Demonstrate Organizational Standing Because the Organizations are Not Harmed by A Pause of Foreign Assistance

Plaintiffs' failure to demonstrate associational standing as to the pause in funding cannot be saved by the doctrine of organizational standing.   To establish organizational standing, a plaintiff must demonstrate "that the defendant's actions cause a 'concrete and demonstrable injury to the organization's activities' that is 'more than simply a setback to the organization's abstract social interests.'" *Elec. Priv. Info. Ctr. v. Presidential. Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017) (quoting *Am. Soc'y for Prevention of Cruelty to Animals v.*

*Feld Ent., Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011)).  To determine whether a plaintiff's allegations are sufficient to convey organizational standing, a court must find that the plaintiff satisfied two prongs: (1) the defendants' "action or omission . . . injured [the plaintiff's] interest;" and (2) that the plaintiff "used its resources to counteract that harm."  *Id.* (quoting *PETA*, 797 F.3d at 1094).

AFGE[3] asserts that it has "devoted considerable resources in recent days responding to requests and providing guidance about the Trump administrations actions at USAID" and will need to divert resources if its members are placed on administrative leave.  Decl. of Ottis Johnson, Jr., Ex. B ¶¶ 6, 8, ECF No. 9-3.  Fundamentally, "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action."  *FDA v. All. for Hippocratic Med.*, 600 U.S. 367, 394 (2024).  And here, AFGE it does not demonstrate, or even allege, that the pause in foreign aid injures its interests.  *See id.*  Nor does it contend that it is using its resources to counteract any purported harm from the pause on foreign aid.  *See id.*  Without such a showing, Plaintiffs cannot "spend its way into standing," *All. for Hippocratic Medicine*, 600 U.S. at 294, and the Court should deny Plaintiffs' request to enjoin the pause in funding.  *Elec. Priv. Info. Ctr*, 878 F.3d at 378.

**B.  Plaintiffs Are Not Likely to Prevail on Their Constitutional Claims (Counts I and II).**

Plaintiffs' constitutional claims are barred at the outset because they are purely statutory. In Count I, Plaintiffs allege, "President Trump's actions to dissolve USAID" exceed the "numerous . . . statutes regarding USAID appropriations and oversight . . . preserving USAID's status as an independent federal agency."  Compl. ¶¶ 57, 59.  In Count II, Plaintiffs allege, "President Trump's

---

[3] AFSA does not provide a declaration asserting how it is using its resources to counteract any alleged harm, and thus, cannot demonstrate organizational standing.  *See generally* Ex. A, Decl. of Randall Chester, Ex. B, ECF No. 9-2. *Elec. Priv. Info. Ctr*, 878 F.3d at 378.

**App. 156**

actions in dissolving USAID violate the Take Care Clause because they violate duly enacted statutes establishing USAID as an independent agency." *Id.* ¶ 66. Both claims are purely statutory. The Supreme Court has made clear that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review . . . ." *Dalton v. Specter*, 511 U.S. 462, 473 (1994). This keeps with the long tradition of "distinguish[ing] between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* at 472. Plaintiffs therefore cannot prevail at the outset on the merits of Counts I or II alleging constitutional violations. There are also additional reasons why each of these two claims must fail.

### 1. Count I (Separation of Powers) Additionally Fails Because the President's Powers in the Realm of Foreign Affairs are Vast and Generally Unreviewable.

Plaintiffs argue that Defendants violated the principle of the separation of powers because "'[t]here is no statute that expressly authorizes the President to' dissolve USAID, '[n]or is there any act of Congress . . . from which such a power can be fairly implied.'" Pls.' Mot. for TRO at 10 (citation omitted). The President's actions were in fact within his authorized discretion to make. *See infra* Section I.B.2. There can be no reasonable doubt that it is the President whose authority reigns principally in the realm of foreign affairs.

Pursuant to Article II of the Constitution, as well as powers conferred by Congress in the Foreign Service Reform and Restructuring Act of 1998, the President has broad authority to attend to the foreign affairs of the nation, including by determining how foreign aid funds are used. While the Executive is "not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue," *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015), the "historical gloss on the 'executive Power' vested in Article II of the Constitution has recognized the President's 'vast share of responsibility for the conduct of our foreign relations,'" *Am. Ins.*

**App. 157**

*Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610–11 (1952) (Frankfurter, J., concurring)). Thus, "in foreign affairs the President has a degree of independent authority to act." *Id.*; *see also United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936) (The President's power in the field of international relations "does not require as a basis for its exercise an act of Congress."); *Youngstown*, 343 U.S. at 635–36, n.2 (the President can "act in external affairs without congressional authority").

The upshot is that Article II affords the President tremendous discretion over foreign affairs, and the actions at issue here must be understood against that backdrop. Again, at bottom, Plaintiffs challenge a general policy initiated by the President—and implemented by his subordinates—to *pause* general aid to confirm that those initiatives were within the national interest. That fits comfortably within the Executive Branch's unique expertise and constitutional role; and it is the sort of conduct that a federal court should be loath to disrupt, absent a valid and binding direction to the contrary.

Plaintiffs' request that this Court step in to supervise USAID's operations in some sort of receivership arrangement would create a grave separation of powers problem. This is because diplomacy and foreign relations fall within the "plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations." *Curtiss–Wright*, 299 U.S. at 319–20; *see Schneider v. Kissinger*, 412 F.3d 190, 195 (D.C. Cir. 2005) ("It cannot [] be denied that decision-making in the areas of foreign policy and national security is textually committed to the political branches."); *see Bancoult v. McNamara*, 445 F.3d 427, 433 (D.C. Cir. 2006) ("[A]n extensive list of constitutional provisions . . . entrusted foreign affairs and national security powers to the political branches[.]"); *Chi. & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) ("[T]he very nature of executive decisions as to foreign policy is political,

**App. 158**

not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative.''); *Johnson v. Eisentrager*, 339 U.S. 763, 789 (1950) (noting that the President is "exclusively responsible" for "conduct of diplomatic and foreign affairs"); *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952) (matters relating "to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference"); *Worthy v. Herter*, 270 F.2d 905, 911 (D.C. Cir. 1959) ("It is settled that in respect to foreign affairs the President has the power of action and the courts will not attempt to review the merits of what he does.  The President is the nation's organ in and for foreign affairs.''").  As such, injunctive relief related to foreign affairs "deeply intrudes into the core concerns of the executive branch" and may be awarded only upon "an extraordinarily strong showing" as to each element.  *Adams*, 570 F.2d at 954–55.  Plaintiffs are not likely to prevail on their separation of powers claim where the relief they seek would in fact result in a serious overstep of the judiciary into the exclusive domain of the Executive.

### 2.  Count II (Take Care Clause Violation) Additionally Fails Because the Take Care Clause Cannot be Used to Obtain Affirmative Relief.

Plaintiffs attempt to circumvent the limitations of the APA by asserting what can only be characterized as a broad programmatic attack against the President as well as the agency Defendants under the Take Care Clause, U.S. Const. art. II, § 3.  *See* Compl. ¶¶ 63–71 (Count II). Plaintiffs' theory is that Defendants' actions "violate the Take Care Clause because they violate duly enacted statutes establishing USAID as an independent agency," *id.* ¶ 66, and they seek both declaratory and injunctive relief to correct this alleged failure, *id.* at 28–29, Compl., Prayer for Relief (b).  It should be noted at the outset that the Government is not aware of any case that has ever held that the Take Care Clause can be used as a mechanism to obtain affirmative relief. Plaintiffs cannot prevail on their Take Care Clause claim because the Take Care Clause does not

**App. 159**

provide a cause of action against the President or any other Defendant, and this Court, in any event, has no jurisdiction to issue declaratory or injunctive relief against the President in his official capacity based on constitutional claims. *See Dalton*, 511 U.S. at 473. Moreover, even if the Clause could furnish a basis for affirmative relief, Plaintiffs seek to rely on violations of purported duties that are found nowhere in the statutes establishing USAID themselves, but rather, are based on Plaintiffs' subjective views about how to best implement and administer USAID.

In their Complaint, Plaintiffs cite *Angelus Milling Co. v. Commissioner*, 325 U.S. 293, 296 (1945) for the proposition that "[t]he Take Care Clause is judicially enforceable against presidential actions that violate or undermine statutes duly enacted by Congress." Compl. ¶ 65. But in fact, that case holds no such thing and does not even reference the Take Care Clause. *See Angelus Milling Co.*, 325 U.S. at 296 (holding only and uncontroversially that "[i]nsofar as Congress has made explicit statutory requirements, they must be observed and are beyond the dispensing power of Treasury officials"). And Plaintiffs' motion for a temporary restraining order contains no case law citations whatsoever and no substantive argument beyond conclusory allegations supporting their Take Care Clause argument. *See* Pls.' Mot. for TRO at 11–12.

Through the Take Care Clause, the Constitution vests broad, discretionary authority to "take Care that the Laws be faithfully executed" by the President. U.S. Const. art. II, § 3. Inevitably, the Laws that the President executes are those enacted by Congress. But no court has read the Take Care Clause as opening the door to any plaintiff seeking to challenge the way the President executes Congress's laws. Rather, as the Supreme Court has recognized, the duty of the President when exercising his power to see that the laws are faithfully executed is "purely executive and political," and not subject to judicial direction. *Mississippi v. Johnson,* 71 U.S. (4 Wall) 475, 499 (1866); *see Marbury*, 5 U.S. (1 Cranch) at 137 ("[T]he President is invested with

certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character."). To hold otherwise would upset our constitutional scheme of separation of powers and allow judicial superintendence over the exercise of Executive power that the Clause commits to the President alone. *Baker v. Carr*, 369 U.S. 186, 217 (1962) (Courts lack jurisdiction over a claim where there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department."); *see also Dalton*, 511 U.S. at 474–75 (judicial review of discretionary Presidential decisions "is not available"); *Lujan*, 504 U.S. at 577 (holding that it would be improper for the courts to take over the President's duty to "take Care that the Laws be faithfully executed" (quoting U.S. Const. art. II, § 3)); *Marbury*, 5 U.S. (1 Cranch) at 170 ("The province of the court is, solely, to decide on the rights of individuals, not to enquire how the executive, or executive officers, perform duties in which they have a discretion. Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court."); *Chi. & S. Air Lines*, 333 U.S. at 114 (refusing to review President's decision that "embod[ied] Presidential discretion as to political matters beyond the competence of the courts to adjudicate"); *Mississippi*, 71 U.S. at 499.

Nor does the Take Care Clause provide a basis to review the actions of subordinate Executive Branch officials. The Clause speaks only to the President, not to his subordinates, and ensures that the President is principally responsible for the actions of the Executive Branch and directly accountable to the people through the political process. *See Free Enter. Fund v. Pub. Co. Acct. Bd.*, 561 U.S. 477, 492–93 (2010) ("It is *his* responsibility to take care that the laws be faithfully executed."); *id.* at 495–97; *see also Printz v. United States*, 521 U.S. 898, 922 (1997); *Morrison v. Olson*, 487 U.S. 654, 689–90 (1988); *Clinton v. Jones*, 520 U.S. 681, 712–13 (1997) (Breyer, J., concurring). A subordinate Executive officer cannot violate the President's duty to

**App. 161**

faithfully execute the laws. To the extent Plaintiffs seek to challenge the other Federal Defendants' alleged attempt to undermine the statutes recognizing USAID, they cannot do so through the Take Care Clause, but must do so, if at all, through the APA, which in this case presents separate insurmountable obstacles for Plaintiffs.

Moreover, Plaintiffs' invocation of the Take Care Clause is particularly inappropriate as a mechanism to advance their own political and policy views. Their challenge must fail because the actions that they identify are discretionary in nature. For example, Plaintiffs challenge USAID's decision to reduce or cut funding for programs like clinics distributing HIV medication, soup kitchens in Khartoum, and rehydration salts to treat diarrhea in Zambia, *see* Compl. ¶ 23, but these are discretionary budgetary decisions made by the agency based on its experience and expertise. The discretionary nature of these programs makes them ill-suited for a Take Care Clause challenge because it is within the President's purview to interpret the statutory guidance Congress provides him as he sees fit in executing the duties of the executive branch.

### C. Plaintiffs Are Not Likely to Prevail on Their Administrative Procedure Act Claims (Counts III and IV).

Under the APA, the Court may set aside an agency action if the Court finds that challenged action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). The Court's review is "ultimately narrow and highly deferential" and focused on "ensur[ing] that the agency has 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action.'" *Am. Whitewater v. Tidwell*, 770 F.3d 1108, 1115 (4th Cir. 2014) (citations omitted). The agency need only "provide[] an explanation of its decision that includes a rational connection between the facts found and the choice made" to have its decision sustained. *Id.* (quoting *Ohio Valley Envt'l Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir.

**App. 162**

2009)).  A court "is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Plaintiffs' APA claims are not likely to succeed here because (1) they do not allege any *agency* action, (2) they do not allege any *final* action, (3) an adequate alternative remedy is available to Plaintiffs, (4) Defendants have not exceeded their statutory authority, (5) Defendants have not acted contrary to law, and (6) Defendants have not acted arbitrarily and capriciously.

### 1.  Plaintiffs Do Not Allege Any Agency Action.

Review under the APA is available only for "agency action."  5 U.S.C. § 704.  Presidential actions are not agency actions reviewable under the APA.  It is "well-settled" that Presidential action is not subject to review under the APA.  *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992) *Tulare Cnty. v. Bush*, 306 F.3d 1138, 1143 (D.C. Cir. 2002).  Because the President is not an "agency" under the APA, his actions cannot meet the APA's requirement of a "final agency action."  *Franklin*, 505 U.S. at 796; *Alexander v. Trump*, 753 F. App'x 201, 206 (5th Cir. 2018).

Because an executive order is a presidential action, and not an agency action, Plaintiffs' challenges to EO 14169 under the APA are not reviewable.  *See Louisiana v. Biden*, 622 F. Supp. 3d 267, 288 (W.D. La. 2022) (citation omitted) (holding that a challenge to EO 14008 "cannot be reviewed under the APA because the President is not an agency")*.*  Thus, Plaintiffs' claim that the President lacked authority to issue the EO, relied upon evidence which lacked veracity, and did not make appropriate findings are all non-cognizable under the APA.  *See id.*

Plaintiffs' challenge to the implementation of the EO likewise fails.  First, where the complaint is effectively seeking review of the President's action by suing an agency acting on behalf of the President, the agency actions are not reviewable under the APA.  *See Ancient Coin Collectors Guild v. CBP*, 801 F. Supp. 2d 383, 402 (D. Md. 2011) (concluding that where the Department of State was acting on behalf of the President, their actions were not reviewable under

29

**App. 163**

the APA), *aff'd*, 698 F.3d 171 (4th Cir. 2012); *Detroit Int'l Bridge Co v. Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016) (noting that "several cases have concluded that an agency's action on behalf of the President, involving discretionary authority committed to the President, is 'presidential' and unreviewable under the APA" and concluding that the action by the Department of State on behalf of the President was unreviewable under the APA).  Second, Plaintiffs do not even so much as allege that either of the defendant agencies here—USAID and State—has taken any action that could specifically be redressed.  Rather, they level a broad programmatic challenge that is not suitable for APA adjudication.

Plaintiffs' challenge to the implementation of the EO likewise fails.  First, where the complaint is effectively seeking review of the President's action by suing an agency acting on behalf of the President, the agency actions are not reviewable under the APA.  *See Ancient Coin Collectors Guild.*, 801 F. Supp. 2d at 402 (concluding that where the Department of State was acting on behalf of the President, their actions were not reviewable under the APA), *aff'd*, 698 F.3d 171 (4th Cir. 2012).

Second, Plaintiffs do not even identify a concrete action that either of the defendant agencies here—USAID and State—has taken that could specifically be redressed by a federal court.  A plaintiff must plead "an identifiable action or event." *Lujan v. Nat'l Wildlife Fed'n.*, 497 U.S. 871, 899 (1990); *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004) (APA limits judicial review to "circumscribed, discrete agency actions").  These final agency actions must be "circumscribed [and] discrete." *Norton v. S. Utah Wilderness Alliance, (SUWA)*, 542 U.S. 55, 62 (2004).  The APA does not provide for "general judicial review of [an agency's] day-to-day-operations," *Lujan*, 497 U.S. at 899, like "constructing a building, operating a program, or performing a contract," *Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186,

**App. 164**

193 (4th Cir. 2013) (cited approvingly in *Louisiana v. United States*, 948 F.3d 317, 321 (5th Cir. 2020)).  The APA thus contains "a prohibition on programmatic challenges," meaning "challenges that seek 'wholesale improvement' of an agency's programs by court decree."  *Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 490 (5th Cir. 2014) (quoting *Sierra Club v. Peterson*, 228 F.3d 559, 566 (5th Cir. 2000)).

Here, Plaintiffs' Complaint does not challenge a discrete agency action.  Rather, Plaintiffs argue that "Agency Defendants' decision to shut down USAID constitutes final agency action and is thus subject to review by this Court.  Agency Defendants' decision to dissolve USAID is evident from their actions laying off staff and contractors, halting foreign assistance funded by USAID, issuing stop work orders, closing down USAID headquarters, and taking down USAID's website."  Pls.' Mot for TRO at 12.  This is the exact type of broad programmatic challenge and supervision of an agency's day-to-day activities that courts have repeatedly ruled are impermissible under the APA.

### 2.  Plaintiffs Do Not Allege Any Final Action.

Agency action must be "final" to be reviewable under the APA.  5 U.S.C. § 704.  Agency action is final only if two requirements are met.  The agency action "must mark the consummation of the agency's decisionmaking process," and "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted).   Plaintiffs argue that "[s]huttering the operations of USAID marks the end of the decisionmaking process by the Agency Defendants to dissolve USAID—a decision that includes the immediate halting of USAID programs and operations and the firing and furloughing of USAID employees and contractors."  Pls.' Mot. for TRO at 12.  But by definition, this pause of operations to permit "reviews of such programs for programmatic efficiency and consistency with United States foreign policy, to be conducted within 90 days of

31

**App. 165**

this order," Exec. Order 14,169, cannot be a final decision.   Indeed, "[t]he responsible department and agency heads, in consultation with the Director of OMB, will make determinations within 90 days of this order on whether to continue, modify, or cease each foreign assistance program based upon the review recommendations, with the concurrence of the Secretary of State." *Id.*   In other words, the agency's decisionmaking process is ongoing—not consummated—and to the extent it one day manifests in a final agency action, that day would come, if at all, only following the review period.  The other consequences to the members of the plaintiff associations such as the placements on paid administrative leave are not ones involving the determination of rights or obligations. Administrative leave is not permanent, and those placed on leave continue to receive pay and have not been fired or told that they will be fired.  Plainly, there is no final agency action here.

### 3. The APA Does Not Provide a Cause of Action Because an Alternative Adequate Remedy is Available to Plaintiffs.

Review under the APA is available only where "there is no other adequate remedy in a court." 5 U.S.C. § 704.  The requirement that a plaintiff have "no other adequate remedy in court," *id.*, reflects that "Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action," *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988).  As the D.C. Circuit has observed, "the alternative remedy need not provide relief identical to relief under the APA, so long as it offers relief of the 'same genre.'"  *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009) (citation omitted).  Further, a remedy may be adequate even if "the arguments that can be raised [in the alternative proceeding] are not identical to those available in an APA suit."  *Elm 3DS Innovations LLC v. Lee*, No. 1:16–cv–1036, 2016 WL 8732315, at *6 (E.D. Va. Dec. 2, 2016).  If there exists an alternative adequate judicial remedy, a plaintiff lacks a cause of action under the APA.  *See Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 621 (D.C. Cir. 2017); *see also Versata Dev. Corp. v. Rea*, 959 F. Supp. 2d 912, 927 (E.D. Va. 2013) (dismissing

**App. 166**

putative APA claim under Rule 12(b)(6) because decision at issue was not a final agency action and an alternative adequate remedy existed by way of appeal to the Federal Circuit). As already described above in Section I.A.1, this is, in essence, an employment action, and there is a CSRA, FSL-MRS, or FSA remedy potentially available to Plaintiffs that is an adequate alternative. Plaintiffs are therefore barred from bringing this as an APA claim.

### 4. Defendants Have Not Exceeded Their Statutory Authority.

As explained above, the Court may set aside an agency action under the APA only if the Court finds that challenged action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). Plaintiffs first argue that "[t]he decision to shut down USAID is in excess of the Agency Defendants' statutory jurisdiction, authority, and limitations" found in the Foreign Affairs Reform and Restructuring Act of 1998 and the Further Consolidated Appropriations Act of 2024. Pls.' Mot. for TRO at 13. These arguments are unfounded.

The Foreign Affairs Reform and Restructuring Act of 1998 (FARRA) in no way prevents Defendants from acting as they have done here. Plaintiffs claim Defendants have exceeded their statutory authority by preventing USAID from operating as "an independent agency" and that "no statute or delegation of authority gives the Secretary of State, the Administrator of USAID, or any Agency Defendant the power to dissolve USAID." *Id.* These arguments appear to be borne out of a misunderstanding of the FARRA. True, Section 1413 of the FARRA established USAID as an "independent establishment." *See* 22 U.S.C. § 6563. But "[f]or the purpose of this title, 'independent establishment' means (a) an establishment in the executive branch . . . which is not an Executive department, military department, Government corporation, or part thereof, or part of an independent establishment." 5 U.S.C. § 104. In other words, USAID is "independent" in the

33

**App. 167**

sense that it is not part of another executive branch agency, but it is still firmly within Executive Branch control. No court has ever read that to mean USAID must be independent from the President, or presidential supervision.

The Further Consolidated Appropriations Act of 2024 similarly grants the President reorganization authority under certain circumstances. Plaintiffs claim that Defendants violated the provisions of that act that provide that "neither the Department of State nor USAID may use any appropriated funds to 'implement a reorganization, redesign, or other plan . . . by the Department of State, [USAID], or any other Federal department, agency, or organization funded by th[at] Act without prior consultation by the head of such department, agency, or organization with the appropriate congressional committees.'" Pls.' Mot. for TRO at 14 (quoting Pub. L. No. 118-47 § 7063(a), 138 Stat. 460 (2024)). "The Act further requires that the congressional committees must be provided a 'detailed justification for any proposed action.'" *Id.* (quoting Pub. L. No. 118-47 § 7063(a)). Plaintiffs claim Defendants violated these provisions by failing to "consult with the appropriate congressional committees or provide them with a 'detailed justification' for shutting down USAID prior to implementing any reorganization, as the statute requires." *Id.* at 14–15. But in fact, as Plaintiffs even admit, Secretary Rubio notified Congress on February 3, 2025, of his "intent to initiate consultations with [Congress] regarding the manner in which foreign aid is distributed around the world through [USAID]." Marocco Decl., Ex. C., Letter from Sec'y of State (Feb. 3, 2025) at 2. And more specifically, Secretary Rubio noted that this review "may include, among other things, the suspension or elimination of programs, projects, or activities; closing or suspending missions or posts; closing, reorganizing, downsizing, or renaming establishments, organizations, bureaus, centers, or offices; reducing the size of the workforce at such entities; and contracting out or privatizing functions or activities performed by Federal

**App. 168**

employees." *Id.* at 3.  No further notice was required here, particularly because Defendants have made no final decision regarding reorganization and have simply paused operations to permit a review process to make those decisions.  Defendants have therefore complied with the notice requirement.  And, in any event, any issue pertaining to the adequacy of the notice is a political question.  The provision is for the benefit of Congress, and it is up to Congress to determine whether it is satisfied—not the courts. If not, Congress has a number of constitutional tools at its disposal to push back on the Executive Branch.  But the federal courts have no role in that back-and-forth; and this Court should not inject itself, superintending Congress's judgment about whether a given notice *really* is sufficient to pass muster.  Instead, this is the precise sort of statutory condition that is not privately enforceable.

### 5.  Defendants Have Not Acted Contrary to Law.

Plaintiffs next argue that "Agency Defendants' decision to shut down USAID is contrary to law," Pls.' Mot. for TRO at 17, for two reasons.  First, Plaintiffs claim that agencies may only place employees on administrative leave for up to ten days pursuant to 5 U.S.C. § 6329a(b)(1). And second, they claim Defendants have violated the Prompt Payment Act, 31 U.S.C. § 3901 *et seq.*, and implementing regulations, requiring agencies to pay valid invoices by their contracted due date or within 30 days.  Both are wrong.  Although employees are generally placed on administrative leave for no more than ten days, the President's inherent Article II authority, which cannot be superseded by statute or regulations, permits him, acting through executive branch agencies, to place employees on paid administrative leave for such time as he deems appropriate.[4] This is particularly true in the realm of foreign affairs, where the President enjoys great latitude to craft policy and actions as he sees fit.  *See supra* Section I.B.1.

---

[4] And again, Plaintiffs' members have a separate statutory scheme for bringing these types of challenges.  *See supra* Section I.A.1.

**App. 169**

And as to the Prompt Payment action, although Plaintiffs allege "Defendants have caused USAID to stop payments to contractors," Pls.' Mot. for TRO at 17, they do not claim that stoppage of payments violated any actual contracts, some of which provide that the Government may withdraw from its obligations if compliance is determined to no longer be in the national interest. Moreover, Federal Acquisition Regulation permits "[s]top-work orders [to be] used, when appropriate, . . . if work stoppage may be required for reasons such as . . . realignment of programs." FAR 42.1303. And certainly, the Government could not have been more than thirty days late on any payments when Plaintiffs only allege it stopped making them on January 24, just seventeen days ago and with time to change course should the Government choose to do so.

### 6. Defendants Have Not Acted Arbitrarily and Capriciously.

Plaintiffs further argue that Defendants acted arbitrarily and capriciously by failing to articulate a "satisfactory explanation for their decision to shut down USAID." Pls.' Mot for TRO at 15. But again, Defendants have not "shut down USAID." Defendants are free to place employees on paid administrative leave—a personnel question—without having to publicly articulate any reason for doing so. And as already explained, the President's powers in the realm of foreign affairs as they relate to funding for various USAID initiatives are vast. *See supra* Section I.B.1. These are not actions reviewable under the APA in the first place, much less ones that are arbitrary and capricious.

Plaintiffs also wrongly argue that "[t]he decision to shut down USAID is also arbitrary and capricious because Agency Defendants failed to consider its harmful consequences." Pls.' Mot. for TRO at 16. This argument fundamentally misunderstands that the entire reason for the pause in activity at USAID is to permit "reviews of such programs for programmatic efficiency and consistency with United States foreign policy, to be conducted within 90 days of this order" and "[t]he responsible department and agency heads, in consultation with the Director of OMB, will

**App. 170**

make determinations within 90 days of this order on whether to continue, modify, or cease each foreign assistance program based upon the review recommendations, with the concurrence of the Secretary of State."  Exec. Order 14,169 § 3(a), (c).  President Trump and Secretary Rubio exercised their discretion to determine that it would not be possible to consider the consequences of various approaches in the absence of a temporary pause because "it is currently impossible to access sufficient information in one place to determine whether the foreign assistance policies and interests supported by appropriations are not duplicated, are effective, and are consistent with President Trump's foreign policy."  Marocco Decl., Ex. B. ¶ 2.

## II. PLAINTIFFS FAIL TO DEMONSTRATE THAT IRREPARABLE HARM WOULD RESULT IN THE ABSENCE OF A PRELIMINARY INJUNCTION.

The touchstone for injunctive relief "has always been irreparable harm."  *Sampson v. Murray*, 415 U.S. 61, 88 (1974) (quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506 (1959)).  To that end, a court can deny a motion for preliminary injunctive relief if the movant fails to demonstrate irreparable harm, "even if the other three factors entering the calculus merit such relief."  *Full Gospel Churches*, 454 F.3d at 297.  To be irreparable, the threatened injury "must be both certain and great; it must be actual and not theoretical."  *Id.* (citation omitted).  And the injury must also be "beyond remediation."  *Id.*  The mere fact that a complaint alleges a violation of a constitutional right does not automatically demonstrate an irreparable injury.  *Ayele v. District of Columbia*, 704 F. Supp. 3d 231, 239 (D.D.C. 2023) ("[T]here is no per se rule that the violation of any constitutional right is inherently irreparable.").

First, Plaintiffs assert that Defendants' recall of foreign service officers to the United States is an irreparable injury.  Although Plaintiffs' claim that their members are subject to a "mandatory recall notice" that requires FSOs to repatriate within thirty days, Pls.' Mot. for a TRO at 18, personnel are not required to return to the United States within any specific deadline, Marocco

**App. 171**

Decl. ¶ 23.  In fact, employees who are abroad, were given, and will be provided with, a choice to either stay at Post, or return to the United States.  *Id.*  Employees only must choose to make a decision to return to the United States within thirty days, and those who chose to return to the United States within that period will have their travel coordinated and financially covered by Defendants.  *Id.* ¶ 25.  But USAID also understands that employees may not be in a position to repatriate within thirty days, and to that end, it will grant case-by-case exceptions and offer extensions based on personal or family hardship, mobility or safety concerns, or other reasons.  *Id.* ¶ 26.  For example, the agency will consider exceptions based on the timing of dependents' school term, personal or familial medical needs, pregnancy, and other reasons. *Id.*

For these reasons, although the Court concluded that the expedited recalls could cause an irreparable injury for the potential damage done to "educational progress, physical safety, and family relations," TRO at 5, that finding was misplaced.  These areas are the exact considerations which Defendants will take into account in granting exemptions.  Marocco Decl. ¶ 26.  Plaintiffs thus cannot show "that they will suffer immediate and significant hardship in the absence of immediate judicial intervention."  *Church v. Biden*, 573 F. Supp. 3d 118, 136 (D.D.C. 2021) (quoting *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 50 (D.C. Cir. 1999); *see also Full Gospel Churches*, 454 F.3d at 297 (holding that to be irreparable, the threatened injury must be "certain" and "actual").

Next, Plaintiffs claim that the placement of their members on paid administrative leave constitutes an irreparable injury.  But typically, employment decisions, like a loss of employment, are only irreparable in "genuinely extraordinary situation[s]." *Sampson*, 415 U.S. at 92 n.68.  Loss of income or reputation are not such extraordinary situations.  *See id.* at 89–92; *see also id.* at 92 n.68 (declining "to define in advance of their occurrence" what might constitute extraordinary

circumstances, but ruling out "insufficiency of savings or difficulties in immediately obtaining other employment . . . however severely they may affect a particular individual"). And this case does not present such a situation, where the employees are placed on *paid* administrative leave. *See, e.g.*, *Farris v. Rice*, 453 F. Supp. 2d 76, 79–80 (D.D.C. 2006) ("[C]ases are legion holding that loss of employment does not constitute irreparable injury"). Although Plaintiffs' claim that the "mass-termination of the USAID workforce" constitutes an extraordinary circumstance, Pls.' Mot. for TRO at 20, such a situation is not before the Court. And the placement on administrative leave itself cannot not present irreparable injury, especially where any incidental harms Plaintiffs' members' face from this action can be redressed through the CSRA or FSA. *See Sampson*, 415 U.S. at 92 n.68; *supra* Section I.A.1.

Finally, Plaintiffs argue that their members are irreparably injured by the loss of USAID's security apparatuses. Pls.' Mot. for TRO at 20. Although it is possible that an employee put on administrative leave will lose access to certain USAID systems,[5] USAID presently has no plan or proposal that an employee would be shut out from access to overseas security resources at a high-risk post. Marocco Decl. ¶ 27. Thus, there is no certain, irreparable injury. *Full Gospel Churches*, 454 F.3d at 297.

Nor has AFGE demonstrated irreparable injury. The organization asserts that it will "lose hundreds of members if the forecast drastic workforce reductions occur" and will be forced to "divert significant resources from other priorities to address pressing needs of its USAID employee members." Pls.' Mot. for TRO at 21. Because the question before the Court is only the placement of employees on administrative leave, AFGE's argument is of no moment. Accordingly, because

---

[5] This is necessary to ensure the security of internal systems and that the "pause" on agency operations can truly go into effect. Marocco Decl. ¶ 27.

**App. 173**

Plaintiffs have failed to demonstrate an irreparable injury, the Court should deny their request for a preliminary injunction. *Full Gospel Churches*, 454 F.3d at 297.

### III. THE BALANCE OF EQUITIES (INCLUDING THE PUBLIC INTEREST) DOES NOT FAVOR A PRELIMINARY INJUNCTION.

An injunction also is not appropriate because the balance of the equities and the public interest tip in Defendants' favor. *See Nken*, 556 U.S. at 435 (holding that "[t]hese factors merge when the Government is the opposing party"). As an initial matter, given that Plaintiff cannot establish the first two factors necessary to obtain an injunction, "it is clear [it] cannot make the corresponding strong showings [on the second two factors] required to tip the balance in their favor." *Davis*, 571 F.3d at 1295.

But even if Plaintiff could satisfy one or both of those factors, the remaining factors weigh in Defendants' favor. *See Kim v. FINRA*, 698 F. Supp. 3d 147, 172 (D.D.C. 2023) ("[A] court can deny preliminary injunctive relief solely on the balance of equities and public interest factors even in cases, like this, involving constitutional claims."), *appeal dismissed*, 2025 WL 313965 (D.C. Cir. 2025). The public has an interest in permitting the President to take decisive action when it comes to foreign affairs. *Curtiss–Wright*, 299 U.S. at 319–20 (holding that foreign affairs fall within the "plenary and exclusive power of the President," as it is a "vast external realm, with . . . important, complicated, delicate and manifold problems"). Here, the President has determined that the "the United States foreign aid industry and bureaucracy are not aligned with American interests and in many cases antithetical to American values," and that such work "serve[s] to destabilize world peace by promoting ideas in foreign countries that are directly inverse to harmonious and stable relations internal to and among countries." *See* Exec. Order 14,169, § 1, Reevaluating and Realigning United States Foreign Aid (Jan. 20, 2025). A preliminary injunction would displace and frustrate the President's decision about how to best address that threat to

**App. 174**

foreign affairs, and the Court must give deference to the Executive Branch's "evaluation of the facts" and the "sensitive and weighty interests of national security and foreign affairs," *Holder v. Humanitarian L. Project*, 561 U.S. 1, 33–34 (2010), including "the timing of those . . . decisions." *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 74 n.28 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003).  To be sure, Defendants are acting this quickly and decisively to gain control of an organization that included some employees who had refused to comply with lawful directives by the President and Secretary, directives designed to identify wasteful or fraudulent programs or those contrary to the foreign policy interests of the United States. *See* Marocco Decl. ¶ 9.  Because the public has an interest in the executive branch effectuating foreign affairs, this final factor tips in favor of Defendants.  The Court should deny Plaintiffs requested preliminary injunctive relief.  *See Kim*, 698 F. Supp. 3d at 172.

## IV. ANY PRELIMINARY INJUNCTION SHOULD BE NARROWLY TAILORED.

For all the foregoing reasons, it would be inappropriate for the Court to issue any preliminary injunction in any form.  However, should the Court choose to do so, "an injunction must be narrowly tailored to remedy the harm shown."  *Gulf Oil Corp. v. Brock*, 778 F.2d 834, 842 (D.C. Cir. 1985).  Here, at most, Plaintiffs have attempted to show that "their members are facing irreparable injury from their placement on administrative leave."  TRO at 3.  As such, any preliminary injunction should apply no more broadly than a prohibition on placing a large number of USAID employees on simultaneous administrative leave.  While the Court may have believed the scope of the current TRO was appropriate as a very short-term stopgap measure, it would be overbroad if applied for any duration in two significant ways.  First, by preventing USAID from placing any employee on administrative leave for any reason whatsoever, it interferes with the day-to-day operations of an executive branch agency that should have available to it a full array of leave options.   Second, by preventing USAID from evacuating *any* employee from *any* host

**App. 175**

country for *any* reason whatsoever, it impermissibly prevents USAID from conducting normal evacuations where necessary for routine purposes. Thus, the current TRO, if extended to a PI, would defy established principles barring equitable relief that is "more burdensome to the defendant[s] than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Instead, the Court should limit any preliminary injunctive relief to a bar on the simultaneous placement of nearly all USAID employees on administrative leave. And should the Court decide to issue any preliminary relief, the Government respectfully requests that the Court stay its order for a short time period to permit the Government to consider whether to appeal.

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

**App. 176**

Dated: February 10, 2025                 Respectfully submitted,

                                         BRETT A. SHUMATE
                                         Acting Assistant Attorney General
                                         Civil Division

                                         ALEXANDER K. HAAS
                                         Director
                                         Federal Programs Branch

                                         LAUREN A. WETZLER
                                         Deputy Director
                                         Federal Programs Branch

                                         CHRISTOPHER R. HALL
                                         Assistant Branch Director
                                         Federal Programs Branch

                                         */s/ Christopher D. Edelman*
                                         CHRISTOPHER D. EDELMAN
                                         DOROTHY M. CANEVARI
                                         Trial Attorneys
                                         United States Department of Justice
                                         Civil Division, Federal Programs Branch
                                         1100 L St. NW
                                         Washington, DC 20005
                                         Phone:
                                         Email:

                                         *Counsel for Defendants*

**App. 177**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AIDS VACCINE ADVOCACY COALITION, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DEPARTMENT OF STATE, *et al.*, <br><br> Defendants. | Civil Action No. 1:25-cv-00400 |

**[PROPOSED] ORDER**

The Court, having fully considered Plaintiffs' motion for a temporary restraining order

(Dkt. 13), and the record herein, hereby **ORDERS** that Plaintiffs' motion is **DENIED**.

IT IS SO **ORDERED**, this__day of February, 2025.


_____
Amir H. Ali
UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AIDS VACCINE ADVOCACY COALITION, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 25-00400 (AHA) |
| UNITED STATES DEPARTMENT OF STATE, *et al.*, | |
| *Defendants*. | |
| GLOBAL HEALTH COUNCIL, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 25-00402 (AHA) |
| DONALD J. TRUMP, *et al.*, | |
| *Defendants*. | |

**STATUS REPORT REGARDING TEMPORARY**
**RESTRAINING ORDER COMPLIANCE**

1.  The Court entered an order on the evening of February 13, 2025 ("TRO"), temporarily restraining Defendants Marco Rubio, Peter Marocco, Russell Vought, the U.S. Department of State (Department), the U.S. Agency for International Development (USAID), and the Office of Management and Budget from "enforcing or giving effect to Sections 1, 5, 7, 8, and 9, of Dep't of State, Memorandum 25 STATE 6828 (Jan. 24, 2025) and any other directives that implement Sections 3(a) and 3(c) of Executive Order Number 14169, 'Reevaluating and Realigning United States Foreign Aid' (Jan. 20, 2025), including by suspending, pausing, or otherwise preventing the

1

**App. 179**

obligation or disbursement of appropriated foreign-assistance funds in connection with any contracts, grants, cooperative agreements, loans, or other federal foreign assistance award that was in existence as of January 19, 2025; or issuing, implementing, enforcing, or otherwise giving effect to terminations, suspensions, or stop-work orders in connection with any contracts, grants, cooperative agreements, loans, or other federal foreign assistance award that was in existence as of January 19, 2025." TRO at 14.

2.    The Court noted Defendants' representation "that some contracts at issue may include terms that allow them to be modified or terminated in certain circumstances." *Id.* The Court concluded "it would be overbroad to enjoin Defendants from taking action to enforce the terms of particular contracts, including with respect to expirations, modifications, or terminations pursuant to contractual provisions." *Id.* The Court thus "ORDERED that nothing in this order shall prohibit the Restrained Defendants from enforcing the terms of contracts and grants." *Id.* at 15.

3.    In addition, the Court ordered Defendants to "take all steps necessary to effectuate this order" and to "provide written notice of this order to all recipients of existing contracts, grants, and cooperative agreements for foreign assistance." *Id.*

4.    Finally, the Court required Defendants to "file a status report by February 18, 2025, apprising the Court of the status of their compliance with this order, including by providing a copy of the written notice described above." *Id.*

5.    Defendants have worked diligently to comply with the Court's order during the two business days and three-day holiday weekend that have passed since the Court entered its order.[1]

---

[1]    The Office of Management and Budget's compliance with the Court's order is explained in the attached declaration of Thomas Mackin Williams. *See* Ex. 2.

**App. 180**

6.    As the attached declaration of Peter Marocco explains, the Department and USAID have used their best efforts to distribute notice of the Court's order to the recipients of existing contracts, grants, and cooperative agreements for foreign assistance. *See* Ex. 1, ¶¶ 4, 20-22.

7.    Mr. Marocco's declaration also explains that the Department and USAID issued directions to contracting officers and grants officers during the holiday weekend to comply with the TRO. *See id.* ¶¶ 5, 22.

8.    Additionally, in light of the TRO, the Department of State and USAID have begun an analysis of the thousands of contracts, grants, and cooperative agreements on which action was taken during the almost four weeks between the issuance of the Executive Order and the Court's order. The Department and USAID have endeavored to determine the effect of the Court's temporary restraint on the Executive Order and the Secretary of State's January 24, 2025, direction as well as the effect of the Court's exception for enforcing the terms of contracts or grants.

9.    Thus far, that analysis has confirmed that at least substantially all of the terminations, suspensions, and stop-work orders issued on USAID contracts, grants, and cooperative agreements were allowed by the terms of those instruments or terms implicitly incorporated into those instruments. *See* Ex. 1 ¶¶ 6, 9-19.  USAID has not yet identified a termination, suspension, or stop-work order issued on a USAID contract, grant, or cooperative agreement that was not allowed by the terms of those instruments or terms implicitly incorporated into those instruments.

10.    The Department's parallel analysis shows that a large share of the terminations, suspensions, and stop-work orders issued on the Department's contracts, grants, and cooperative agreements was allowed by those instruments' terms or terms implicitly incorporated into those instruments. *See id.* ¶¶ 23-30.

3

**App. 181**

11. The Department has identified about 70 contracts and 6,824 grants suspended or on which a stop-work order has issued where the contract or grant instrument may not *expressly* authorize a suspension or stop-work order. *See id.* ¶¶ 26, 28. Given the number of contract and grant instruments involved, review is ongoing. Nevertheless, the Department understands it is entitled to terminate each of these contracts and grants under the express terms of those contracts and grants, or under terms implicitly incorporated into those instruments. *See id.*

12. To the extent there are instruments that do not explicitly or implicitly address suspensions and stop-work orders, the Department likewise understands it may terminate, suspend, or issue a stop-work order on those contracts and grants under its own authorities—independent of any authority conferred by the now-temporarily enjoined Executive Order or January 24, 2025, memorandum. *See id.* ¶¶ 24-28.

13. As was true before the Court's order, the Department of State and USAID continue to disburse substantial funding for foreign assistance. Mr. Marocco's declaration notes USAID's intent to disburse more than $250 million under foreign assistance awards this week. *See id.* ¶ 15.

14. The Court's order permits Defendants to exercise their rights under the terms of contracts and grants, which Defendants understand to include express and implied terms. The Court's order, however, appears to be silent on Defendants' exercise of authorities under statutes, regulations, and other legal authorities (not including the Executive Order and January 24, 2025, memorandum). Defendants have not read the TRO to temporarily restrain the exercise of those authorities. Defendants perceive no meaningful difference between exercising authority conferred by contracts, grants, and cooperative agreements and authority conferred by statutes, regulations, and other legal authorities. *See, e.g.*, *New York v. Trump*, No. 25-cv-39, Dkt. 107, at 3 (D.R.I. Feb. 12, 2025) (clarifying that a temporary restraining order did not apply to "acting to terminate

**App. 182**

funding when that decision is based on *actual authority in the applicable statutory, regulatory, or grant terms*") (emphasis in original).

15. Out of an abundance of caution, Defendants are bringing this point to the Court's attention. To the extent Defendants' understanding of the Court's order is incorrect, Defendants respectfully request that the Court *sua sponte* modify its TRO—or permit Defendants to file an appropriate motion requesting such modification—so that the TRO explicitly does not restrain Defendants from exercising their legal authorities independent of the Executive Order and January 24, 2025, memorandum with respect to contracts, grants, cooperative agreements, loans or other federal foreign assistance awards.

16. Any such modification, should it prove necessary, would be consistent with the temporary restraining order entered in *New York v. Trump*, No. 25-cv-39 (D.R.I.), against a January 27, 2025, memorandum issued by the Office of Management and Budget. As the Plaintiffs in *AIDS Vaccine Advocacy Coalition* acknowledge, the *New York* temporary restraining order contained an "except[ion]" for conduct consistent with "applicable authorizing statutes, regulations, and terms." Complaint ¶ 36, *AIDS Vaccine Advocacy Coalition*, No. 1:25-cv-400, Dkt. 1 (Feb. 10, 2025). To the extent it does not already, Defendants respectfully submit that the same exception should apply to the temporary restraining order entered in this case.

17. If Defendants have misunderstood the Court's order, this modification may also prevent Defendants' termination of additional contracts and grants. The Department suspended instead of terminating the contracts and grants discussed in paragraphs 11-12, *supra*, and opted to consider the possibility of continuing these contracts and grants during the 90-day review process ordered by the Executive Order. If not permitted to rely on independent authorities to suspend or stop work under foreign assistance awards, the Department will need to review each of these

**App. 183**

contracts and grants individually and may issue additional terminations, as allowed by the relevant contract and grant terms, to achieve compliance with the Court's order.

18. To the extent the Court intended to restrain Defendants from exercising their authorities under statutes, regulations, and other legal authorities not mentioned in the TRO, and the Court is unwilling to modify its order to exclude the exercises of those authorities, Defendants respectfully request that the Court convert its temporary restraining order into a preliminary injunction to permit Defendants to take an immediate appeal, stay its order pending any appeal authorized by the Solicitor General, and comply with Federal Rule of Civil Procedure 65(c) by requiring Plaintiffs to post security for any taxpayer funds wrongfully distributed during the pendency of the Court's Order.

**App. 184**

Dated: February 18, 2025                    Respectfully submitted,

                                           BRETT A. SHUMATE
                                           Acting Assistant Attorney General

                                           ERIC J. HAMILTON
                                           Deputy Assistant Attorney General

                                           ALEXANDER K. HAAS
                                           Director

                                           LAUREN A. WETZLER
                                           Deputy Director

                                           CHRISTOPHER R. HALL
                                           Assistant Branch Director

                                           */s/ Indraneel Sur*
                                           INDRANEEL SUR
                                           CHRISTOPHER D. EDELMAN
                                           Senior Counsels
                                           United States Department of Justice
                                           Civil Division, Federal Programs Branch
                                           1100 L St. NW
                                           Washington, DC 20005
                                           Phone: (202) 616-8488
                                           Email: indraneel.sur@usdoj.gov

                                           *Counsel for Defendants*

**App. 185**

# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AIDS VACCINE ADVOCACY COALITION, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF STATE, *et al.*, <br><br> *Defendants*. | Civil Action No. 25-00400 (AHA) |
| GLOBAL HEALTH COUNCIL, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, *et al.*, <br><br> *Defendants*. | Civil Action No. 25-00402 (AHA) |

## DECLARATION OF PETE MAROCCO

I, PETE MAROCCO, declare the following to be true and correct:

Background

     1.    This declaration is based on my personal knowledge and information provided to me in my official capacity by others.

     2.    Since Thursday, January 30, 2025, I have performed the duties and functions of Deputy Administrator of the United States Agency for International Development (USAID). Since January 20, 2025, I have also served as the Director of Foreign Assistance at the Department of State (State). Previously, I served as a U.S. Marine and a Deputy Assistant Secretary at both the Department of State and the Department of Defense. Additionally, I served on a special assignment as the Senior Advisor for Intelligence and Security to the Secretary of Commerce and served as the Assistant to the Administrator at USAID, overseeing the Bureau for Conflict Prevention and Stabilization.

1

**App. 187**

3.      On January 20, 2025, President Trump exercised his constitutional authority to conduct foreign policy to issue an executive order directing a pause on "United States foreign development assistance" and requiring agencies to conduct a review of existing foreign aid programs to determine whether they should be modified or terminated.   Exec. Order No. 14169 § 3(a), 90 Fed. Reg. 8619 (Jan. 20, 2025).  On January 24, the Secretary of State issued a direction (25 STATE 6828) implementing the executive order and pausing all new obligations of foreign assistance funded by State or USAID pending review. In addition, for existing foreign assistance awards, the Secretary directed contracting officers and grant officers to immediately issue stop work orders, consistent with the terms of the relevant award, until such time as the Secretary shall determine, following a review.

4.      I am aware that this Court entered a temporary restraining order (TRO) on February 13, 2025, against State, USAID, and OMB.  USAID and State provided notice of the Court's order to contract and grant counterparties, attached hereto as Exhibits A (USAID Notice) and B (State Notice).  *See also* https://sam.gov/opp/f71de5a84d7044b09d48f8f7550a1edc/view.

USAID

5.      Over the holiday weekend, USAID's Chief Acquisition Officer and Senior Procurement Executive notified USAID acquisition and assistance staff of the TRO. That notice states that: "[U]ntil further notice, all Contracting and Agreement Officers should not enforce any Agency directive issued under Executive Order 14169 and the Secretary's implementing memorandum that requires the generalized stop work, suspension, or pause of Agency contracts, grants, or other federal assistance awards." *See* Exhibit C.

6.      As described below, USAID paused foreign aid payments in order to facilitate a targeted, case-by-case review of foreign assistance programs. The case-by-case review remains ongoing.  Consistent with the TRO, USAID will continue to exercise Agency discretion to individually examine outgoing payments pursuant to a new Payment Integrity Review Process, and, as appropriate, to enforce the terms and conditions, including provisions allowing the Agency to issue stop work or termination notices, contained in USAID awards and contracts.

7.      Historically, USAID had limited and insufficient payments control or review mechanisms. Certifying officers pushed out payments—or grantees directly drew down on letters of credit or other facilities—and the system automatically processed those payments, without sufficient opportunity for payments integrity or program review. Under that legacy system, USAID employees were unable to adequately identify basic information about specific payments, such as the programs with which specific payments were associated.  Moreover, following the Executive Order, USAID staff were unable—for several days in some instances, including for urgent national security and humanitarian aid payments—to identify which payments were associated with particular enumerated accounts or programs.  These system deficiencies and inability to provide complete information led to serious questions about waste, fraud, abuse, and even illegal payments. The lack of sufficiently effective controls of an integrated payments review process has led to significant payment delays in some cases and has placed certain USAID programs at risk of catastrophic failure.

2

**App. 188**

8.    To correct these deficiencies, USAID is in the process of adopting a comprehensive review process for assuring payment integrity and determining that payments under existing contracts and grants are not subject to fraud or other bases for termination.  Payments will be released as they are processed through this process, which will require a clear link between outgoing payments and specific USAID programs or appropriated accounts. Any entities that are dissatisfied with individualized payment determinations have recourse both within USAID and in the courts. *See infra* ¶ 17.  This payment-by-payment processing is especially important because in the absence of such a program, certain USAID funding recipients could obtain lines of credit on certain grants and contracts, allowing them to rapidly drain the full amount of an award without proper review or accountability to the authorizing agency.  *See* 48 C.F.R. 732.4; Automatic Directives System (ADS) 636.3.2.1.

9.    In accord with the Executive Branch's robust statutory and constitutional authority over the provision of foreign aid, USAID has broad authority under the specific instruments themselves and existing statutes and regulations to suspend and terminate foreign assistance funding obligations.

10.    For example, substantially all of USAID's foreign assistance grants and cooperative agreements authorize the agency to "suspend or terminate [the] award in whole or in part" if the Agency "determines that continuation of all or part of the funding for a program . . . would not be in the national interest of the United States or would be in violation of an applicable law." 2 CFR 700.14.  Likewise, USAID grants permit suspension "pending a decision to resume or terminate the award." 2 CFR 700.1; *see also* ADS Chapter 303 MAB § M10.[1]

11.    Substantially all USAID contracts are terminable by the Agency for convenience, pursuant to the Federal Acquisition Regulation (FAR) and USAID regulations.[2] *See* 48 C.F.R. 52.249-1(authorizing termination for convenience when termination is "in the Government's interest"); *id.* 49.502(a)-(b), 52.249-4, 52.249-6(a)(1).  Termination for convenience terms are mandatory and are implied when not included explicitly.  *K-Con, Inc. v. Sec'y of Army*, 908 F.3d 719, 724 (Fed. Cir. 2018).  *Cf. M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1304 (D.C. Cir. 1971) ("[e]ven if [a] clause [permitting the government to terminate a contract for its own convenience] is omitted from a particular contract it will be incorporated into the contract by operation of law since it is required by [the Armed Services Procurement Regulations] and this requirement has the force and effect of law").  Likewise, applicable FAR regulations also authorize contract suspension in certain circumstances.  48 C.F.R. 42.1305(a)-(b), 52.242-14, 52.242-15.

12.    Since January 22, 2025, USAID has terminated 498 contracts, grants, and related funding instruments. Other contracts, grants, and related funding instruments were separately placed on stop work, *i.e.*, were paused or suspended, consistent with the terms and rights of the

---

[1] Other authorities may apply to non foreign assistance grants. For example, government grants generally may be terminated "[b]y the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities."  2 CFR 200.340.

[2] Some contracts may have even more permissive termination rights. *See, e.g.*, ADS Chapter 308 MAB § M9 (permitting termination at will for certain Agency contracts).

**App. 189**

specific awards or contracts at issue. USAID has not quantified those contracts, grants, and related funding instruments that were placed on stop work.

13.    The USAID Front Office has generally terminated or suspended instruments after a multistep, case-by-case review process, and those instruments are not being reinstated because the terminations were, to the best of my knowledge, permissible under the terms of the contracts. First, senior USAID staff and political appointees identify specific awards they believe should be evaluated for termination or suspension.  Those recommendations are submitted to me, and I evaluate them in consultation with the Office of Foreign Assistance at the Department of State. This review may in some cases include outreach to relevant intergovernmental and external stakeholders.  We examine the relevant program and account; potential operational and programmatic consequences of termination; and reliance interests and the effect on third parties including USAID contractors, partners, and counterparties.  We then submit a list of awards for suspension or termination to Secretary Rubio who is performing the duties and functions of (PTDO) USAID Administrator, in consultation with senior staff, conducts an independent review that considers, among other things, American foreign policy and national interests.

14.    Awards or obligations approved for termination or suspension are transmitted to the Agency's Office of Acquisition Assistance (OAA), which disseminates them to contracting officers and program officers.  Before any termination or suspension notice is finalized, OAA consults USAID's regional and pillar bureaus to obtain additional stakeholder input and discuss potential consequences.  Bureaus have the option of requesting that senior leadership pause or reconsider their decision.  As a result of this process, more than 20 awards or obligations previously slated for termination were not terminated by USAID.

15.    Since the TRO, the Agency has authorized at least 21 payments that are in total worth more than $250 million and are expected to be paid this week. These payments are on contracts, grants, cooperative agreements, loans, or other federal foreign assistance awards that were in existence as of January 19, 2025. They are not covered by waivers issued before the TRO was issued.

16.    To the best of my knowledge, the 498 contracts, grants, and related instruments terminated by the USAID Front Office thus far were subject to termination either under particular contract terms or implicitly incorporated terms.  In summary, the relevant instruments – which were terminated for national interest or convenience – were identified by the following policy bases and Administration priorities:

    a.    DEIA Oriented Awards

    b.    Unnecessary Reliance on Third-Party Consultants and Contractors or Organizations with Accountability Issues

    c.    Operational Expenses and/or General Waste

    d.    Unrelated to USAID's Core Mission or Delivery of Life-Saving Aid

    e.    Regime Change, "Civic Society" or "Democracy Promotion"

**App. 190**

     f.     Sustainability and Climate Change

     g.     Inconsistency with Unrelated Executive Orders or Presidential Directives

17.    To the extent that counterparties believe they are entitled to reimbursement for past work or other remedies under their funding instruments, USAID is prepared to entertain such claims and seek resolution.  Indeed, there is an established mechanism for counterparties to submit disputes for resolution to USAID. *See, e.g.*, ADS Chapter 303 MAB § M10(e) & M13 (disputes and appeals). If counterparties believe they have claims that resolution process does not vindicate, established mechanisms are available for them to pursue any claims, including through settlement and in certain cases through judicial review in the Civilian Board of Contract Appeals or the United States Court of Federal Claims.  *See, e.g.*, 48 C.F.R. 49.201 (providing rules for settlement of certain contract claims); 2 C.F.R. 200.343 (effects of suspension and termination); *cf. Pennsylvania Dep't of Pub. Welfare v. United States*, 48 Fed. Cl. 785, 790 (2001) (discussing Tucker Act jurisdiction).

18.    Consistent with its constitutional, statutory, regulatory, and instrument-specific authorities, and pursuant to the terms of the TRO stating that Defendants may still "enforce[e] the terms of contracts or grants," USAID intends to continue its case-by-case review of existing contracts and grants. Following its review process and consistent with the terms and conditions of the relevant instruments, USAID intends to terminate instruments that the PTDO Administrator determines are inconsistent with the national interests or USAID's mission.

19.    USAID also issued numerous stop-work orders.  Those orders directed work stoppages pursuant to specified contract and grant terms.

<u>State</u>

20.    The Department of State drafted a notice to alert the Department's contractors and grant recipients of this Court's TRO. That notice is attached as Exhibit B. The Department posted it on SAM.gov, the official platform for federal contracting notices, at approximately 11:35 pm on Friday, February 14th.  All domestic federal contractors, as well as overseas federal contractors whose contract award values exceed $30,000, are required to be registered in SAM.gov.  It is the Department of State's experience that the overwhelming number of registered contractors also sign-up for automatic push notifications of all Department SAM.gov postings. The Department is in the process of identifying the population of overseas contractors that are not registered in SAM.gov that may require notification and will push notification via email once that is determined. Many federal assistance recipients are also registered on SAM.gov and would have received the notice in a similar manner.

21.    For other overseas grant recipients, the Department conducted a data pull from the Department's internal grants system identifying available email addresses for federal assistance award recipients. The notice was directly emailed to 12,000 grants recipients beginning at approximately 11:35 pm on Friday February 14th and finishing by 1:20 am on Saturday February 15th. The Department also conducted a separate data pull from an internal database for overseas grants and sent a second round of emails to 2000 grants recipients at approximately 1:26pm on Sunday, February 16th.

**App. 191**

22.    On Monday, February 17, the Department issued FAMA-2025-05(A) and Acquisition Alert 25-05-01, Exhibits D and E.  These notices directed grant officers and contracting officers, respectively, to cease any further actions to newly pause or terminate any Foreign Assistance-funded Federal Assistance Awards at this time.

23.    The Department of State has broad authority under statutes, regulations, and specific instruments to terminate funding obligations.  Among other things:

      a.    Again, as with USAID, State may terminate contracts for convenience.  48 C.F.R. Part 49.502; *see G.L. Christian & Associates v. United States*, 312 F.2d 418 (Ct. Cl. 1963).  Additionally, many contracts include stop-work or similar provisions.  *See* 48 C.F.R. 42.1305(b); 48 C.F.R. 52.242-15.

      b.    As with USAID, State may terminate grants "if an award no longer effectuates the program goals or agency priorities." 2 CFR 200.340(a)(4).

24.    As described below, State broadly paused or terminated foreign assistance awards and foreign assistance payments in a manner consistent with its legal authorities and relevant contract or grant instruments.  Almost immediately, however, Secretary Rubio issued a number of programmatic waivers of the pause that permitted broad categories of foreign aid to flow where consistent with foreign policy priorities of the United States. Other, more targeted waivers followed. Given these waivers, Plaintiffs' characterization of a "blanket" pause is inaccurate.

25.    Since January 20th, the Department has terminated 25 foreign assistance-funded contracts. Those contracts were all terminated for convenience, which is a mandatory term that must be included in all contracts governed by the Federal Acquisition Regulation (FAR).

26.    Additionally, the Department has issued stop work or suspension orders for at least 711 additional contracts. Each of these stop work or suspension orders is consistent with the President's and Secretary of State's authority. In addition, the majority of these orders were issued pursuant to terms included in the contracts themselves (*e.g.*, FAR 52.242-15 Stop Work Order clause) or pursuant to bilaterally negotiated modifications. There are approximately 70 contracts that did not contain stop work or suspension terms and for which no contractual modifications have been able to be negotiated thus far. The Department would be entitled to terminate each of these contracts under those contracts' terms if it chooses to do so. *See* ¶ 24, *supra*.

27.    Since January 20th, the Department has terminated 733 foreign assistance-funded grants. Those grants were terminated pursuant to their terms, which permit awards to be terminated if they no longer effectuate the program goals or agency priorities (consistent with 2 CFR 200.340(a)(4)).

28.    In addition, since January 20th, the Department has issued guidance to suspend approximately 6,824 grants. The Department did not wish to exercise its right under the terms of the grant documentation to terminate those grants; instead, it wished to examine these grants individually, consistent with the review directed by President Trump and the Secretary of State, to ascertain whether those grants should be continued. As with the approximately 70 contracts identified in paragraph 26, *supra*, the suspension of these 6,824 grants is consistent with the Secretary of State's statutory authorities.

**App. 192**

29.    If the Department were not permitted to leave the approximately 70 contracts and 6,824 grants in a suspended status under its legal authorities—authorities that the Department understands were not enjoined by the TRO—then the Department would consider terminating these contracts and grants on a case-by-case basis. Restarting work now would impose additional expenses, and if these grants are subsequently paused again, further expenses still. These escalating costs may exhaust or even exceed the federal assistance funds obligated under individual contracts or grants, which might leave State with no choice but to terminate the awards even if the ongoing review by the Secretary determines that they should be continued.

30.    As is the case with USAID, *see supra* ¶ 17, to the extent that counterparties of State believe they are entitled to reimbursement for past work or other remedies under their particular funding instruments, State is prepared to entertain such claims and seek resolution. *See* Contracts Disputes Act, 41 U.S.C. § 7101, *et seq.* Likewise, there is an established mechanism for counterparties to submit disputes for resolution. And if counterparties believe the claims process is not sufficient, mechanisms exist to pursue, settle, and in certain cases litigate such claims through judicial review in the Civilian Board of Contract Appeals or the United States Court of Federal Claims. *See, e.g.*, 48 C.F.R. 49.201 (providing rules for settlement of certain contract claims); 2 C.F.R. 200.343 (effects of suspension and termination); *cf. Pennsylvania Dep't of Pub. Welfare v. United States*, 48 Fed. Cl. 785, 790 (2001) (discussing Tucker Act jurisdiction).

31.    Following the issuance of the Secretary's pause on foreign assistance but before the Court entered its TRO, the Department implemented revisions to the system for disbursements of foreign assistance funds related to foreign assistance awards.

32.    The Administration, upon review of USAID disbursements, including many that were unauthorized, discovered there were insufficient review mechanisms before disbursements of funds to ensure policy compliance. Payments were being input by contracting and certifying officers, and processed by Treasury, HHS, State or others without sufficient explanation or checks, and automatically released for disbursement resulting in hundreds of payments not in compliance with policy.

33.    To ensure payments are both in compliance with policy and have the appropriate management controls, the Administration implemented new procedures. These new procedures require employees submitting requests for payments for contract services or grants to have documentary evidence from a senior official to validate compliance with policy. Controls were also established within the financial systems to ensure disbursements were not submitted without evidence of compliance, tracking each payment to authorization. These internal controls are intended to assure payment integrity and determine that payments under existing contracts and grants are not subject to fraud or other bases for termination.

34.    The Administration has established improved process and system controls, consolidating functions in State's Bureau of Comptroller and Global Financial Services (CGFS), and providing additional training and guidance to over a thousand staff members involved in administrative management. In addition to enhancing the integrity of payments, improved processes are required to eliminate the inefficiency and risk inherent in the broken and nearly untraceable system that existed as of January 20, which, for example, required dozens of people in three agencies to see a single payment through to completion. As described earlier in this

**App. 193**

declaration, USAID is implementing similar procedures to strengthen management controls and oversight.

35.    Since January 24, the U.S. Department of State has authorized or requested the disbursement of $112.9 million in foreign assistance funding and anticipates the new payment process will accelerate outlays as staff members become more efficient with the new process and procedures.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 18th day of February, 2025

/s/ Peter Marocco

PETE MAROCCO

**App. 194**

Exhibit A

---------- Forwarded message ---------
From: USAID Industry Liaison <USAID-Industry-Liaison@subscribe.usaid.gov>
Date: Sat, Feb 15, 2025 at 3:27 PM
Subject: Special Notice to All Foreign Assistance Recipients
To: <lrapier@usaid.gov>



On February 13, 2025, the Court hearing the case of *AIDS Vaccine Coalition v. U.S. Department of State* and *Global Health Council v. Trump* entered a temporary restraining order against the Department of State, USAID, and OMB, that contains the following operative language:

"Consistent with the reasoning above, it is hereby ORDERED that Defendants Marco Rubio, Peter Marocco, Russell Vought, the U.S. Department of State, the U.S. Agency for International Development, and the Office of Management and Budget (the "Restrained Defendants") and their agents are temporarily enjoined from enforcing or giving effect to Sections 1, 5, 7, 8, and 9 of Dep't of State, Memorandum, 25 STATE 6828 (Jan. 24, 2025) and any other directives that implement Sections 3(a) and 3(c) of Executive Order Number 14169, "Reevaluating and Realigning United States Foreign Aid" (Jan. 20, 2025), including by:

- suspending, pausing, or otherwise preventing the obligation or disbursement of appropriated foreign-assistance funds in connection with any contracts, grants, cooperative agreements, loans, or other federal foreign assistance award that was in existence as of January 19, 2025; or

- issuing, implementing, enforcing, or otherwise giving effect to terminations, suspensions, or stop-work orders in connection with any contracts, grants, cooperative agreements, loans, or other federal foreign assistance award that was in existence as of January 19, 2025.

"It is further hereby ORDERED that nothing in this order shall prohibit the Restrained Defendants from enforcing the terms of contracts or grants.

"It is further hereby ORDERED that the Restrained Defendants shall take all steps necessary to effectuate this order and shall provide written notice of this order to all

recipients of existing contracts, grants, and cooperative agreements for foreign assistance.

"It is further hereby ORDERED that the Restrained Defendants shall file a status report by February 18, 2025, apprising the Court of the status of their compliance with this order, including by providing a copy of the written notice described above."

We will provide further guidance on this TRO as soon as we are able to do so.

**Subscribe**

   

Manage Subscriptions  |  Unsubscribe All  |  Help

Update your subscriptions, modify your password or email address, or stop subscriptions at any time on your Subscriber Preferences Page. You will need to use your email address to log in. If you have questions or problems with the subscription service, please visit subscriberhelp.govdelivery.com.

This service is provided to you at no charge by United States Agency for International Development.

This email was sent to lrapier@usaid.gov using govDelivery Communications Cloud on behalf of: United States Agency for International Development · 1300 Pennsylvania Avenue NW · Washington, DC · 20004



Exhibit B

**From:** Linder, Carla E **On Behalf Of** aopeapfagrantspolicy@state.gov
**Sent:** Saturday, February 15, 2025 12:28 AM
**To:** A/OPE/FA Grants Policy <aopefagrantspolicy@state.gov>
**Subject:** Special notice to Foreign Assistance Recipients

On February 13, 2025, the Court hearing the case of *AIDS Vaccine Coalition v. U.S. Department of State* and *Global Health Council v. Trump* entered a temporary restraining order against the Department of State, USAID, and OMB, that contains the following operative language:

"Consistent with the reasoning above, it is hereby ORDERED that Defendants Marco Rubio, Peter Marocco, Russell Vought, the U.S. Department of State, the U.S. Agency for International Development, and the Office of Management and Budget (the "Restrained Defendants") and their agents are temporarily enjoined from enforcing or giving effect to Sections 1, 5, 7, 8, and 9 of Dep't of State, Memorandum, 25 STATE 6828 (Jan. 24, 2025) and any other directives that implement Sections 3(a) and 3(c) of Executive Order Number 14169, "Reevaluating and Realigning United States Foreign Aid" (Jan. 20, 2025), including by:

•    suspending, pausing, or otherwise preventing the obligation or disbursement of appropriated foreign-assistance funds in connection with any contracts, grants, cooperative agreements, loans, or other federal foreign assistance award that was in existence as of January 19, 2025; or

•    issuing, implementing, enforcing, or otherwise giving effect to terminations, suspensions, or stop-work orders in connection with any contracts, grants, cooperative agreements, loans, or other federal foreign assistance award that was in existence as of January 19, 2025.

"It is further hereby ORDERED that nothing in this order shall prohibit the Restrained Defendants from enforcing the terms of contracts or grants.

"It is further hereby ORDERED that the Restrained Defendants shall take all steps necessary to effectuate this order and shall provide written notice of this order to all recipients of existing contracts, grants, and cooperative agreements for foreign assistance.

"It is further hereby ORDERED that the Restrained Defendants shall file a status report by February 18, 2025, apprising the Court of the status of their compliance with this order, including by providing a copy of the written notice described above."

We will provide further guidance on this TRO as soon as we are able to do so.

Exhibit C

---------- Forwarded message ---------
From: **Jami Rodgers** <jrodgers@usaid.gov>
Date: Mon, Feb 17, 2025 at 8:43 PM
Subject: Notice to USAID A&A Staff to Suspend Blanket Pause on Foreign Assistance
To: m.oaamaillistusaid@usaid.gov <m.oaamaillistusaid@usaid.gov>, mission-fs-coaos-all@usaid.gov <mission-fs-coaos-all@usaid.gov>, allexosmissionmaillist@usaid.gov <allexosmissionmaillist@usaid.gov>, usaidoaafsnnetwork@usaid.gov <usaidoaafsnnetwork@usaid.gov>
CC: Kenneth Jackson <kensjackson@usaid.gov>, Joel Borkert <jborkert@usaid.gov>, Jason Gray <jasgray@usaid.gov>, Aiyong (Paul) Seong <aseong@usaid.gov>, Lynn Winston <lwinston@usaid.gov>, Rebecca Krzywda <rkrzywda@usaid.gov>, Jeremy Lewin <jlewin@usaid.gov>, Nadeem Shah <nshah@usaid.gov>, Chitahka Floore <cfloore@usaid.gov>, Gregory Marchand <gmarchand@usaid.gov>, m.oaa.comms@usaid.gov <m.oaa.comms@usaid.gov>


Dear Colleagues,


On February 13, 2025, the U.S. District Court for the District of Columbia, in cases titled *AIDS Vaccine Coalition v. U.S. Department of State* and *Global Health Council v. Trump,* entered a temporary restraining order (TRO) against the Department of State, USAID, and OMB that prevents "enforcing or giving effect to Sections 1, 5, 7, 8, and 9 of Dep't of State, Memorandum, 25 STATE 6828 (January 24, 2025) and any other directives that implement Sections 3(a) and 3(c) of Executive Order Number 14169, 'Reevaluating and Realigning United States Foreign Aid' (January 20, 2025)," including by "suspending, pausing, or otherwise preventing the obligation or disbursement of appropriated foreign-assistance funds in connection with any contracts, grants, cooperative agreements, loans, or other federal foreign assistance award that was in existence as of January 19, 2025," or "issuing, implementing, enforcing, or otherwise giving effect to terminations, suspensions, or stop-work orders in connection with any contracts, grants, cooperative agreements, loans, or other federal foreign assistance award that was that was in existence as of January 19, 2025." The Court's order does not "prohibit [USAID] from enforcing the terms of contracts or grants."


**Accordingly, until further notice, all Contracting and Agreement Officers should not enforce any Agency directive issued under Executive Order 14169 and the Secretary's implementing memorandum that requires the generalized stop work, suspension, or pause of Agency contracts, grants, or other federal assistance awards.**


The Front Office is in the process of adopting a comprehensive review process for assuring payment integrity and determining that payments under existing contracts and grants are not subject to fraud or other bases for termination. These new case-by-case review processes will be consistent with

the TRO. Further guidance on the new payments integrity and grants and contracts review process is forthcoming.


Sincerely,


**Jami J. Rodgers, CPCM**

U.S. Agency for International Development (USAID)

Chief Acquisition Officer and Senior Procurement Executive

Director, Bureau for Management Office of Acquisition and Assistance (M/OAA)

Exhibit D

# BUREAU OF ADMINISTRATION
# Global Acquisition

**FEDERAL ASSISTANCE MANAGEMENT ADVISORY NUMBER 2025-05 (A)**

SUBJECT: Amended Guidance on Pause of Foreign Assistance-funded Federal Assistance Awards

**1. Scope:**

This policy applies to all foreign assistance-funded federal assistance awards.

**2. Background and Purpose:**

On February 13, 2025, the Court hearing the case of *AIDS Vaccine Coalition v. U.S. Department of State and Global Health Council v. Trump* entered a temporary restraining order (TRO) against the Department of State, USAID, and OMB.  In connection with the litigation, Grants Officers (GOs) must not take further action to effectuate terminations or suspensions (including those pursuant to previously issued guidance) at this time. Notification of the TRO was provided via a SAM.Gov notice posted on February 14, 2025. notice posted on February 14, 2025.

**3. Policy:**

GOs must cease further action to pause any new obligations or disbursements of foreign assistance funds (including those pursuant to previously issued guidance) at this time. However, GOs may continue any actions under any exceptions or waivers granted by the Secretary of State, including to lift a previously issued suspension, or to certify the disbursement of a payment.

**4. Authority:**

Global Acquisition (A/GA) prescribes policies, regulations, and procedures for the award and administration of Federal financial assistance agreements.

**5. Effective Date**

This Federal Assistance Management Advisory is effective as of February 17, 2025.

**6. Questions:**

Please send questions regarding this policy via e-mail to aopefagrantspolicy@state.gov, or refer to the A/GA/APD/FA/FAPD SharePoint at https://usdos.sharepoint.com/sites/A-OPE/FA/SitePages/Home.aspx for additional policy resources, training materials, useful forms, and points of contact.

If payment\disbursement questions come about as a result of this pause, please reach out to CGFS\FAFM at FAFM@state.gov.

Sharon D. James

Managing Director, Acquisitions Policy Directorate

U.S. Department of State

Issuance Date: February 17, 2025

_____

Exhibit E



# BUREAU OF ADMINISTRATION
# Global Acquisition

**Acquisition Alert 25-05-01**

**TO:**      All Contracting Activities

**FROM:**   Sharon James
             Managing Director
             Acquisition Policy Directorate, U.S. Department of State

**SUBJECT:** **Guidance to Suspend the Pause of Foreign Assistance-Funded Acquisitions**

**1. Introduction:**  The purpose of the amended Acquisition Alert (AA) is to instruct all Contracting Activities to cease all actions to further comply with the guidance provided under the initial AA 25-05, Guidance on Pause of Foreign Assistance-Funded Acquisitions, or with any other guidance directing the termination or suspension of foreign assistance funded contracts.

**2. Background:**  On February 13, 2025, the Court hearing the case of *AIDS Vaccine Coalition v. U.S. Department of State* and *Global Health Council v. Trump* entered a temporary restraining order (TRO) against the Department of State, USAID, and OMB. Notification of the TRO was provided to the contractor community via a [SAM.Gov](SAM.Gov) notice posted on February 14, 2025.

**3. Acquisition Impact:**  In connection with the litigation, Contracting Officers (COs) must not take further action to effectuate terminations or suspensions (including those pursuant to previously issued guidance) at this time.

**4. Action Required:**  COs must cease further action to pause any new obligations or disbursements of foreign assistance funds to contractors (including those pursuant to previously issued guidance) at this time.  However, COs may continue any actions under any exceptions or waivers granted by the Secretary of State, including to lift a previously issued suspension, or to certify the disbursement of a payment.

5. **Effective Date:** This Acquisition Alert is effective upon issuance.

6. **Expiration Date:** This Acquisition Alert expires when future guidance is issued.

7. **Additional Information:** Questions regarding this Acquisition Alert may be directed to AcquisitionPolicy@state.gov.

8. **Attachments:** None.

9. **Referenced Documents:  N/A**

# EXHIBIT 2

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AIDS VACCINE ADVOCACY COALITION, *et al.*, | |
|       Plaintiffs, | |
| v. | Civil Action No. 1:25-cv-00400 |
| UNITED STATES DEPARTMENT OF STATE, *et al.* | |
|       Defendants. | |
| GLOBAL HEALTH COUNCIL, *et al.*, | |
|       Plaintiffs, | |
| v. | Civil Action No. 1:25-cv-00402 |
| PRESIDENT DONALD TRUMP, *et al.*, | |
|       Defendants. | |

## DECLARATION OF THOMAS MACKIN WILLIAMS

I, Thomas Mackin Williams, pursuant to 28 U.S.C. 1746, hereby declare as follows:

1.     This declaration is based on my personal knowledge and information provided to me in my official capacity by others.

2.     I am a Program Associate Director in the Office of Management and Budget and have been responsible for international programs, including the foreign aid portfolio, since I joined OMB on January 30, 2025. In my most recent previous government service, I performed the duties of Deputy Under Secretary of Defense for Policy at the Department of Defense from 2020 to 2021. From 2018 to 2020, I served at the National Security Council as Deputy Assistant to the President and Senior Director for European Affairs.

3.     On January 20, 2025, President Trump issued an executive order directing a pause on "United States foreign development assistance" and requiring agencies to conduct a review of

1

existing foreign aid programs to determine whether they should be modified or terminated.   Exec. Order No. 14169 § 3(a), 90 Fed. Reg. 8619 (Jan. 20, 2025) ("the Executive Order").  The Executive Order directed OMB to enforce the pause through its apportionment authority.  *See id.*  The Executive Order further provided that "responsible department and agency heads, in consultation with the Director of OMB, will make determinations within 90 days of this order on whether to continue, modify, or cease each foreign assistance program based upon the review recommendations, with the concurrence of the Secretary of State."  *Id.* § 3(c).

4.    I am aware that this Court entered a temporary restraining order (TRO) on February 13, 2025, that enjoins Defendants from taking certain actions relating to foreign assistance funds.

5.    OMB does not make obligations or disbursements of foreign assistance, with the exception of funds for Foreign Military Financing, which are obligated upon apportionment by operation of law.  OMB has not exercised the apportionment authority referenced in the second sentence of § 3(a) of the Executive Order to enforce the pause.

6.    OMB does not understand the TRO to prevent it from engaging in consultations required by § 3(c) of the Executive Order.  Because the TRO did not "enjoin any aspect of the Government's ability to conduct a comprehensive internal review of government programs," TRO at 13, OMB intends to continue to consult with department and agency heads regarding whether to continue, modify, or cease each foreign assistance program pursuant to § 3(c) of the Executive Order.

7.    Finally, because OMB is not a party to any contracts, grants, or cooperative agreements for foreign assistance, OMB has not notified the recipients of existing contracts, grants, and cooperative agreements for foreign assistance about the TRO.

I declare that the foregoing is true and correct to the best of my knowledge.


/s/ Thomas Mackin Williams                                2/18/2025

Thomas Mackin Williams                                    DATE

2

**App. 211**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AIDS VACCINE ADVOCACY COALITION, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF STATE, *et al.*, <br><br> *Defendants*. | Civil Action No. 25-00400 (AHA) |
| GLOBAL HEALTH COUNCIL, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, *et al.*, <br><br> *Defendants*. | Civil Action No. 25-00402 (AHA) |

## DEFENDANTS' MOTION TO STAY THE COURT'S
## FEBRUARY 25 ORDER PENDING APPEAL

Defendants respectfully seek a stay pending emergency appellate relief of the Court's oral ruling and minute order of February 25, 2025, granting Plaintiffs' emergency motions to enforce the Court's temporary restraining order (Plaintiffs' oral Emergency Motion to Enforce Temporary Restraining Order, Civil Action No. 25-cv-400; Plaintiffs' Emergency Motion to Enforce Temporary Restraining Order, ECF No. 36, Civil Action No. 25-cv-402). Because the Court's order requires Defendants to disburse nearly $2 billion dollars by 11:59 PM tomorrow, including payments that Defendants may have a reasonable basis to dispute, a stay is warranted pending requests for immediate appellate relief. *See* Fed. R. App. P. 8(a) ("A party must ordinarily move

1

first in the district court for . . . a stay of the judgment or order of a district court pending appeal.").[1]

In particular, by prohibiting Defendants from conducting a payment integrity review process (including pursuant to statutorily or contractually conferred authority to suspend or terminate contracts or grants) and by ordering the United States to make specific payments amounting to monetary damages in violation of the United States's sovereign immunity, the Court's orders raise serious constitutional concerns and infringe on the Government's interests in a manner that amply warrant a short stay.[2]

"[T]he factors regulating the issuance of a stay are . . . (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). Here, each of the factors favor a stay as to two aspects of the February 25 Order: Its unreasonably short time limitation for compliance, and its failure to grapple with the limits on the Court's subject-matter jurisdiction.

In an oral ruling following today's hearing on Plaintiffs' motions to enforce, the Court ordered Defendants to pay all invoices and letter of credit drawdown requests on all contracts for work completed prior to the entry of the Court's TRO on February 13, 2025, and to permit and promptly pay letter of credit drawdown requests and requests for reimbursements on grants and assistance agreements for work completed prior to the entry of the Court's TRO on February 13— all by 11:59 p.m. on February 26, 2025. Defendants are likely to succeed on appeal from the Court's order for several reasons.

To start, it is not possible for Defendants to comply. As the attached declaration explains,

---

[1] Pursuant to Local Rule 7(m), counsel for Defendants conferred with counsel for Plaintiffs before filing this motion. Plaintiffs oppose the relief requested herein.

[2] Defendants did not have an opportunity to brief sovereign immunity at an earlier stage of the proceeding because the Court ruled on Plaintiffs' TRO motions before Defendants submitted any written response. *See Woodyard v. Harper*, 162 F. Supp. 3d 3, 6 (D.D.C. 2016) ("[D]oubts about subject matter jurisdiction may be raised at any time[.]").

**App. 213**

"[t]hese payments cannot be accomplished in the time allotted by the Court and would instead take multiple weeks." Marocco 2/25 Decl. ¶ 4, attached hereto as Exhibit A. "Restarting funding related to terminated or suspended agreements is not as simple as turning on a switch or faucet." *Id.* ¶ 14. "Rather, the payment systems of USAID and State are complicated and require various steps before payments are authorized to be disbursed by the U.S. Treasury, Department of Health and Human Services, and/or the Department of State, involving multiple agencies." *Id.* The payment system has five steps and "takes time." *Id.*

In addition, the February 25 Order vastly undermines and hence irreparably injures the President's authority. Although Defendants disagree with the court's original orders, those orders at least appeared to respect the Executive Branch's authority to decline to award federal funds based on considerations separate from the President's Executive Order and the Secretary's memorandum. Although those orders stated that the government was "temporarily enjoined from enforcing or giving effect" to relevant portions of the Secretary's memorandum, "including by" "suspending, pausing, or otherwise preventing the obligation or disbursement of appropriated foreign-assistance funds," they nonetheless also made clear the government was not prohibited "from enforcing the terms of contracts or grants." ECF No. No. 17, at 14-15; *see also* ECF No. 30, at 5-6; ECF No. No. 34, at 2-3. And none of those orders required the government to fulfill any specific reimbursement requests, much less to do so on a specific timeline.

The February 25 Order is far different. When informed that the government had not immediately provided all of the funds that plaintiffs have requested, the district court concluded that the government had violated the court's earlier restraining order. But in the Secretary's memorandum announcing the pause, the Secretary also made clear that the pause would not apply to payments for "legitimate expenses incurred prior to the date of" the memorandum "under existing awards" or to "legitimate expenses associated with stop-work orders." 25 STATE 6828, at ¶ 12. To the extent that the bulk of plaintiffs' complaints relate to invoices seeking payments for such expenses, any delay in processing the relevant payments is thus not attributable to the pause—and not implicated by the court's order enjoining that pause.

**App. 214**

Nonetheless, in the name of enforcing its earlier order, the district court ordered the government to, "[b]y 11:59 p.m." tomorrow, "pay all invoices and letter of credit drawdown requests on all contracts for work completed prior to the entry of the Court's TRO on February 13." Hearing Tr. 57-58. And the court ordered the government to "permit and promptly pay letter of credit drawdown requests and requests for reimbursements on grants and assistance agreements." *Id.* at 58.

By requiring payment of enormous sums in less than 36 hours, the February 25 Order intrudes deeply into the prerogatives of the Executive Branch and the discretion committed to the President under Article II. The order apparently requires the Government to expend taxpayer dollars without regard to any processes for ensuring that the expenses are legitimate—even though Executive Branch leadership harbors concerns about the possibility of waste and fraud and is in the process of developing revised payment processing systems to address those concerns.

As the record explains, relevant agency leadership have determined that, "[h]istorically, USAID had limited and insufficient payments control or review mechanisms," which led to payments being made "without sufficient opportunity for payments integrity or program review." ECF No. 22-1, at 2. Agency leadership has determined that those "system deficiencies and inability to provide complete information" has "led to serious questions about waste, fraud, abuse, and even illegal payments." *Id.* As a result, "USAID is in the process of adopting a comprehensive review process for assuring payment integrity and determining that payments under existing contracts and grants are not subject to fraud." *Id.* at 3. Agency leadership has determined that payments "will be released as they processed through" this comprehensive review structure. *Id.*[3]

Similarly, agency leadership has "implemented revisions to the system for disbursements

---

[3] Defendants respectfully disagree that, in the hearing, "Counsel for defendants . . . acknowledged that the Court's TRO forecloses giving effect at least to any suspension or termination which took place before the Court's temporary restraining order on February 13, 2025." 2/25 Hrg. Tr. 56:18-21. Defendants understand the TRO to apply to the pause policy of the Executive Order and Secretary of State's directive. *Id.* 40:1-5 ("I thought I was responding to the Court's question about the concept of a blanket."). Defendants further understand the TRO to not apply to exercises of authority under legal authority like statutes and regulations or contractual and grant rights.

4

**App. 215**

of foreign assistance funds" from the State Department. ECF No. 22-1, at 7. Those "new procedures" are intended to "ensure payments are both in compliance with policy and have the appropriate management controls"—controls that "are intended to assure payment integrity and determine that payments under existing contracts and grants are not subject to fraud or other bases for termination." *Id.* As with USAID, the record reflects that the State Department has begun processing legitimate payments through these new systems—including "authoriz[ing] or request[ing] the disbursement of $112.9 million" between January 24 and February 18. *Id.* at 8.

The February 25 Order has now entirely disregarded the Executive Branch's serious interest in ensuring that payments are made only for legitimate expenses and in curbing any waste, fraud, and abuse. By requiring that the Government make payments by 11:59 p.m. tomorrow— less than 36 hours after entry of the court's order—the February 25 Order has effectively precluded the Government from scrutinizing the relevant invoices or conducting a payment-by-payment analysis to ensure the legitimacy of all payments. As a result, the Government faces the possibility of being forced to expend enormous sums of taxpayer dollars without knowing whether those payments are for legitimate expenses—and with no sure possibility of the Government's recovering the funds if it later determines that particular payments did reflect waste, fraud, or abuse.

By contrast, the February 25 Order is not necessary to protect Plaintiffs from irreparable harm. To the contrary, if Plaintiffs believe that the government has failed to timely make payments on contracts or quasi-contractual funding instruments, Plaintiffs may be able to pursue monetary claims through specified administrative processes and in the Court of Federal Claims. Plaintiffs thus have a potential opportunity to recover whatever damages they may suffer if Defendants wrongly fail to make prompt payment on their legitimate claims. Such a "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, [weighs] heavily against a claim of irreparable harm." *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (alteration in original) (quotation omitted).

Defendants are also likely to succeed on the merits because the February 25 Order requiring

5

**App. 216**

the Government to fulfill specific requests for payments on contracts and grants within the next day was not jurisdictionally proper. The Court's earlier orders—and Plaintiffs' underlying claims in these actions—relate only to the permissibility of the Government's implementation of an asserted "blanket" funding "freeze." Defendants have significant concerns about whether there is any proper basis for the exercise of jurisdiction over those claims, as necessary to support the Court's earlier orders. See ECF No. 33, at 11-21. But regardless of the answer to that question, there can be no doubt that the February 25 Order—which requires Defendants to make *specific* payments on *particular* contracts and grants—is not a proper exercise of this Court's subject-matter jurisdiction.

As explained, Defendants intend to pay legitimate expenses incurred under contracts and grants before January 24.Defendants are attempting to ensure, prior to payment, that each request is legitimate. And to the extent that Plaintiffs believe that the Government has violated the terms of those instruments by delaying payment while it conducts this review—or to the extent that Plaintiffs ultimately have a dispute with the Government about whether any particular legitimacy determination is correct—they may well have a remedy. But that remedy is not a suit in District Court under the APA.

To the contrary, the Federal Government is "immune from suit in federal court absent a clear and unequivocal waiver of sovereign immunity." *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1105 (D.C. Cir. 2022). And although the APA provides "a limited waiver of sovereign immunity for claims against the United States" seeking non-monetary relief, that waiver does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *Id.* (quotation omitted).

In these actions, Plaintiffs failed to demonstrate that their request for an order requiring the Government to promptly make specific payments on grants or contracts is not foreclosed by those principles. To the contrary, although the specifics of the relevant funding instruments may differ among the Plaintiffs, it is generally the case that such requests for payment—even if cast as APA claims—may not be brought in District Court. Thus, to the extent that some of the funding

6

**App. 217**

instruments at issue in this case are procurement contracts, any dispute about payment on those contracts would be governed by the Contract Disputes Act, which permits suit only following administrative exhaustion in the Civilian Board of Contract Appeals or the United States Court of Federal Claims. *See* 41 U.S.C. §§ 7103, 7104, 7105. Those remedies operate to the exclusion of any suit in district court under the APA. *See A&S Council Oil Co. v. Lader*, 56 F.3d 234, 239-42 (D.C. Cir. 1995).

For other instruments, the Tucker Act may provide a remedy. That statute states that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a). The D.C. Circuit "ha[s] held that the Tucker Act impliedly forbids" the bringing of "contract actions" against "the government in a federal district court." *Albrecht v. Committee on Employee Benefits of the Federal Reserve Employee Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004) (quotation omitted). And indeed, the Tucker Act's preclusive effect may not be limited to funding instruments described by Plaintiffs as contracts. Instead, to the extent that the government has implemented its grant programs by "employ[ing] contracts to set the terms of and receive commitments from recipients," then the proper recourse for any asserted violation of those grant terms may also be a "suit in the Claims Court for damages relating to an alleged breach." *Boaz Housing Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021).

In all events, the February 25 Order requiring Defendants to make specific contractual or grant-based payments exceeds the Court's subject-matter jurisdiction. Yet this Court declined to even consider those jurisdictional problems before entering its order. Instead, although the Court recognized that Defendants had articulated many of these principles in its "briefing at the preliminary injunction stage," it believed that the argument was "not sufficiently developed to be considered" before entering its order. Hearing Tr. 57; *see also* Hearing Tr. 46-47 (government pressing the jurisdictional argument at the hearing).

The District Court's refusal to consider its own jurisdiction before entering its order was incorrect. For one, the court scheduled a telephone hearing at 11 a.m. on February 25 after

7

receiving the GHC Plaintiffs' emergency motion on the evening of February 24; in those circumstances Defendants can hardly be faulted for failing to file a brief in advance of the hearing—particularly when, as the District Court recognized, Defendants had already developed this argument in its preliminary injunction brief, which was filed last week. Regardless, even if Defendants had failed to brief that issue at all, that would not have relieved the court of its "obligation to assure" itself that it "ha[d] jurisdiction" to enter its payment-requiring order. *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017). That "obligation extends to sovereign immunity"—including issues regarding whether the APA's waiver applies or is impliedly displaced by other statutes like the Tucker Act—because that question "is jurisdictional in nature." *Id.* (quotation omitted).

At a minimum, the Court's order should be stayed as to parties who are not properly before the Court, and who have no valid claim to the enforcement of an injunction to which they have not demonstrated their own entitlement. *Gill v. Whitford*, 585 U.S. 48, 73 (2018) (holding that judicial remedies "must be tailored to redress the plaintiff's particular injury"); *see also Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring) ("Whether framed as injunctions of 'nationwide,' 'universal,' or 'cosmic' scope, these orders share the same basic flaw—they direct how the defendant must act toward persons who are not parties to the case."); *see Trump v. Hawaii*, 585 U.S. 667, 712-21 (2018) (Thomas, J., concurring). And of course, that broad relief increases the amount of money that Defendants are effectively required to pay without regard to internal payment controls, making it substantially harder for Defendants to properly conduct a payment-by-payment analysis for waste, fraud, and abuse by increasing substantially the number of requests that Defendants must process within the next day.

## CONCLUSION

For the foregoing reasons, the Could should stay its February 25, 2025 order granting Plaintiffs' motion to enforce the TRO pending appeal.

**App. 219**

Dated: February 25, 2025                    Respectfully submitted,

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division

ALEXANDER K. HAAS
Director
Federal Programs Branch

LAUREN A. WETZLER
Deputy Director
Federal Programs Branch

CHRISTOPHER R. HALL
Assistant Branch Director

*/s/ Indraneel Sur*
INDRANEEL SUR (D.C. Bar 978017)
Senior Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Phone: (202) 616-8488
Email: indraneel.sur@usdoj.gov

*Counsel for Defendants*

9

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AIDS VACCINE ADVOCACY COALITION, *et al.*, <br><br> *Plaintiffs,* <br><br> v. <br><br> UNITED STATES DEPARTMENT OF STATE, *et al.*, <br><br> *Defendants.* | Civil Action No. 25-00400 (AHA) |
| GLOBAL HEALTH COUNCIL, *et al.*, <br><br> *Plaintiffs,* <br><br> v. <br><br> DONALD J. TRUMP, *et al.*, <br><br> *Defendants.* | Civil Action No. 25-00402 (AHA) |

I, Pete Marocco, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am over 18 years of age, of sound mind, and otherwise competent to make this declaration. This declaration is based on my personal knowledge and information provided to me in my official capacity by others.

2. Since Thursday, January 30, 2025, I have performed the duties and functions of both Deputy Administrators of the United States Agency for International Development ("USAID" or the "Agency"). I manage the day-to-day operations at USAID including personnel matters and operations. Since January 20, 2025, I have also served as the Director of Foreign Assistance at the Department of State. Previously, I served as a United States Marine and as a Deputy Assistant

1

Secretary at both the Department of State and the Department of Defense. Additionally, I served on a special assignment as the Senior Advisor for Intelligence and Security to the Secretary of Commerce and served as the Assistant to the Administrator at USAID, overseeing the Bureau for Conflict Prevention and Stabilization.

A. Payment Process

3. The Department of State and USAID are currently completing individualized review of contracts and grants. Determining the appropriate course for existing contracts and grants is a cumbersome, multi-step process. Once an initial decision is made concerning whether to lift a stop-work order or terminate a contract, under authority conferred by both the contracts/grants and independent legal authority, State and USAID began the process of lifting stop work orders and terminating others as quickly as possible with the resources they have.

4. The Court's latest order enforcing the TRO and requiring payments to issue by February 26 at 11:59pm will have drastic consequences. For USAID, I estimate the Court's order would require the payment of at a minimum **$1.5 billion dollars** across approximately 2,000 outstanding and newly created payment requests. For State, I estimate the Court's order would require the payment of at a minimum **$400 million** in outstanding payment requests. These payments cannot be accomplished in the time allotted by the Court and would instead take multiple weeks.

5. USAID led a rigorous multi-level review process that began with spreadsheets including each contract, grant, or funding instrument where each line of the spreadsheeting reflected one such agreement and included information about the recipient, the amount of the award, the subject matter, and a description of the project that often included the location of the project. Policy staff first performed a first line review to determine whether the individual agreement was in line with foreign policy priorities (and therefore could potentially be continued) or not (and presumptively

2

could be terminated as inconsistent with Agency priorities and the national interest). Those recommendations were reviewed by a senior policy official to confirm that, for awards recommended for termination, that ending the program was consistent with the foreign policy of the United States and the operations and priorities of the Agency. The results of that review were routed to me for further review, including of institutional and diplomatic equities. As one example, a presumptively terminated agreement might be continued for a variety of foreign policy reasons, such as the location of the project or the general subject matter, or the judgment and foreign policy perspectives of the second line reviewer. Termination recommendations approved by me ultimately received the Secretary of State's review. The Secretary of State's personal involvement confirmed that termination decisions were taken with full visibility into the unique diplomatic, national security, and foreign policy interests at stake vis-à-vis foreign assistance programs.

6. At the Department of State, the review process for grants began with compiling a list of all the grants administered by the Department. This list was then sorted by the Department bureau responsible for each grant. The Senior Bureau Official (Assistant Secretary or equivalent) in each Bureau was tasked with reviewing each grant within his or her Bureau and providing a recommendation to the Office of the Secretary on whether to continue or terminate the grant. If the Bureau desired to continue the grant, a justification was required. Bureau responses were due at 12 noon on Friday, February 21st. Upon receipt, the Office of the Secretary would review the recommendations and made additional edits pursuant to the Secretary's instructions. As with USAID, this resulted in recommendations that receive the Secretary of State's ultimate review. The Secretary of State's personal involvement confirms that, for example, work of particular importance to the United States' relationships with particular foreign nations is not impaired. With respect to contracts, the Department of State ran a similar process. At both USAID and State, there

3

are also other lists of contracts and grants that were sent to the leadership at USAID for termination through a content search or other means and these were approved for termination.

7.  USAID and State terminated instruments according to their terms and conditions, consistent with the provisions previously cited to the Court. *See 2/18 Marocco Decl.* (No. 25-cv-400 Dkt. 22-1) ¶¶ 9-11, 23 (citing the various authorities available for State and USAID to terminate agreements).  The review processes described above is ongoing with respect to the ten plaintiffs' grants and contracts, and is also ongoing with respect to other grants and contracts.

8.  With respect to the ten plaintiff entities, State and USAID identified the contracts, grants, or funding instruments to which they are counterparties. Each is subject to termination under the provisions cited previously as well as the terms of those agreements.  The outcome of the case-by-case review with respect to the ten plaintiffs' agreements is still ongoing.

9.  For terminated agreements of the Plaintiffs (and others)—as specified in Section 12(d) of the January 24, 2025 ALDAC, (a section that this Court did not enjoin), and the February 5, 2024 ALDAC, see Exhibit B, providing further guidance on Section 12—USAID and State will make payments for legitimate expenses incurred prior to January 24, 2025 as specified in that Guidance. In doing so, they will require only the same basic materials any rational counterparty would normally require—an invoice that documents verifiable work that the Government actually committed to fund in its contract, grant, or other instrument, payments entries that actually match said invoices, and receipts, vouchers or other supporting information that explains the purpose and amount of funds sought. For payments that meet those basic prerequisites, State and USAID are committed to payment of money owed under the relevant instrument. Further, a description of the steps related to initiating payments to counterparties is described in Part C.

10. Separately, terminated contracts, grants, and funding instruments of Plaintiffs (and others)

each have close-out procedures that the counterparty may utilize regarding any wind down payments related to the termination of these agreements. A description of these close-out procedures is described below in Part D.

B. Status of Payments

11. In Section 12 of his January 24, 2025 ALDAC, the Secretary of State approved a waiver of the pause for any "legitimate expenses incurred prior to the date of this ALDAC [January 24, 2025] under existing awards or legitimate expenses associated with stop-work orders". Jan. 24, ALDAC, Exh. A at ¶ 12(d).

12. On February 5, 2025, Secretary Rubio issued an additional ALDAC to provide "Technical Guidance for Waivers Approved by the Secretary of State and the Director of Foreign Assistance." Feb. 5, 2025 ALDAC, 25 STATE 10948, attached as Exh. B. As relevant to the pre-January 24, 2025, obligations under existing contracts and legitimate expenses associated with stop-work orders, "'Legitimate expenses' must include allowable and allocable costs under the terms and conditions of the applicable award or contract that are approved by the Director of Foreign Assistance after submission for consideration …." *Id.* ¶ 9. The disbursement of obligated funds that are excepted under Paragraph 12(d) is addressed in Paragraph 13 of the February 5 ALDAC.

13. On February 25, 2025, amended FAQs were issued regarding the exception process. See State & USAID Foreign Assistance Pause Exception Process and Disbursement FAQs (Feb. 25, 2025), attached as Exh. C. Among other things, these FAQs, streamlined the clearance process, see id. ¶ 1, provided additional guidance regarding disbursements, *id.* ¶¶ 13-14, and explained what is required for authorized payments under Paragraph 12(d) of the January 24 ALDAC, *id.* ¶ 16, and explained what costs associated with stop-work orders may be incurred. *Id.* ¶¶ 17-18. While the payment of pre-January 24, 2025 obligations for "existing awards or legitimate expenses

**App. 225**

associated with stop-work orders, bureaus/offices **do not** need to get approval of the Director of Foreign Assistance but should obtain approval from the Senior Bureau Official (SBO) of the relevant bureau. *Id.* ¶ 16. USAID expects to pay individual funding recipient Plaintiffs' invoices for legitimate expenses incurred under Paragraph 12(d). State expects to pay individual funding recipient Plaintiffs' invoices for legitimate expenses incurred under Paragraph 12(d).

C.  Delays in Restarting Payments

14. Restarting funding related to terminated or suspended agreements is not as simple as turning on a switch or faucet. Rather, the payment systems of USAID and State are complicated and require various steps before payments are authorized to be disbursed by the U.S. Treasury, Department of Health and Human Services, and/or the Department of State, involving multiple agencies, which are not a party to this litigation. The approval process must comply with the Federal Managers Financial Integrity Act and the Federal Financial Management Improvement Act. At a high level, their payment system is: (1) working with vendors, (2) creating new payment requests, (3) getting them certified, (4) getting them re-certified, and (5) effectuating payments electronically through the Department of the Treasury, Health and Human Services or if overseas through the Department of State, or a combination thereof. The documentary evidence necessary to ensure compliance with policy added time to a process that already required the necessary controls, including appropriate separation of duties, to validate an invoice, review for compliance with appropriation law and accounting standards, and make the final payment. Adding an additional documentation step into an existing complex process, takes time to before it is fully efficient. Training for the staff, adjusting the system, and developing data management tools all resulted in a backlog of payments which is being addressed.

15. At times, both State and USAID could process several thousand payments each day. The

**App. 226**

overseas mission adds further complexity with the use of 244 overseas banks and 133 different currencies.  For payments, State and USAID rely on multiple methods depending on location on execution and the type of payment and/or agreement.

16. For State domestic payments, most contract payments are now run through Treasury's Invoice Processing Platform (IPP).  For IPP, vendors submit invoices electronically into IPP, which are then routed through bureau/program defined approvals, including the contracting officer representative (COR).  Once approved in IIP, State invoices are interfaced into State's Global Financial Management System (GFMS) for certification and payment. USAID domestic invoices are routed through the GLAAS contract management system and ultimately ported into the Phoenix accounting system. From Phoenix, payments are directed to GFMS or similar systems operated by Treasury or the Health and Human Services (HHS). Some payment packages, given certain complexities, continue to be submitted and routed manually.

17. For domestic grants, both State and USAID utilizes HHS' payment management system (PMS) to process grant payments.  Bureau program personnel enter approvals and payment instruction into PMS and these activities are recorded into GFMS. State's Comptroller staff are now approving program office requests before final payment.  For overseas, invoices for contracts and/or grants funded and executed at posts are received at post and either reviewed, certified, and paid by post or sent through State's Comptroller for centralized voucher examination, certification, and payment in dollars and foreign currency. As part of system of new controls, all overseas payments will be certified by this central unit. USAID payments are similarly being manually reviewed and approved by a specialized task-force of payments specialists, before receiving a final check to ensure the validity and completeness of supporting documentation. Restarting payments on the 10 plaintiffs' contracts and grants would be burdensome and take time to make sure they

**App. 227**

are legitimate.

18. Moreover, at USAID, my understanding is that some payment requests are not supported by any documentation or, where there is documentation, inadequate documentation to show actual work performed, compliance with the terms of the relevant contract or award, and the like. In addition and for example, my understanding is that payments to associations have been submitted without the names of specific members who have done work or even the names of vendors associated with the awards or payments. Nor are payment requests all submitted in the same format—often they do not contain consistent numbers or consistent supporting documentation— and payments have been requested across multiple different payment systems, administered by partner agencies, which process payments differently and use different computer systems to identify and release payments. Payments have also been made across different timetables.

19. As a result, for a majority of the plaintiff requests, there are currently no payments prepared and sitting in the USAID system that can be readily sent to recipients. Making the payments the Court has ordered will generally require an entirely new process for each that includes the creation of a new payment, certification, approval at the accounting level, preparation in the payment computer, and recertification for disbursement.

20. At USAID, contractual counterparties and grant recipients frequently submit payment requests before they are due under the governing instruments. The Court's Order appears to now require early payment without any review of these payment requests. Additionally, many payments are submitted in batched payment requests that cannot be disentangled or paid separately. The Court's order thus appears to require payment of requests related to new work.

D. Closeout Procedures for Terminated Agreements and Counterparties Remedies

21. As described in the February 18 Marocco Declaration and described further below, when

8

a contract, grant, or funding instrument is terminated, the counterparty may utilize the closeout procedures regarding funds that they believe that they are owed under those agreements.

22. To the extent that counterparties believe they are entitled to reimbursement for past work or other remedies under their funding instruments, USAID is prepared to entertain such claims and seek resolution. Indeed, there is an established mechanism for counterparties to submit disputes for resolution to USAID. *See, e.g.*, ADS Chapter 303 MAB § M10(e) & M13 (disputes and appeals). If counterparties believe they have claims that resolution process does not vindicate, established mechanisms are available for them to pursue any claims, including through settlement and in certain cases through judicial review in the Civilian Board of Contract Appeals or the United States Court of Federal Claims. *See, e.g.*, 48 C.F.R. 49.201 (providing rules for settlement of certain contract claims); 2 C.F.R. 200.343 (effects of suspension and termination); cf. *Pennsylvania Dep't of Pub. Welfare v. United States*, 48 Fed. Cl. 785, 790 (2001) (discussing Tucker Act jurisdiction).

23. Similarly, to the extent that counterparties of State believe they are entitled to reimbursement for past work or other remedies under their particular funding instruments, State is prepared to entertain such claims and seek resolution. For contracts, the process is governed by the Contracts Disputes Act, 41 U.S.C. § 7101, *et seq*, and begins with the submission of a written claim to the relevant contracting officer. The contracting officer must issue a written decision that "shall state the reasons for the decision reached and shall inform the contractor of the contractor's rights as provided [by the Contract Disputes Act]." The contracting officer must issue his decision within 60 days for claims less than $100,000 and within a reasonable time for larger claims (and for such claims, the contracting officer must notify the contractor of the timeframe for his decision will be made within 60 days). For grants and other federal assistance awards, 2 CFR 200.344 describes

9

**App. 229**

the closeout process for awards following their termination or conclusion, including the process by which a recipient submits financial reports for payment. 2 CFR 200.343 and 200.403 further describe what costs are allowable under federal assistance awards, including specifically in the case of a suspension or termination. If counterparties believe these claims processes are not sufficient, mechanisms exist to pursue, settle, and in certain cases litigate such claims through judicial review in the Civilian Board of Contract Appeals or the United States Court of Federal Claims. *See, e.g.*, 48 C.F.R. 49.201 (providing rules for settlement of certain contract claims); 2 C.F.R. 200.343 (effects of suspension and termination); *cf. Pennsylvania Dep't of Pub. Welfare v. United States*, 48 Fed. Cl. 785, 790 (2001) (discussing Tucker Act jurisdiction).

24.   Recouping any taxpayer dollars sent under the Court's order that we later determine to have been improperly billed or sent would be extremely difficult.  Contractual counterparties and grant recipients are often overseas and once money leaves the Government's accounts, we cannot control what those counterparties and recipients will do with it. Since many USAID programs involve sub-awards, it is likely that any funds disbursed would soon be transferred to third-party sub-vendors and contractors.

25. Moreover, the plaintiffs have claimed that many grant recipients and contractual counterparties are insolvent or nearly so, raising the high likelihood that they will immediately spend any funds they receive—making it impossible for the Government to recover those funds as a practical matter.

10

**App. 230**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 25, 2025

_____
Pete Marocco

# EXHIBIT A

**UNCLASSIFIED**



| | |
|---|---|
| **MRN:** | 25 STATE 6828 |
| **Date/DTG:** | Jan 24, 2025 / 241600Z JAN 25 |
| **From:** | SECSTATE WASHDC |
| **Action:** | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *Immediate* |
| **E.O:** | 13526 |
| **TAGS:** | PREL, AID, EAID |
| **Subject:** | Executive Order on Review of Foreign Assistance Programs |

1. (U) Consistent with the President's Executive Order on Reevaluating and Realigning United States Foreign Aid, this ALDAC pauses all new obligations of funding, pending a review, for foreign assistance programs funded by or through the Department and USAID.

2. (U) Across the United States government, it is currently impossible to access sufficient information in one place to determine whether the foreign assistance policies and interests supported by appropriations are not duplicated, are effective, and are consistent with President Trump's foreign policy.  The Department needs a centralized repository from which senior Department, USAID officials, Ambassadors, missions and others can draw sufficiently detailed information from which the Secretary can make judgments.  Further guidance regarding a new or updated repository and mandatory bureau submissions to it will be forthcoming.

**ACTIONS TO BE TAKEN**

**App. 233**

3. (U) Within thirty (30) days, the Director of the Policy Planning Staff (S/P) or its designate shall develop appropriate review standards and collaborate with the Director of the Office of Foreign Assistance (F), the Office of Budget and Planning (BP), the Office of Management and Budget (OMB), and/or other departments and agencies as appropriate to ensure that all foreign assistance is aligned with President Trump's foreign policy agenda and that data regarding all foreign assistance spending in the future is aggregated and inputted into a comprehensive internal Department repository.

4. (U) Within eighty-five (85) days of this ALDAC, the government-wide comprehensive review of all foreign assistance shall be completed, and a report shall be produced to the Secretary of State for his consideration and recommendation to the President.

5. (U) In keeping with one voice of American foreign policy, the United States government, through any department, agency or entity, shall not provide foreign assistance funded by or through the Department and USAID without the Secretary of State's authorization or the authorization of his designee.

6. (U) All U.S. foreign assistance shall be aligned under the Secretary of State's coordination, direction, and supervision, as appropriate, consistent with section 622(c) of the Foreign Assistance Act of 1961 and section 1523 of the Foreign Affairs Reform and Restructuring Act of 1998 (FARRA) within 180 days.

7. (U) Effective immediately, Assistant Secretaries and Senior Bureau Officials shall ensure that, to the maximum extent permitted by law, no new

obligations shall be made for foreign assistance until such time as the Secretary shall determine, following a review.  For existing foreign assistance awards, contracting officers and grant officers shall immediately issue stop-work orders, consistent with the terms of the relevant award, until such time as the Secretary shall determine, following a review.  Decisions whether to continue, modify, or terminate programs will be made following this review.

8. (U) Effective immediately, pending a review of foreign assistance programs:  no new requests for proposals (RFPs), requests for application (RFAs), notices of funding opportunities (NOFOs), or any other kind of solicitation or request for foreign assistance funding shall be published or processed by the Department, USAID, or other agencies implementing programs funded by the Department or USAID until each has been reviewed and approved by F as consistent with the President's policy; no further technical evaluation committees shall be convened; and there shall be no further funding obligated to awards and contracts or indefinite delivery /indefinite quantity (IDIQ) contracts.

9. (U) Effective immediately, I am suspending the review process for proposals for new foreign assistance grants, subgrants, contracts, or subcontracts.  No new funds shall be obligated for new awards or extensions of existing awards until each proposed new award or extension has been reviewed and approved by F as consistent with the President Trump's agenda.

10. (U) Within thirty (30) days of the issuance of the review standards in paragraph 4, every Bureau, agency office and entity providing any type of

**App. 235**

foreign assistance shall produce to F for review a list of all active, pending, or proposed grants, subcontracts, contracts, or subcontracts, and provide a clear and concise statement explaining if and how the current or proposed use of obligated funds advances President Trump's policy.

11. (U) The spokesperson will also release a public statement to this effect.

12. (U) The Secretary of State has approved waivers of the pause under the Executive Order and this ALDAC, subject to further review, with respect to:

(a) foreign military financing for Israel and Egypt and administrative expenses, including salaries, necessary to administer foreign military financing;

(b) emergency food assistance and administrative expenses, including salaries, necessary to administer such assistance;

(c) on a temporary basis, salaries and related administrative expenses, including travel, for U.S. direct hire employees, personal services contractors, and locally employed staff;

(d) legitimate expenses incurred prior to the date of this ALDAC under existing awards or legitimate expenses associated with stop-work orders; and

(e) exceptions to the pause approved by the Director of Foreign Assistance.

DEFINITIONS

13. (U) Only for purposes of this ALDAC, foreign assistance means assistance funded from accounts in titles III and IV and from International

Organizations and Programs in the Department of State, Foreign Operations, and Related Programs Appropriations Acts.

| | |
|---|---|
| **Signature:** | RUBIO |

| | |
|---|---|
| **Drafted By:** | S/TT:Marocco, Peter |
| **Cleared By:** | S/TT:Holler, Daniel |
| | L:Visek, Richard |
| | L:Dorosin, Joshua |
| | S/TT:Anton, Michael |
| | C:Needham, Michael |
| **Approved By:** | S: Rubio, Marco |
| **Released By:** | POEMS_P:Acker, Vanessa G |
| **Info:** | IO COLLECTIVE *Immediate* |
| **XMT:** | BASRAH, AMCONSUL; CARACAS, AMEMBASSY; CHENGDU, AMCONSUL; KABUL, AMEMBASSY; MINSK, AMEMBASSY; SANAA, AMEMBASSY; ST PETERSBURG, AMCONSUL; VLADIVOSTOK, AMCONSUL; YEKATERINBURG, AMCONSUL |

**UNCLASSIFIED**

# EXHIBIT B

**UNCLASSIFIED**



| | |
|---|---|
| **MRN:** | 25 STATE 10948 |
| **Date/DTG:** | Feb 05, 2025 / 052237Z FEB 25 |
| **From:** | SECSTATE WASHDC |
| **Action:** | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *Immediate* |
| **E.O:** | 13526 |
| **TAGS:** | ABUD, AFIN |
| **Subject:** | (SBU) Department of State Foreign Assistance Review Technical Guidance for Waivers Approved by the Secretary of State and the Director of Foreign Assistance |

1. (SBU) This ALDAC provides additional technical guidance consistent with Executive Order 14169 on *Reevaluating and Realigning United States Foreign Aid* and the Secretary's direction in *ALDAC 25 STATE 6828*, which paused all new obligations and disbursements of Department of State and USAID foreign assistance not covered by certain waivers, pending a review. As noted in the ALDAC, all bureaus, offices, and missions responsible for foreign assistance funding from accounts in titles III and IV and the International Organizations and Programs account (IO&P) of the annual appropriations acts must comply with this guidance. All relevant links related to the foreign assistance pause, including forms and templates, are available on the *F Managing for Results SharePoint* in the 2025 Foreign Assistance Review Guidance folder.

**(SBU) Executive Orders and Secretary of State Waivers**

2. (SBU) President Trump has issued a series of executive orders to protect the American people and safeguard valuable taxpayer resources, including *Protecting the American People Against Invasion* (Jan. 20, 2025), *Reevaluating and Realigning United States Foreign Aid* (Jan. 20, 2025), *Putting America First in International Environmental Agreements* (Jan. 20, 2025), *Unleashing American Energy* (Jan. 20, 2025), *Ending Radical and Wasteful Government DEI Programs and Preferencing* (January 20, 2025), *Initial Rescissions of Harmful Executive Orders and Actions* (January 20, 2025), and Ending Illegal Discrimination and Restoring Merit-Based Opportunity (Jan. 21, 2025).

3. (SBU) On Friday, January 24, consistent with Executive Order 14169 on *Reevaluating and Realigning United States Foreign Aid*, Secretary Rubio issued ALDAC 25 STATE 6828. The ALDAC paused all new obligations of funding for foreign assistance programs funded by the Department and USAID and instructed that no new requests for proposals (RFPs), requests for application (RFAs), notices of funding opportunities (NOFOs), or any other kind of solicitation or request for foreign assistance funding shall be

published or processed by the Department, USAID, or other agencies implementing programs funded by the Department or USAID until each has been reviewed and approved by F as consistent with President Trump's policy. For existing foreign assistance awards, the Secretary directed contracting officers and grant officers to immediately issue stop-work orders, consistent with the terms of the relevant award, pending the review. No further technical evaluation committees shall be convened; and there shall be no further funding obligated to awards and contracts or indefinite delivery/indefinite quantity (IDIQ) contracts. The Secretary also instructed that no new funds shall be obligated for new awards or extensions of existing awards until each proposed new award or extension has been reviewed and approved by F as consistent with the President's agenda. Paragraph 12 of the ALDAC included specific waivers of the pause approved by the Secretary.

4. (SBU) The Secretary also issued an *Emergency Humanitarian Waiver* on January 28, which applies to life-saving humanitarian assistance (as described in the waiver). This waiver allows existing implementers to continue or resume work under existing awards subject to the following directions. No new contracts shall be entered into. This waiver for life saving humanitarian assistance applies to life-saving medicine, medical services, food, shelter, and subsistence assistance as well as supplies and reasonable administrative costs as necessary to deliver such assistance. The waiver does not apply to activities that involve abortions, family planning, conferences, administrative costs other than those covered as outlined, DEI or gender ideology programs, transgender surgeries, or other non-life saving assistance. Migration and Refugee Assistance (MRA) may only be used to support life-saving humanitarian assistance activities outlined in the waiver and repatriation of third country nationals to their country of origin or safe-third-country.

**(SBU) Scope of Current Waivers**

5. (SBU) For purposes of the ALDAC and related waivers, including the Emergency Humanitarian Waiver, foreign assistance means assistance funded from accounts in titles III and IV and from the IO&P account in the Department of State, Foreign Operations, and Related Programs Appropriations Acts.

- **Title III Accounts:** Development Assistance (DA), Global Health Programs (GHP), International Disaster Assistance (IDA), Transition Initiatives (TI), Complex Crises Fund (CCF), Economic Support Fund (ESF), Democracy Fund (DF), Assistance for Europe, Eurasia, and Central Asia (AEECA), Migration and Refugee Assistance (MRA), U.S. Emergency Refugee and Migration Assistance Fund (ERMA)
- **Title IV Accounts:** International Narcotics Control and Law Enforcement (INCLE), Nonproliferation, Anti-terrorism, Demining and Related Programs (NADR), Peacekeeping Operations (PKO), International Military Education and Training (IMET), Foreign Military Financing (FMF)
- International Organizations and Programs (IO&P)

6. (SBU) **Current Waivers:** The Secretary has approved waiver categories of the pause under the Executive Order and ALDAC 25 State 6828, subject to further review, with respect to:

- 12(a) - Foreign Military Financing for Israel and Egypt and administrative expenses, including salaries, necessary to administer Foreign Military Financing;
- 12(b) - emergency food assistance and administrative expenses, including salaries, necessary to administer such assistance;

- 12(c) - on a temporary basis, salaries and related administrative expenses, including travel, for U.S. direct hire employees, personal services contractors, and locally employed staff;
- 12(d) - legitimate expenses incurred prior to the date of this ALDAC under existing awards or legitimate expenses associated with stop-work orders;
- 12(e) - exceptions to the pause approved by the Director of Foreign Assistance; and
- via separate waiver, life-saving humanitarian assistance that applies to core life-saving medicine, medical services, food, shelter, and subsistence assistance, such as supplies and reasonable administrative costs as necessary to deliver such assistance.

7. (SBU) Assistant Secretaries (A/S) (or Acting A/S) and Senior Bureau Officials (SBO) are **required** to fill out an *Obligation or Disbursement under Waiver of Foreign Assistance Pause form* for all waived categories (e.g., 12(a) - 12(e) and separate HA waiver) to confirm that approved costs fall within this waiver. This form and any 12(e) exception approvals (as outlined below) are required in all payment packages processed domestically and overseas. For domestic payments, these documents should be uploaded in the IPP system with the payment or included with manually submitted payment packages for certification and payment. For payments processed at posts, for the period of the pause, foreign assistance payments covered under approved waiver categories and exceptions must be submitted to the Post Support Unit (PSU) for certification and payment. Posts can still elect to partial pay any portion of a payment that does not contain foreign assistance funds and send the remaining portion to PSU. For now, system relationship edits in RFMS for foreign assistance funded payments will remain in effect for posts. For foreign assistance funded official travel, bureaus and posts are responsible for ensuring adequate controls A/S or SBO approval. This approval should be noted in the remarks section of the E2 travel authorization. For federal assistance payments that use the HHS Payment Management System, the approved form must be uploaded to the MyGrants system prior to the approval in the Payment Management System. The form must be uploaded as a Post Award Activity and then submitted to integrate into the award file.

**(SBU) Additional information on administrative expenses under paragraph 12(c) of the ALDAC**

8. (SBU) The waiver, on a temporary basis, for salaries and related administrative expenses, including travel, for U.S. direct hire (USDH) employees, personal services contractors (PSCs); and locally employed (LE) staff exemption in paragraph 12(c) of the ALDAC allows for operations related to salaries and administrative expenses to continue while the review of foreign assistance is taking place. These administrative expenses may include the following expenses where funded from foreign assistance: salaries and benefits for USDH, PSCs and LE Staff; approved official travel for USDH, PSCs, and LE Staff; insurance payments for USDH, PSCs, and LE Staff; USDH, PSC, and LE Staff work cell phone costs; PSC contract costs; ICASS costs; USDH and PSC housing leases; residential trash collection for USDH and PSC residences at post; utility expenses for USDH and PSC residences at post; security costs- (including security guard services, surveillance systems, and related security measures); communication costs for USDH and PSCs (including phone lines, internet access, and other communication infrastructure); potable water deliveries for USDH, PSC, and LE Staff; rent for leased spaced used for offices, equipment, utility, or data storage, security readiness and storage used by USDH, PSCs, and LE Staff; maintenance and repair of equipment used by USD, PSCs, and LE Staff; security, legal, accounting, and information technology professional services; contractor facilities, utilities, and fuel direct charged to the Department; costs related to eligible family members (EFMs); and payments to Citi Bank for government Purchase cards for expenses already incurred and approved.

**App. 241**

**(SBU) Additional information on "legitimate expenses" under paragraph 12(d) of the ALDAC**

9. (SBU) "Legitimate expenses" must include allowable and allocable costs under the terms and conditions of the applicable award or contract that are approved by the Director of Foreign Assistance after submission for consideration through FAWaivers@State.gov.

**(SBU) EXCEPTION PROCESS**

10. (SBU) Bureaus and Offices that wish to continue critical obligations and/or disbursements for foreign assistance programs **not included** in existing waivers must seek an exception from the Director of Foreign Assistance (DFA) under paragraph 12(e) of the ALDAC or a waiver from the Secretary. Bureaus and Offices that wish to seek an exception under paragraph 12(e) for new obligations and/or disbursements must submit an Exception Action Memo to the DFA for approval. **There is a very high bar for such exceptions.** The memo should follow the linked template and clearly demonstrate how the program is aligned to President Trump's policy.

25 STATE 6828 FA Review Exception Memo Template.docx

11. (SBU) Illustrative high-bar examples of things that could be considered for exceptions by the Director of Foreign Assistance include, but are not limited to:

> (1) obligations or disbursements tied directly to a known Trump Administration priority,
> (2) significant risk of program breaks, work stoppage, or closures for programs where American lives and security would be at risk and that align to a known Trump Administration priority, or
> (3) third party contract staff salaries and other related contract costs required for the safety and security of Americans and/or U.S. property.

**(SBU) DISBURSEMENT OF OBLIGATED FUNDS UNDER THE WAIVER IN PARAGRAPHS 12(a) - 12(c) OF THE ALDAC**

12. (SBU) Any Bureau, Office, or post seeking to disburse funds that have already been obligated and are covered by a waiver specified in paragraphs 12(a)-(c) of the ALDAC, should have the applicable A/S or SBO fill out and sign an *Obligation or Disbursement under Waiver of Foreign Assistance Pause form* to confirm that that the disbursement falls within an approved waiver. This form may not be signed by anyone other than those listed above.

**(SBU) DISBURSEMENT OF OBLIGATED FUNDS THAT REQUIRE AN EXCEPTION UNDER PARAGRAPH 12(d)- 12(e) OF THE ALDAC**

13. (SBU) Any Bureau, Office, or post seeking to disburse funds that have already been obligated, but currently on pause due to the Executive Order and ALDAC and require an exception approved by the Director of Foreign Assistance under paragraph 12(d)-(e) of the ALDAC, should submit the *FA Review Exception Memo template*. Drafters should include all relevant disbursement requirements related to the activity and/or program. Once the exception is approved, the *Obligation or Disbursement under Waiver of Foreign Assistance Pause form* signed by the applicable A/S or SBO, and the signed exception should be submitted with the invoice(s) for payment. Bureaus that have received an approved waiver for disbursements, should send the waiver to the program office and cognizant CO/GO/AO as well as the CGFS disbursement office.

**(SBU) EXCEPTIONS TO OBLIGATE FUNDS AND/OR RESUME ACTIVITIES UNDER PARAGRAPH 12(e) OF THE ALDAC**

14. (SBU) If a Bureau, Office, or post is seeking an exception for the obligation of foreign assistance funds or the resuming of activities funding by foreign assistance then they should use the _FA Review Exception Memo Template_ and the _Exemption Excel Template_ and add **an additional decision block for the exception request for each program.**

15. (SBU) Completed exception packages for approval will only be accepted with approval from A/S or SBOs**.**  Requests not already provided to F as of the release of this guidance should be sent by email to Foreign Assistance Waiver (FAWaivers@state.gov), which is listed in the GAL.  If you have previously submitted waiver requests that are still pending, please follow this format to expedite your request.

**The Director of Foreign Assistance will either approve, disapprove, or request a discussion on each Bureau or Office request.**

**(SBU) OBLIGATION OR DISBURSEMENT OF FUNDS RECEIVED UNDER SECTION 635(D) OR SECTION 607 OF THE FOREIGN ASSISTANCE ACT (GIFT FUNDS AND SECTION 607 AUTHORITY)**

16. (SBU) If a Bureau,  Office, or post is seeking to obligate or disburse funds received via sections 635(d) or 607 of the Foreign Assistance Act, then they should use the FA Review Exception Memo Template and include a decision block for the exception request for each program which identifies the donor, the program, and the request as one for donor-received funds.

**App. 243**

| Signature: | RUBIO |
|---|---|

| Drafted By: | F/RA:Pulford, Lauren |
|---|---|
| Cleared By: | F/RA:Williams, Rebecca |
| | CGFS:Walsh, James |
| | CGFS:Davisson, William |
| | BP/RPBI:Crumbly, Angelique |
| | F/FO:Dashtara, Abraham |
| | F:Peterson, Kyle |
| | A/FO:Gray, Matthew |
| | A/GA/AP:Drabkin, Sarah |
| | A/GA/AP:Urman, Anna |
| | M:Inzerillo, Suzanne |
| | S/TT:Orr, Caleb |
| | C:Veprek, Andrew |
| | L/BA:O'Connor, Elizabeth |
| | L/M:Cracraft, Valerie |
| | L/LFA:Pompian, Shawn |
| | S/ES:Mennuti, Deborah |
| | AF/EX:Hazel, Steven |
| | EAP/EX:Johnson, Horace |
| | EUR-IO/EX:Karber, Jon |
| | NEA-SCA/EX:Landis, Rebecca |
| | NEA/AC:Walters, Danika |
| | SCA/STA:Briggs, Jason |
| | WHA/PPC:Jilka, Lucy |

**App. 244**

DU[ Y ˙*˙cZ+

WHA/EX:Cavey, Michael

**Approved By:**    S/TT:Marocco, Peter
**Released By:**    RM_DCFO:Anderson, Veronique Z
**XMT:**    BASRAH, AMCONSUL; CARACAS, AMEMBASSY; CHENGDU, AMCONSUL;
KABUL, AMEMBASSY; MINSK, AMEMBASSY; SANAA, AMEMBASSY; ST
PETERSBURG, AMCONSUL; VLADIVOSTOK, AMCONSUL;
YEKATERINBURG, AMCONSUL

---

**UNCLASSIFIED**

**App. 245**

# EXHIBIT C

# (SBU) State and USAID Foreign Assistance Pause
# Exception Process and Disbursement FAQs

### *Issued February 24, 2025*

Please note these FAQs also include new or clarifying guidance on procedures, processes, and approval flows.

1. **Is the exception and payment process applicable to State and USAID?**
   *Yes. ALDAC 25 State 10948 technical guidance applies to State and USAID unless otherwise noted below. There are USAID applicable sections below. Additional information on the USAID internal waiver process and other requirements may be found on USAID's Executive Secretariat internal website.*

**Exception Request Approver Updates**

- Effective February 24, 2025, John A. Zadrozny is the Deputy Director of the Office of Foreign Assistance.  All requests for exceptions must now be addressed to Mr. Zadrozny.

**Clearance process updates**

- Effective February 24, 2025, C and P clearances are no longer required on 12(d) or 12(e) Waiver Memos to the Director of Foreign Assistance (DFA).

**Expenses and disbursements under the Secretary's 12(c) waiver**

2. **Do 12(c) direct bi-weekly payroll payments require Senior Bureau Official (SBO) approval?**
   *No.*

3. **Do 12(c) expenses require a "Obligation or Disbursement under Waiver of Foreign Assistance Pause" form?**
   *No.  To facilitate timely and essential critical payments supporting mission operations related to 12(c) waived expenses, posts may proceed processing through the Post Support Unit (PSU) and obligating these expenses at post without obtaining Senior Bureau Officer (SBO) approvals for waived 12(c) related expenses. The PSU will verify these 12(c) expenses as expenditures related to the 1000-2000 budget object classes (BOC), which by definition are administrative costs and related 4160 BOC for Value Added Tax on those expenses. Please refer to ALDAC 25 STATE 14458 for additional information.  USAID also issued a message to the agency reinforcing the ALDAC and communicating that 12(c) expenses paid with Operating Expense (OE) funds also no longer require additional steps.  USAID Controllers will ensure OE payments that fall outside 12(c) administrative expenses (e.g. Free Russia Foundation) will be flagged for further analysis and sent to the SBO for approval.*

4. **Does the 12(c) waiver "on a temporary basis, salaries, and related administrative expenses, including travel, for U.S. direct hire employees, personal services contractors, and locally employed staff" cover new obligations for not-yet-issued PSC contracts or do bureaus need to submit an AM to the Director of Foreign Assistance?**
*The Department and USAID currently have a hiring freeze in place. In general, no new obligations for such purposes should occur; however, if an SBO determines such new obligations are necessary an exception should be sought under 12(e).*

5. **Please clarify SBO approval requirements for new travel authorizations and vouchers.**
*In line with current travel guidance, all official travel, international and domestic, must be approved by the SBO.  Approval for travel that originates abroad is to be approved by the relevant COM.  For COMs, their travel should be approved by the relevant Bureau SBO.  Proof of the SBO's/COM's approval of the travel should be noted in E2 in the remarks section and supplemental documentation may be attached to the travel authorization.  Bureau SBOs approve travel payment by signing the Obligation and Disbursement waiver form.*

**Interagency Agreements (IAAs) and Transfers**

6. **Are U.S. Direct Hire (USDH) and Locally Employed Staff (LES) at the IAA servicing agency (recipient agency) considered USDH within the context of the waiver?  i.e. some IAA agency partners are asking whether their USDH and LES that charge the IAA to cover the staff's salaries fall under 12(c).**
*Per 25 STATE 14458, the 12(c) waiver includes administrative expenses for all USDH, personal services contractors (PSCs) and LES staff funded from foreign assistance.  Regardless of the mechanism used to fund the positions, these costs are covered by the waiver.  For program staff, they should only work on programs that have an approved waiver/exception. However, if a PSC contract is terminated during the pause, it will not be paid further.*

7. **If State and USAID bureaus have entered into a 632(a) or 632(b) agreement with another U.S. agency to implement a program, is the SBO for the originating/requesting State/USAID bureau/office responsible for approving the "Obligation or Disbursement under Waiver of Foreign Assistance Pause" form for disbursements made by the interagency partner (servicing/recipient agency)?**
*No.  The State or USAID SBO is only responsible for certifying and approving the "Obligation or Disbursement under Waiver of Foreign Assistance Pause" form for disbursements when their agency is the disbursing agency.*

**Payments and new obligations**

8. **What should be included when submitting payment requests for processing?**
*In addition to regularly provided information, bureaus/offices should attach: 1) The SBO signed "Obligation or Disbursement under Waiver of Foreign Assistance Pause" form (including information requested on page 2 of that form). Disbursements under 12(c) do not require this form and bureaus and posts should refer to ALDAC 25 STATE 14458 and the message to the USAID workforce on 12(c) expenses (for USAID OE expenses).*

9. **Is the "Obligation or Disbursement under Waiver of Foreign Assistance Pause" form required for all mechanisms (contracts, grants, IAAs, etc.)?**
*Yes. The form is required for all mechanisms and should be uploaded as supporting documentation with the payment request or new obligation action.*

   a. *For State bureaus submitting payments, you should upload the "Obligation or Disbursement under Waiver of Foreign Assistance Pause" form, which should include recipient and invoice information as requested on page 2 of the form. Multiple invoices may be attached to one payment form for SBO review.  Approved payment memos and forms should also be submitted to CGFSWaiver_Intake@state.gov with the subject line denoting PMS or IPP payment for approval to ensure CGFS is tracking all necessary details to help facilitate payments.*

   b. *For USAID Operating Units submitting payments in Phoenix, you should attach the "Obligation or Disbursement under Waiver of Foreign Assistance Pause" form.*

10. **Do you need recipient/vendor information on the "Obligation or Disbursement under Waiver of Foreign Assistance Pause" form?**
*Yes. When "Obligation or Disbursement under Waiver of Foreign Assistance Pause" forms are submitted with payments, the bureau/office should attach additional identifying information utilizing the fields provided on page 2 of the form.*

11. **Can I advance costs to a grantee to execute activities approved under a waiver/exception?**
*Yes, but only for the time period agreed to as part of the waiver/exception approval.  If no specific time period was provided, then funds should only be advanced for the period of the foreign assistance review, that is until April 19, 2025.  Additional guidance will be provided following the conclusion of the foreign assistance review.*

12. **Does the pause extend to no cost extensions (NCEs) or the execution of contract option years?**
*Yes.  Bureaus seeking to continue any program with existing funding must seek an exception from the Director of Foreign Assistance (DFA) for that program to continue during the 90-day pause.*

13. **Do the restrictions on disbursements under the 12(d) waiver apply for payments to third-party contractors for contract staff and regular contract payments?**
*Yes.  The Secretary has issued a waiver for legitimate expenses incurred prior to the date of ALDAC 25 STATE 6828 under existing awards or legitimate expenses associated with stop-work orders.  The ALDAC was issued January 24, 2025, therefore legitimate expenses incurred through January 23, 2025 will need a 12(d) waiver.*

14. **Is explicit approval required by the Director of Foreign Assistance to disburse funds under the Secretary's 12(d) waiver?**
*Yes, 25 STATE 10948, outlines in paragraphs 9 and 13 that legitimate expenses that are not covered by an additional current waiver/exception (e.g., a specific exception issued under 12(e)) are subject to a policy review and must be approved by the Director of Foreign Assistance. Therefore, the appropriate SBO should complete a waiver memo and submit it along with all relevant disbursement requirements related to the activity and/or program for consideration*

*through FAWaivers@State.gov or aid.estaskermaillistusaid@usaid.gov, copying fundingapprovalrequest@usaid.gov if it is a USAID activity per the instructions in 25 State 10948 so legitimate expenses may be paid. Any legitimate expenses for stop-work orders should get your contracting/grant officers clearance. If bureaus/offices are seeking to cover expenses incurred after January 23, they should seek an exception from the Director of Foreign Assistance.*

15. **If you have an approved exception for activities under 12(e), do you need separate approval for prior expenses incurred, etc.?**
*No, if the program, project, or activity was approved by the Director of Foreign Assistance to continue by a 12(e) exception, legitimate expenses incurred prior to the issuance of 25 STATE 6828 that are part of that same program or project may be paid with SBO confirmation on the "Obligation or Disbursement under Waiver of Foreign Assistance Pause" form. The ALDAC was issued January 24, 2025, therefore legitimate expenses incurred through January 23, 2025 are covered by the waiver.*

16. **What is required for 12(d) payments?**
*For legitimate expenses incurred prior to the January 24 release of 25 STATE 6828 under existing awards or legitimate expenses associated with stop-work orders, bureaus/offices **do not** need to get DFA approval but should obtain SBO approval on the "Obligation or Disbursement under Waiver of Foreign Assistance Pause" form, checking the 12(d) category on the form. This form should be submitted along with the payment request.*

*In submitting 12(d) payment requests, bureaus/offices and SBOs will also be confirming that these payments are aligned to existing Executive Orders and policy guidance from this Administration, e.g., DEIA, climate activism, or gender ideology. If there are 12(d) payments that may be misaligned to existing Executive Orders and policy guidance from this Administration, bureaus/offices should consult with F and L prior to submitting the payment requests.*

17. **What costs associated with stop work orders may be incurred?   Are organizations that receive funds for a program that is on pause, but not terminated, allowed to continue to pay operational costs to keep personnel, leases, etc.?**
*As a starting point, bureaus and offices should first consult with their contracting or grants / agreement (USAID) officer regarding the terms and conditions governing their agreements.  For contracts with a FAR 52.242-15 Stop-Work Order clause, there will be FAR guidance and a normal procedure by which the CO decides which costs would typically be allowable.  For contracts where a stop-work order clause (or similar) was not included, COs were directed to negotiate bilateral modifications providing for work stoppages.  Which costs would be allowable will depend on what the contract says (and what type of contract it is) and what those bilateral modifications say.*

*When this initial assessment is completed, bureaus and offices should apply to the Director of Foreign Assistance for a waiver under 12(d) as soon as possible.  Please note ALDAC 25 STATE 6828 outlines that the Secretary has approved a waiver for 12(d), "legitimate expenses incurred*

*prior to the date of this ALDAC under existing awards or legitimate expenses associated with stop work orders".  Subsequently, 25 STATE 10948, paragraph 13, outlines that "Any bureau, office, or post seeking to disburse funds that have already been obligated, but currently on pause due to the Executive Order and ALDAC and **require an exception approved by the Director of Foreign Assistance** under paragraph 12(d)-(e) of the ALDAC should submit the FA Review Exception memo template."  You must include a detailed explanation of what the expenses were for.*

18. **If we have non-admin costs that need to be paid at post, for which there is a waiver or approved exception, who is the SBO that approves disbursement of those funds?**
*For State Department wholly-owned accounts (e.g. INCLE, MRA, etc.) the accountable Senior Bureau Official (SBO) for those funds/that manages those funds must approve the SBO obligation and waiver disbursement form (not the regional bureau SBO). So, in this case, the INL SBO would approve.*

19. **Who are the Senior Bureau Officials (SBOs) that are the accountable official for each functional foreign assistance account or other foreign assistance accounts?**

   a. ***For USAID,** all payment requests for USAID SBO approval should be sent to aid.estaskermaillistusaid@usaid.gov, copying FundingApprovalRequest@USAID.gov. Depending on the account/program, the USAID/FO will route the request to the appropriate SBO.*

   **For State Bureaus and Offices:**

   b. ***Assistance for Europe, Eurasia, and Central Asia (AEECA):** EUR - Assistant Secretary of State (European and Eurasian Affairs):  Louis Bono (Senior Bureau Official) will approve EUR-related items. For SCA-related items, Assistant Secretary of State (South and Central Asian Affairs):  Eric Meyer (Senior Bureau Official) will approve.*

   c. ***Democracy Fund (DF):** DRL - Assistant Secretary of State for Democracy, Human Rights, and Labor:  Jonathan Mennuti (Acting)*

   d. ***International Narcotics Control and Law Enforcement (INCLE):** INL - Assistant Secretary of State:  F. Cartwright Weiland (Senior Bureau Official). For INCLE funds implemented by J/GCJ, J/TIP or NEA (i.e. for Syria), the respective bureau/office SBO should approve those funds.*
      i. *Please send requests for INCLE allotted to posts that require SBO approval to: INL-SBO-12C-REQUESTS@state.gov.*

   e. ***International Organizations and Programs (IO&P):** IO - Assistant Secretary of State: McCoy Pitt (Senior Bureau Official)*

   f. ***Foreign Military Financing (FMF), Peacekeeping Operations (PKO), and International Military Education and Training (IMET):** PM:  James Holtsnider (Senior Bureau Official)*
      i. *NOTE: The "Obligation or Disbursement under Waiver of Foreign Assistance Pause" form is not required for funds managed by DSCA.*

   g. ***Global Health Programs (GHP-State):** GHSD - Ambassador at Large and Coordinator of United States Government Activities to Combat HIV/AIDS Globally (S/GAC):  Jeffrey D. Graham (Senior Bureau Official)*

**h. Migration and Refugee Assistance (MRA):** *PRM - Assistant Secretary of State:  Adam Zerbinopoulos (Senior Bureau Official)*

    i. *Please send requests for PRM funding allotted to posts that require SBO approval to* PRM-EX-Budget@state.gov.

**i. Nonproliferation, Anti-terrorism, Demining and Related Programs (NADR) funds/subaccounts:**

    i. **Arms Control, Deterrence, and Stability (ADS), Contributions to the Comprehensive Test Ban Treaty International Monitoring System (CTBT IMS) and the Organization's Prepatory Commission (CTBTO PrepComm):** *ADS - Assistant Secretary of State:  Paul B. Dean (Acting)*

    ii. **Anti -Terrorism Assistance (ATA):**

        1. **CT** - *Coordinator for Counterterrorism:  Gregory D. LoGerfo (Acting) For requests related to CT funding that need SBO approval, please send to* ct_ex_budget-fa@state.gov.

        2. **DS** - *Carlos Matus (acting). For requests related to DS ATA funding that need SBO approval, please send to* Dscfoatainvoices@state.gov

    iii. **Export Control and Border Security (EXBS), Global Threat Reduction (GTR), International Atomic Energy Agency (IAEA), Nonproliferation and Disarmament Fund (NDF), Nonproliferation Cooperation (NPTCoop), and Weapons of Mass Destruction Terrorism (WMDT):** *ISN - Assistant Secretary of State:  Ann Ganzer (Acting)*

    iv. **Conventional Weapons Destruction/Humanitarian Demining (CWD):** *PM - James Holtsnider (Senior Bureau Official)*

**j. Other function 150 international accounts and agencies, such as DFC, MCC, CDC and other relevant agencies, non-function 150 accounts:** *Guidance is being working through a separate track for interagency partners such as* DFC, USTDA, DEA, CBP, *MCC, CDC and others that implement foreign assistance.*  **F will share additional details when they are available.**

**For State, for Economic Support Funds (ESF), and other accounts not specified, the regional or functional bureau SBO for the bureau managing the program is responsible for certifying the obligation or implementation of those funds.**

**20. Do you have additional guidance on the life-saving humanitarian assistance? What costs are included?  What accounts are included in this particular waiver?**

The S waiver for life-saving humanitarian assistance applies *to core life-saving medicine, medical services, food, shelter, and subsistence assistance, as well as supplies and reasonable administrative costs as necessary to deliver such assistance.*

*The intended Humanitarian Assistance FA accounts that fall under the S waiver are: International Disaster Assistance (IDA), Migration and Refugee Assistance (MRA), Emergency Refugee and Migration Assistance (ERMA), and Title II Food For Peace (FFP).  Additionally, the DFA approved an exception for specific life-saving assistance through PEPFAR — life-saving HIV care/treatment services, testing, and commodities/drugs; prevention only for mother-to-child transmission services and commodities/drugs (e.g., PrEP); and reasonable admin costs necessary to deliver this assistance — through the Global Health*

*Programs (GHP-State and GHP-USAID for HIV/AIDS assistance) accounts. All activities consistent with the waiver definition and PEPFAR exception funded by these accounts may continue unless they are prohibited by other guidance (e.g., DEI EO). Any non-HA accounts, such as Economic Support (ESF) and Development accounts (DA, DF) where medical services, food, subsistence assistance programs are funded will need to seek an exception consistent with 12(e) of ALDAC 25 STATE 6828.*

*For life-saving humanitarian assistance reasonable administrative costs, 12(c) "salaries and related administrative expenses" as paragraph 8 in ALDAC 25 STATE 10948 lists most benefits that are applicable to HA; other HA specific expenses that are included in 12(c) are medevac payments for USDH, tuition payments for minor children of employees posted overseas, and education allowances for FTEs.*

*For any other HA activities funded from any other accounts that SBOs determine may fit under the definition of the life-saving assistance waiver, a bureau would need to seek an exception from the Director of Foreign Assistance (DFA) consistent with 12(e) in the ALDAC 25 STATE 6828.*

**22. Do gift funds or 607 funds, which are not foreign assistance, require DFA approval?**

*Gift funds or section 607 funds received from other countries that are added to US contracts, grants, and/or transferred to other foreign assistance accounts **do not** require DFA approval but do require SBO approval. Bureaus documenting their SBO approval for these activities should clear the associated memo with F. Once gift funds hit the financial systems, they are managed in a similar manner to other foreign assistance. Bureaus should fill out the "Notes" section in the "Obligation or Disbursement under Waiver of Foreign Assistance Pause" form and specifically note that these are gift funds.*

**23.Where can I locate the ALDACs, templates, and forms related to the waiver/exception and payment process?**

State/MfR SharePoint: 2025 Foreign Assistance Review Guidance

USAID Executive Secretariat FA Blanket Waiver and Exceptions Guidance may be found here.

USAID/FA Bureau USAID Pages: https://my.usaid.gov/node/43304

**24. Where can I go if I have additional questions?**

Questions on Waivers or Exceptions, including Director of Foreign Assistance approval for 12(d) legitimate expenses may be directed to State/F at fawaivers@state.gov. Please CC your relevant F POC.

Questions on State Department disbursements may be directed to: State/CGFS at *gfscbureauinvoiceinquirymailbox1@state.gov.*

FAQs on State Department grants and contracts may be found here:
https://usdos.sharepoint.com/sites/A-OPE/PO/SitePages/nk2aafgo.aspx

Questions on USAID disbursements from USAID staff may be directed to:
aid.estaskermaillistusaid@usaid.gov, copying fundingapprovalrequest@usaid.gov.

Questions on USAID contracts / agreements from USAID staff may be directed to: A&A via the Transition and Executive Order form.

Questions from USAID implementers may be directed to industryliaison@usaid.gov

Department/Agency Notice Text:

**State and USAID Foreign Assistance Pause Exception Process and Disbursement FAQs**

The Office of Foreign Assistance (F) has issued Frequently Asked Questions (FAQs) to provide additional information for State and USAID bureaus, offices, and missions regarding the foreign assistance waiver process and disbursement process.  The FAQs may be found on the State Department Managing for Results Budgeting Guidance SharePoint and F's USAID pages site.

Please refer additional questions to your F POC or the F/Resources and Appropriations team at F-RA-Execution@state.gov.


Approved:          F - Pete Marocco [PM]

Clearances:
CGFS/FO: Jim Walsh (ok)
CGFS: Butch Davisson (ok)
C: Matt Rhodes (ok)
M: Andy Hay (ok)
P: No Response
S/P: Wesam Hassanein (ok)
F/LEA: James Kennedy (ok)
F/RA: Becky Williams (ok)
F/RG: Kyle Peterson (ok)
F/RG/GP: Heather Harms (ok)
F/FO: Abraham Dashtara (ok)
A/GA/APD/FA: Sarah Drabkin (ok)
A/GA/AMD: Vincent Sanchez (ok)
L/BA: Elizabeth O'Connor (ok)
L/M: Valerie Cracraft (ok)
L/LFA: Shawn Pompian (ok)
USAID/FO: Aiyong (Paul) Seong (ok)

APPEAL,TYPE-D

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:25-cv-00400-AHA

AIDS VACCINE ADVOCACY COALITION et al v. UNITED STATES DEPARTMENT OF STATE et al
Assigned to: Judge Amir H. Ali
 Related Case: 1:25-cv-00402-AHA
Cause: 05:551 Administrative Procedure Act

Date Filed: 02/10/2025
Jury Demand: None
Nature of Suit: 360 P.I.: Other
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**AIDS VACCINE ADVOCACY
COALITION**

represented by **Allison Marcy Zieve**
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street, NW
Washington, DC 20009
(202) 588-1000
Fax: (202) 588-7795
Email: azieve@citizen.org
*ATTORNEY TO BE NOTICED*

**Nicolas Sansone**
PUBLIC CITIZEN
1600 20th Street NW
Washington, DC 20009
202-588-1000
Email: nsansone@citizen.org
*ATTORNEY TO BE NOTICED*

**Lauren Bateman**
PUBLIC CITIZEN
Litigation Group
1600 20th St NW
Washington, DC 20009
202-588-7739
Email: lbateman@citizen.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JOURNALISM DEVELOPMENT
NETWORK, INC.**

represented by **Allison Marcy Zieve**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nicolas Sansone**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lauren Bateman**

**App. 255**

(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**UNITED STATES DEPARTMENT OF STATE**

represented by **Indraneel Sur**
U.S. DEPARTMENT OF JUSTICE
1100 L St. NW
Washington, DC 20530
202-616-8488
Email: Indraneel.Sur@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher D. Edelman**
U.S. DEPARTMENT OF JUSTICE
1100 L Street, NW
Washington, DC 20530
202-305-8659
Email: christopher.edelman@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT**

represented by **Indraneel Sur**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher D. Edelman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**MARCO RUBIO**
*Secretary of State, and Acting Administrator of United States Agency for International Development*

represented by **Indraneel Sur**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher D. Edelman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**OFFICE OF MANAGEMENT & BUDGET**

represented by **Indraneel Sur**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher D. Edelman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**App. 256**

**Defendant**

**RUSSELL VOUGHT**                       represented by  **Indraneel Sur**
*Director, Office of Management and Budget*                (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Christopher D. Edelman**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Defendant**

**DONALD TRUMP**                         represented by  **Indraneel Sur**
*President of the United States of America*                (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Christopher D. Edelman**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Amicus**

**CONSTITUTIONAL**                       represented by  **Brianne Jenna Gorod**
**ACCOUNTABILITY CENTER**                                 CONSTITUTIONAL ACCOUNTABILITY
                                                          CENTER
                                                          1200 18th Street, NW
                                                          Suite 501
                                                          Washington, DC 20036
                                                          (202) 296-6889 ext. 304
                                                          Email: brianne@theusconstitution.org
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Miriam Becker-Cohen**
                                                          CONSTITUTIONAL ACCOUNTABILITY
                                                          CENTER
                                                          1200 18th Street, NW
                                                          Suite 501
                                                          Washington, DC 20036
                                                          202-296-6889
                                                          Email: miriam@theusconstitution.org
                                                          *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|---|-------------|
|            |   |             |

**App. 257**

USCA Case #25-5047     Document #2102746          Filed: 02/26/2025     Page 260 of 277

| 02/10/2025 | 1 | COMPLAINT *for Declaratory and Injunctive Relief* against All Defendants ( Filing fee $ 405 receipt number ADCDC-11470533) filed by JOURNALISM DEVELOPMENT NETWORK, INC., AIDS VACCINE ADVOCACY COALITION. (Attachments: # 1 Civil Cover Sheet, # 2 Summons to Department of State, # 3 Summons to OMB, # 4 Summons to Marco Rubio, # 5 Summons to Donald Trump, # 6 Summons to USAID, # 7 Summons to Russell Vought, # 8 Summons U.S. Attorney's Office, # 9 Summons to Attorney General, # 10 Exhibit State Dep't Memorandum, # 11 Exhibit Declaration of Mitchell Warren, # 12 Exhibit Declaration of Andrew Sullivan)(Bateman, Lauren) (Attachment 1 replaced on 2/11/2025) (znmw). (Entered: 02/10/2025) |
| --- | --- | --- |
| 02/10/2025 | 2 | NOTICE of Appearance by Nicolas Sansone on behalf of All Plaintiffs (Sansone, Nicolas) (Entered: 02/10/2025) |
| 02/10/2025 | 3 | NOTICE of Appearance by Allison Marcy Zieve on behalf of All Plaintiffs (Zieve, Allison) (Entered: 02/10/2025) |
| 02/10/2025 | 4 | NOTICE OF RELATED CASE by All Plaintiffs. Case related to Case No. 25-239, 25-352. (Zieve, Allison) (Entered: 02/10/2025) |
| 02/10/2025 | 5 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by AIDS VACCINE ADVOCACY COALITION (Zieve, Allison) (Entered: 02/10/2025) |
| 02/10/2025 | 6 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by JOURNALISM DEVELOPMENT NETWORK, INC. (Zieve, Allison) (Entered: 02/10/2025) |
| 02/11/2025 | | Case Assigned to Judge Loren L. AliKhan. (znmw) (Entered: 02/11/2025) |
| 02/11/2025 | 7 | SUMMONS (8) Issued Electronically as to All Defendants, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(znmw) (Entered: 02/11/2025) |
| 02/11/2025 | | MINUTE ORDER: Plaintiffs are hereby ORDERED to show cause on or before February 11, 2025 at 2:00 p.m. as to why this case should not be randomly assigned. It is not obvious that the instant case, which brings claims related to Executive Order 14169, 90 Fed. Reg. 8619, is related to the Office of Management and Budget memorandum that is at issue in *National Council of Nonprofits, et al. v. Office of Management and Budget, et al.*, No. 25-CV-239. Under Local Civil Rule 40.5(a)(3), cases are properly deemed related when they "(i) relate to common property, or (ii) involve common issues of fact, or (iii) grow out of the same event or transaction or (iv) involve the validity or infringement of the same patent." Given that "the mere presence of overlapping parties is not among the bases for a related-case designation," *Klayman v. Porter*, No. 20-CV-3109, 2021 WL 1668067, at *2 (D.D.C. Apr. 28, 2021) (internal quotation marks and citation omitted), Plaintiffs are ordered to show cause as to why this case fits into the "narrow exception," codified in Local Rule 40.5, to the "foundational principle of random assignment only when the relationship between the [related] cases is certain," *Klayman*, 2021 WL 1668067 at *1. Signed by Judge Loren L. AliKhan on 02/11/2025. (lclla1) (Entered: 02/11/2025) |
| 02/11/2025 | 8 | NOTICE OF RELATED CASE by All Defendants. Case related to Case No. 1:25-cv-352. (Edelman, Christopher) (Entered: 02/11/2025) |
| 02/11/2025 | 9 | RESPONSE TO ORDER TO SHOW CAUSE re Order to Show Cause,,,,, filed by AIDS VACCINE ADVOCACY COALITION, JOURNALISM DEVELOPMENT NETWORK, INC.. (Sansone, Nicolas) (Entered: 02/11/2025) |
| 02/11/2025 | | NOTICE OF ERROR regarding 9 Response to Order to Show Cause. Please note the following: Invalid attorney signature-signature on document must match PACER login. Do |

**App. 258**

| | | |
|---|---|---|
| | | not refile; future non-compliant documents will be entered in error. (znhw) (Entered: 02/11/2025) |
| 02/11/2025 | | MINUTE ORDER: Upon consideration of Plaintiffs' response 9 to the show-cause order, it is hereby ORDERED that Defendants shall file a response to the show-cause order on or before February 11, 2025 at 5:00 p.m. Signed by Judge Loren L. AliKhan on 02/11/2025. (lclla1) (Entered: 02/11/2025) |
| 02/11/2025 | 10 | RESPONSE TO ORDER TO SHOW CAUSE re Order, filed by UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, MARCO RUBIO, OFFICE OF MANAGEMENT & BUDGET, RUSSELL VOUGHT, DONALD TRUMP. (Edelman, Christopher) (Entered: 02/11/2025) |
| 02/11/2025 | 11 | ERRATA re 1 Complaint by AIDS VACCINE ADVOCACY COALITION, JOURNALISM DEVELOPMENT NETWORK, INC.. (Bateman, Lauren) Modified on 2/12/2025 to add link (mg). (Entered: 02/11/2025) |
| 02/11/2025 | 12 | ORDER directing the Clerk of Court to TRANSFER this matter to the Calendar and Case Management Committee. See order for details. Signed by Judge Loren L. AliKhan on 02/11/2025. (lclla1) (Entered: 02/11/2025) |
| 02/11/2025 | | Case randomly reassigned to Judge Amir H. Ali pursuant to 12 Order dated 2/11/2025. Judge Loren L. AliKhan is no longer assigned to the case. (ztnr) (Entered: 02/12/2025) |
| 02/12/2025 | | MINUTE ORDER. The Court will hold a telephonic motion hearing in No. 25-cv-00400 and No. 25-cv-00402 on February 12, 2025, at 1:30 p.m. The information for the public access line is as follows: the toll-free number is 833-990-9400, and the Meeting ID is 771021014. Signed by Judge Amir H. Ali on 2/12/2025. (lcaha2) Modified on 2/12/2025. (zalh) (Entered: 02/12/2025) |
| 02/12/2025 | 13 | MOTION for Temporary Restraining Order by AIDS VACCINE ADVOCACY COALITION, JOURNALISM DEVELOPMENT NETWORK, INC.. (Attachments: # 1 Memorandum in Support, # 2 Declaration Declaration of Mitchell Warren, # 3 Exhibit Exhibit A to Warren Declaration, # 4 Declaration Declaration of Andrew Sullivan, # 5 Exhibit Exhibit A to Sullivan Declaration, # 6 Text of Proposed Order)(Sansone, Nicolas) (Entered: 02/12/2025) |
| 02/12/2025 | 14 | NOTICE OF RELATED CASE by All Defendants. Case related to Case No. 1:25cv352. (Edelman, Christopher) (Entered: 02/12/2025) |
| 02/12/2025 | | Minute Entry for telephonic proceeding held before Judge Amir H. Ali: Motion Hearing held on 2/12/2025 re 13 Plaintiff's Motion for a Temporary Restraining Order. Oral arguments heard. The Court takes the motion under advisement. A written order is forthcoming via Chambers. The Court orders the parties to submit a proposed order by 4:30 PM today. (Court Reporter: William Zaremba) (zalh) (Entered: 02/12/2025) |
| 02/12/2025 | 15 | NOTICE *Related to February 12, 2025 Hearing* by UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, MARCO RUBIO, OFFICE OF MANAGEMENT & BUDGET, RUSSELL VOUGHT, DONALD TRUMP (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D - Proposed Order)(Edelman, Christopher) (Entered: 02/12/2025) |
| 02/12/2025 | 16 | NOTICE of Proposed Order by AIDS VACCINE ADVOCACY COALITION, JOURNALISM DEVELOPMENT NETWORK, INC. re 13 MOTION for Temporary Restraining Order , Motion Hearing, (Attachments: # 1 Text of Proposed Order)(Sansone, Nicolas) (Entered: 02/12/2025) |
| 02/13/2025 | 17 | ORDER granting in part and denying in part Plaintiffs' 13 motion for a temporary restraining order. See document for details. Signed by Judge Amir H. Ali on 2/13/2025. |

**App. 259**

| | | |
|---|---|---|
| | | (lcaha2) (Entered: 02/13/2025) |
| 02/14/2025 | 18 | TRANSCRIPT OF STATUS CONFERENCE - MOTIONS - TEMPORARY RESTRAINING ORDER VIA ZOOM TELECONFERENCE PROCEEDINGS before Judge Amir H. Ali held on February 12, 2025; Page Numbers: 1-74. Court Reporter/Transcriber: William Zaremba; Email: William_Zaremba@dcd.uscourts.gov. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, PDF or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 3/7/2025. Redacted Transcript Deadline set for 3/17/2025. Release of Transcript Restriction set for 5/15/2025.(Zaremba, William) (Entered: 02/14/2025) |
| 02/14/2025 | 19 | Joint STATUS REPORT by AIDS VACCINE ADVOCACY COALITION, JOURNALISM DEVELOPMENT NETWORK, INC.. (Bateman, Lauren) (Entered: 02/14/2025) |
| 02/14/2025 | | MINUTE ORDER. The Court is in receipt of the parties' 19 joint status report proposing a briefing schedule. Defendants shall respond to Plaintiffs' 13 motion for preliminary relief by February 21, 2025. Plaintiffs shall reply by 12:00 p.m. on February 27, 2025. Signed by Judge Amir H. Ali on 2/14/2025. (lcaha2) (Entered: 02/14/2025) |
| 02/16/2025 | 20 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 2/11/2025. Answer due for ALL FEDERAL DEFENDANTS by 4/12/2025. (Attachments: # 1 Exhibit Acceptance of Summons)(Bateman, Lauren) (Entered: 02/16/2025) |
| 02/18/2025 | 21 | NOTICE of Appearance by Indraneel Sur on behalf of All Defendants (Sur, Indraneel) (Entered: 02/18/2025) |
| 02/18/2025 | 22 | STATUS REPORT *regarding Compliance* by UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, MARCO RUBIO, OFFICE OF MANAGEMENT & BUDGET, RUSSELL VOUGHT, DONALD TRUMP. (Attachments: # 1 Exhibit USAID & State Decl, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit OMB Decl)(Sur, Indraneel) (Entered: 02/18/2025) |
| 02/19/2025 | 23 | Unopposed MOTION for Leave to File *Amicus Curiae Brief* by CONSTITUTIONAL ACCOUNTABILITY CENTER. (Attachments: # 1 Exhibit Proposed Amicus Brief, # 2 Text of Proposed Order)(Gorod, Brianne) (Entered: 02/19/2025) |
| 02/19/2025 | 24 | NOTICE of Appearance by Brianne Jenna Gorod on behalf of CONSTITUTIONAL ACCOUNTABILITY CENTER (Gorod, Brianne) (Entered: 02/19/2025) |
| 02/19/2025 | 25 | NOTICE of Appearance by Miriam Becker-Cohen on behalf of CONSTITUTIONAL ACCOUNTABILITY CENTER (Becker-Cohen, Miriam) (Entered: 02/19/2025) |
| 02/19/2025 | 26 | Emergency MOTION for Contempt by AIDS VACCINE ADVOCACY COALITION, JOURNALISM DEVELOPMENT NETWORK, INC.. (Attachments: # 1 Exhibit Third Declaration of Mitchell Warren, # 2 Exhibit Third Declaration of Andrew Sullivan, # 3 |

**App. 260**

| | | Exhibit Declaration of Jessica Doe, # 4 Text of Proposed Order Proposed Order)(Bateman, Lauren) (Entered: 02/19/2025) |
|---|---|---|
| 02/19/2025 | | MINUTE ORDER. Defendants are directed to respond to Plaintiffs' 26 emergency motion for contempt by 1:00 p.m. on February 20, 2025. Signed by Judge Amir H. Ali on 2/19/2025. (lcaha2) (Entered: 02/19/2025) |
| 02/20/2025 | 27 | ERRATA *to ECF 26* by AIDS VACCINE ADVOCACY COALITION, JOURNALISM DEVELOPMENT NETWORK, INC.. (Bateman, Lauren) (Entered: 02/20/2025) |
| 02/20/2025 | 28 | RESPONSE re 26 Emergency MOTION for Contempt filed by UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, MARCO RUBIO, OFFICE OF MANAGEMENT & BUDGET, RUSSELL VOUGHT, DONALD TRUMP. (Sur, Indraneel) (Entered: 02/20/2025) |
| 02/20/2025 | 29 | REPLY to opposition to motion re 26 Motion for Contempt, filed by AIDS VACCINE ADVOCACY COALITION, JOURNALISM DEVELOPMENT NETWORK, INC.. (Bateman, Lauren) (Entered: 02/20/2025) |
| 02/20/2025 | 30 | ORDER. Plaintiffs' 26 motion for contempt and to enforce the Court's temporary restraining order is granted in part and denied in part. See document for details. Signed by Judge Amir H. Ali on 2/20/2025. (lcaha2) (Entered: 02/20/2025) |
| 02/21/2025 | | MINUTE ORDER. The parties in this case and No. 25-cv-00402 shall meet and confer and file a consolidated joint status report by February 26, 2025, at 12:00 p.m., addressing Defendants' "prompt compliance with the order." Defendants' Br., ECF No. 28 at 8. Signed by Judge Amir H. Ali on 2/21/2025. (lcaha2) (Entered: 02/21/2025) |
| 02/21/2025 | 31 | STANDING ORDER. The parties are ordered to comply with the directives set forth in the attached standing order. See document for details. Signed by Judge Amir H. Ali on 2/21/2025. (lcaha2) (Entered: 02/21/2025) |
| 02/21/2025 | 32 | MOTION to Clarify re 30 Order on Motion for Contempt, 17 Order on Motion for TRO, Set/Reset Deadlines , MOTION to Stay by UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, MARCO RUBIO, OFFICE OF MANAGEMENT & BUDGET, RUSSELL VOUGHT, DONALD TRUMP. (Sur, Indraneel) (Entered: 02/21/2025) |
| 02/21/2025 | 33 | Memorandum in opposition to re 13 Motion for TRO, *combined with opposition in No.402* filed by UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, MARCO RUBIO, OFFICE OF MANAGEMENT & BUDGET, RUSSELL VOUGHT, DONALD TRUMP. (Sur, Indraneel) (Entered: 02/21/2025) |
| 02/22/2025 | 34 | ORDER. To the extent Defendants' 32 motion to clarify is not mooted by the discussion herein, it is denied, and Defendants' motion to stay the Court's TRO pending an emergency appeal is also denied. See document for details. Signed by Judge Amir H. Ali on 2/22/2025. (lcaha3) (Entered: 02/22/2025) |
| 02/24/2025 | | MINUTE ORDER. The Court is in receipt of the emergency motion to enforce filed in No. 25-cv-00402. The Court will hold a telephonic status hearing on February 25, 2025, at 11:00 a.m. The information for the public access line is as follows: the toll-free number is 833-990-9400, and the Meeting ID is 771021014. Signed by Judge Amir H. Ali on 2/24/2025. (lcaha1) Modified on 2/25/2025. (zalh) (Entered: 02/24/2025) |
| 02/25/2025 | | Set/Reset Hearings: Status Conference set for 2/25/2025 at 11:00 AM via teleconference before Judge Amir H. Ali. (zalh) (Entered: 02/25/2025) |

**App. 261**

| | | |
|---|---|---|
| 02/25/2025 | 35 | TRANSCRIPT OF MOTION HEARING before Judge Amir H. Ali held on February 25, 2025; Page Numbers: 1-60. Date of Issuance: 2/25/2025. Court Reporter: Bryan A. Wayne. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 3/18/2025. Redacted Transcript Deadline set for 3/28/2025. Release of Transcript Restriction set for 5/26/2025.(Wayne, Bryan) (Main Document 35 replaced on 2/25/2025) (znbn). (Entered: 02/25/2025) |
| 02/25/2025 | | Minute Entry and Order for Proceedings held before Judge Amir H. Ali: Status Conference held via Zoom on 2/25/2025. Oral motion by the Plaintiff for " Emergency MOTION to Enforce Temporary Restraining Order", HEARD and GRANTED for the reasons stated on the record after oral argument. The restrained defendants are ORDERED to comply as discussed by 11:59 p.m. on February 26, 2025. (Court Reporter Bryan Wayne) (znbn) (Entered: 02/25/2025) |
| 02/25/2025 | 36 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to Status Conference, by UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, MARCO RUBIO, OFFICE OF MANAGEMENT & BUDGET, RUSSELL VOUGHT, DONALD TRUMP. Fee Status: No Fee Paid. Parties have been notified. (Sur, Indraneel) (Entered: 02/25/2025) |
| 02/25/2025 | 37 | MOTION to Stay re Status Conference, by UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, MARCO RUBIO, OFFICE OF MANAGEMENT & BUDGET, RUSSELL VOUGHT, DONALD TRUMP. (Attachments: # 1 Declaration)(Sur, Indraneel) (Entered: 02/25/2025) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 02/25/2025 23:37:53 | | |
| **PACER Login:** | sean.janda.doj | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:25-cv-00400-AHA |
| **Billable Pages:** | 7 | **Cost:** | 0.70 |

**App. 262**

APPEAL,TYPE-D

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:25-cv-00402-AHA

GLOBAL HEALTH COUNCIL et al v. DONALD J. TRUMP et al
Assigned to: Judge Amir H. Ali
Related Case: 1:25-cv-00400-AHA
Cause: 05:0706 Judicial Review of Agency Actions

Date Filed: 02/11/2025
Jury Demand: None
Nature of Suit: 899 Administrative
Procedure Act/Review or Appeal of Agency
Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**GLOBAL HEALTH COUNCIL**                 represented by **Allison Gardner**
ARNOLD & PORTER KAYE SCHOLER
LLP
601 Massachusetts Avenue, NW
Washington D.C., DC 20001-3743
202-942-5000
Email: allison.gardner@arnoldporter.com
*ATTORNEY TO BE NOTICED*

**Dana Kagan McGinley**
ARNOLD & PORTER
601 Massachusetts Ave. NW
Washington, DC 20001
202-942-6421
Email:
Dana.KaganMcGinley@arnoldporter.com
*ATTORNEY TO BE NOTICED*

**Daniel Reuben Yablon**
ARNOLD & PORTER KAYE SCHOLER
LLP
601 Massachusetts Ave., NW
Washington, DC 20001
202-942-5009
Email: Daniel.Yablon@arnoldporter.com
*ATTORNEY TO BE NOTICED*

**Sally Pei**
ARNOLD & PORTER KAYE SCHOLER
LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
(202) 942-5000
Fax: (202) 942-5999
Email: sally.pei@arnoldporter.com

**App. 263**

USCA Case #25-5047    Document #2102746    Filed: 03/26/2025    Page 266 of 277

*ATTORNEY TO BE NOTICED*

**Samuel M. Witten**
ARNOLD & PORTER
601 Massachusetts Avenue, NW
Washington, DC 20817
202-942-6115
Email: samuel.witten@apks.com
*ATTORNEY TO BE NOTICED*

**Stephen K. Wirth**
ARNOLD & PORTER KAYE SCHOLER
LLP
601 Massachusetts Ave. NW
Washington, DC 20001
202-942-6739
Fax: 202-942-5999
Email: stephen.wirth@arnoldporter.com
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**SMALL BUSINESS ASSOCIATION**          represented by  **Allison Gardner**
**FOR INTERNATIONAL COMPANIES**                         (See above for address)
*ATTORNEY TO BE NOTICED*

**Dana Kagan McGinley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sally Pei**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samuel M. Witten**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen K. Wirth**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**HIAS**          represented by  **Allison Gardner**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Dana Kagan McGinley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen K. Wirth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**App. 264**

**Plaintiff**

**MANAGEMENT SCIENCES FOR**                    represented by    **Allison Gardner**
**HEALTH, INC.**                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Dana Kagan McGinley**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Daniel Reuben Yablon**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Sally Pei**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Samuel M. Witten**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Stephen K. Wirth**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

**Plaintiff**

**CHEMONICS INTERNATIONAL, INC.**              represented by    **Allison Gardner**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Dana Kagan McGinley**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Daniel Reuben Yablon**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Sally Pei**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Samuel M. Witten**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Stephen K. Wirth**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

**Plaintiff**

**DAI GLOBAL LLC**                             represented by    **Allison Gardner**
                                                                 (See above for address)

**App. 265**

*ATTORNEY TO BE NOTICED*

**Dana Kagan McGinley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel Reuben Yablon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sally Pei**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samuel M. Witten**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen K. Wirth**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>
**DEMOCRACY INTERNATIONAL, INC.**  represented by  **Allison Gardner**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Dana Kagan McGinley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel Reuben Yablon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sally Pei**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samuel M. Witten**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen K. Wirth**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>
**AMERICAN BAR ASSOCIATION**  represented by  **Allison Gardner**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Dana Kagan McGinley**
(See above for address)

**App. 266**

*ATTORNEY TO BE NOTICED*

**Daniel Reuben Yablon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sally Pei**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samuel M. Witten**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen K. Wirth**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**DONALD J. TRUMP**
*in his official capacity as President of the United States of America*

represented by **Indraneel Sur**
U.S. DEPARTMENT OF JUSTICE
1100 L St. NW
Washington, DC 20530
202-616-8488
Email: Indraneel.Sur@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**MARCO RUBIO**
*in his official capacity as Secretary of State and Acting Administrator of the United States Agency for International Development*

represented by **Indraneel Sur**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**PETER MAROCCO**
*in his official capacity as Acting Deputy Administrator for Policy and Planning, Acting Deputy Administrator for Management and Resources of the United States Agency for International Development, and Director of Foreign Assistance at the Department of St*

represented by **Indraneel Sur**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**RUSSELL T. VOUGHT**
*in his official capacity as Director of the Office of Management and Budget*

represented by **Indraneel Sur**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**App. 267**

**Defendant**

**UNITED STATES DEPARTMENT OF**              represented by   **Indraneel Sur**
**STATE**                                                     (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Defendant**

**UNITED STATES AGENCY FOR**                 represented by   **Indraneel Sur**
**INTERNATIONAL DEVELOPMENT**                                 (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Defendant**

**OFFICE OF MANAGEMENT AND**                 represented by   **Indraneel Sur**
**BUDGET**                                                    (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Amicus**

**CONSTITUTIONAL**                           represented by   **Brianne Jenna Gorod**
**ACCOUNTABILITY CENTER**                                     CONSTITUTIONAL ACCOUNTABILITY
                                                             CENTER
                                                             1200 18th Street, NW
                                                             Suite 501
                                                             Washington, DC 20036
                                                             (202) 296-6889 ext. 304
                                                             Email: brianne@theusconstitution.org
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Miriam Becker-Cohen**
                                                             CONSTITUTIONAL ACCOUNTABILITY
                                                             CENTER
                                                             1200 18th Street, NW
                                                             Suite 501
                                                             Washington, DC 20036
                                                             202-296-6889
                                                             Email: miriam@theusconstitution.org
                                                             *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/11/2025 | 1 | COMPLAINT against All Defendants ( Filing fee $ 405 receipt number ADCDC-11470798) filed by DAI GLOBAL LLC, HIAS, DEMOCRACY INTERNATIONAL, INC., SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, AMERICAN BAR ASSOCIATION, GLOBAL HEALTH COUNCIL, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC.. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Summons, # 7 Summons, # 8 Summons, # 9 Summons, # 10 Summons) (Wirth, Stephen) (Entered: 02/11/2025) |
| 02/11/2025 | 2 | NOTICE OF RELATED CASE by All Plaintiffs. Case related to Case No. 25-cv-400. (Wirth, Stephen) (Main Document 2 replaced on 2/11/2025) (znmw). (Entered: |

**App. 268**

USCA Case #25-5047   Document #2102746        Filed: 02/26/2025    Page 271 of 277

| 02/11/2025 | | (Entered: 02/11/2025) |
|---|---|---|
| 02/11/2025 | 3 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION (Wirth, Stephen) (Entered: 02/11/2025) |
| 02/11/2025 | 4 | MOTION for Temporary Restraining Order , MOTION for Preliminary Injunction by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION. (Attachments: # 1 Text of Proposed Order)(Wirth, Stephen) (Entered: 02/11/2025) |
| 02/11/2025 | 5 | NOTICE of Appearance by Daniel Reuben Yablon on behalf of GLOBAL HEALTH COUNCIL, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION (Yablon, Daniel) (Entered: 02/11/2025) |
| 02/11/2025 | 6 | NOTICE of Appearance by Sally Pei on behalf of GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION (Pei, Sally) (Entered: 02/11/2025) |
| 02/11/2025 | 7 | DECLARATION by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION re 4 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction . (Attachments: # 1 Declaration of Elisha Dunn-Georgiou, # 2 Declaration of Robert Nichols, # 3 Declaration of Mark Hetfield, # 4 Exhibit to Hetfield Decl., # 5 Declaration Marian Wentworth, # 6 Declaration of James Butcher, # 7 Declaration of Zan Northrip, # 8 Declaration of Eric Bjornlund, # 9 Declaration of Scott Carlson)(Wirth, Stephen) (Entered: 02/11/2025) |
| 02/11/2025 | | Case Assigned to Judge Loren L. AliKhan. (znmw) (Entered: 02/11/2025) |
| 02/11/2025 | 8 | SUMMONS (9) Issued Electronically as to All Defendants, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(znmw) (Entered: 02/11/2025) |
| 02/11/2025 | 9 | NOTICE of Appearance by Samuel M. Witten on behalf of GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION (Witten, Samuel) (Entered: 02/11/2025) |
| 02/11/2025 | 10 | NOTICE of Appearance by Allison Gardner on behalf of GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION (Gardner, Allison) (Entered: 02/11/2025) |
| 02/11/2025 | 11 | ENTERED IN ERROR.....NOTICE of Appearance by William Perdue on behalf of GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, MANAGEMENT SCIENCES FOR HEALTH, INC., |

**App. 269**

| | | CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION (Perdue, William) Modified on 2/11/2025 (znmw). (Entered: 02/11/2025) |
|---|---|---|
| 02/11/2025 | 12 | NOTICE of Appearance by Dana Kagan McGinley on behalf of GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION (Kagan McGinley, Dana) (Entered: 02/11/2025) |
| 02/11/2025 | | NOTICE OF ERROR regarding 11 Notice of Appearance,. The following error(s) need correction: Attorney William Perdue is not an active member of this Court's bar; a Pro Hac Vice motion has not been filed in this case. (znmw) Modified on 2/11/2025 (znmw). (Entered: 02/11/2025) |
| 02/11/2025 | | RESOLVED.....NOTICE of Provisional Status re 12 NOTICE of Appearance by Dana Kagan McGinley on behalf of All Plaintiffs (Kagan McGinley, Dana). |
| | | Your attorney renewal has not been received. As a result, your membership with the U.S. District & Bankruptcy Courts for the District of Columbia is not in good standing, and you are not permitted to file. Pursuant to Local Civil Rule 83.9, you must immediately correct your membership status by following the appropriate instructions on this page of our website: https://www.dcd.uscourts.gov/attorney-renewal. |
| | | Please be advised that the presiding judge in this case has been notified that you are currently not in good standing to file in this court. Renewal Due by 2/18/2025. (znmw) Modified on 2/12/2025 (zhcn). (Entered: 02/11/2025) |
| 02/11/2025 | 13 | NOTICE OF RELATED CASE by All Defendants. Case related to Case No. 1:25-cv-352. (Edelman, Christopher) (Entered: 02/11/2025) |
| 02/11/2025 | 14 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- William Perdue, Filing fee $ 100, receipt number ADCDC-11472347. Fee Status: Fee Paid. by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION. (Wirth, Stephen) (Entered: 02/11/2025) |
| 02/11/2025 | 15 | RESPONSE re 13 Notice of Related Case filed by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION. (Wirth, Stephen) (Entered: 02/11/2025) |
| 02/11/2025 | | MINUTE ORDER: For the reasons stated in the court's order in *AIDS Vaccine Advocacy Coalition v. U.S. Department of State*, No. 25-CV-400, ECF No. 12, it is hereby ORDERED that the Clerk of Court shall TRANSFER this related matter to the Calendar and Case Management Committee. Signed by Judge Loren L. AliKhan on 02/11/2025. (lclla1) (Entered: 02/11/2025) |
| 02/11/2025 | | Case directly reassigned to Judge Amir H. Ali, as related, pursuant to Minute Order dated 2/11/2025. Judge Loren L. AliKhan is no longer assigned to the case. (ztnr) (Entered: 02/12/2025) |
| 02/12/2025 | 16 | NOTICE by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY |

**App. 270**

USCA Case #25-5047     Document #2102746     Filed: 02/26/2025     Page 273 of 277

| | | INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION re [4](javascript:void(0)) Motion for TRO,, Motion for Preliminary Injunction, (Wirth, Stephen) (Entered: 02/12/2025) |
|---|---|---|
| 02/12/2025 | | MINUTE ORDER. The Court will hold a telephonic motion hearing in No. 25-cv-00400 and No. 25-cv-00402 on February 12, 2025, at 1:30 p.m. The information for the public access line is as follows: the toll-free number is 833-990-9400, and the Meeting ID is 771021014. Signed by Judge Amir H. Ali on 2/12/2025. (lcaha2) Modified on 2/12/2025. (zalh) (Entered: 02/12/2025) |
| 02/12/2025 | | Minute Entry for telephonic proceeding held before Judge Amir H. Ali: Motion Hearing held on 2/12/2025 re 4 Motion and Memorandum of Law in Support of Temporary Restraining Order and Preliminary Injunction. Oral arguments heard. The Court takes the motion under advisement. A written order is forthcoming via Chambers. The Court orders the parties to submit a proposed order by 4:30 PM today, and the necessary documentation regarding any terminations by 7:00 PM today. (Court Reporter: William Zaremba) (zalh) (Entered: 02/12/2025) |
| 02/12/2025 | 17 | NOTICE *Related to February 12, 2025 Hearing* by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D: Proposed Order)(Edelman, Christopher) (Entered: 02/12/2025) |
| 02/12/2025 | 18 | NOTICE *of Revised Proposed Order* by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION re Motion Hearing,, 4 Motion for TRO,, Motion for Preliminary Injunction, (Pei, Sally) (Entered: 02/12/2025) |
| 02/12/2025 | 19 | RESPONSE TO ORDER OF THE COURT re 2/12/2025 MINUTE Order by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) (Wirth, Stephen) Modified event on 2/13/2025 (mg). (Entered: 02/12/2025) |
| 02/12/2025 | 20 | NOTICE *of supplemental information* by UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT re 17 Notice (Other), (Attachments: # 1 Exhibit) (Sur, Indraneel) (Entered: 02/12/2025) |
| 02/13/2025 | 21 | ORDER granting in part and denying in part Plaintiffs' 4 Motion for a Temporary Restraining Order. Defendants shall file a status report by 2/18/2025. The parties shall file a joint status report by 2/14/2025 at 5:00 PM. See document for details. Signed by Judge Amir H. Ali on 2/13/2025. (lcaha2) Modified on 2/14/2025. (zalh) (Entered: 02/13/2025) |
| 02/14/2025 | 22 | TRANSCRIPT OF STATUS CONFERENCE - MOTIONS - TEMPORARY RESTRAINING ORDER VIA ZOOM TELECONFERENCE PROCEEDINGS before Judge Amir H. Ali held on February 12, 2025; Page Numbers: 1-74. Court Reporter/Transcriber: William Zaremba; Email: William_Zaremba@dcd.uscourts.gov. Transcripts may be ordered by submitting the [Transcript Order Form](javascript:void(0)) <br><br> For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, PDF or ASCII) may be purchased from the court reporter. |

**App. 271**

**NOTICE RE REDACTION OF TRANSCRIPTS.** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 3/7/2025. Redacted Transcript Deadline set for 3/17/2025. Release of Transcript Restriction set for 5/15/2025.(Zaremba, William) (Entered: 02/14/2025)

| | | |
|---|---|---|
| 02/14/2025 | 23 | Joint STATUS REPORT by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION. (Wirth, Stephen) (Entered: 02/14/2025) |
| 02/14/2025 | | MINUTE ORDER. The Court is in receipt of the parties' 23 joint status report proposing a briefing schedule. Defendants shall respond to Plaintiffs' 4 motion for preliminary relief by February 21, 2025. Plaintiffs shall reply by 12:00 p.m. on February 27, 2025. Signed by Judge Amir H. Ali on 2/14/2025. (lcaha2) (Entered: 02/14/2025) |
| 02/18/2025 | 24 | NOTICE of Appearance by Indraneel Sur on behalf of All Defendants (Sur, Indraneel) (Entered: 02/18/2025) |
| 02/18/2025 | 25 | STATUS REPORT *regarding Compliance* by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET. (Attachments: # 1 Exhibit USAID & State Decl, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit OMB Decl)(Sur, Indraneel) (Entered: 02/18/2025) |
| 02/19/2025 | 26 | Unopposed MOTION for Leave to File *Amicus Curiae Brief* by CONSTITUTIONAL ACCOUNTABILITY CENTER. (Attachments: # 1 Proposed Amicus Brief, # 2 Text of Proposed Order)(Gorod, Brianne) (Entered: 02/19/2025) |
| 02/19/2025 | 27 | NOTICE of Appearance by Miriam Becker-Cohen on behalf of CONSTITUTIONAL ACCOUNTABILITY CENTER (Becker-Cohen, Miriam) (Entered: 02/19/2025) |
| 02/20/2025 | 28 | ORDER. Plaintiffs' motion for contempt and to enforce the Court's temporary restraining order in No. 25-cv-00400 is granted in part and denied in part. See document for details. Signed by Judge Amir H. Ali on 2/20/2025. (lcaha2) (Entered: 02/20/2025) |
| 02/20/2025 | 29 | MOTION to Enforce *Temporary Restraining Order* by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION. (Attachments: # 1 Declaration of Elisha Dunn-Georgiou, # 2 Declaration of Robert Nichols, # 3 Declaration of Rachel Levitan, # 4 Declaration of Marian Wentworth, # 5 Declaration James Butcher, # 6 Declaration Zan Northrip, # 7 Declaration Eric Bjornlund, # 8 Declaration Scott Carlson, # 9 Text of Proposed Order)(Wirth, Stephen) (Entered: 02/20/2025) |
| 02/20/2025 | 31 | RESPONSE re 25 Status Report, filed by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION. (See docket entry 29 to view document)(mg) (Entered: 02/21/2025) |

**App. 272**

USCA Case #25-5047     Document #2102746     Filed: 02/26/2025     Page 275 of 277

| | | |
|---|---|---|
| 02/21/2025 | 30 | ERRATA by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION re 1 Complaint,,. (Attachments: # 1 Errata (Corrected Complaint))(Wirth, Stephen) (Entered: 02/21/2025) |
| 02/21/2025 | | MINUTE ORDER. The Court is in receipt of Plaintiffs' 29 motion to enforce the Court's temporary restraining order. Plaintiffs request that the Court order "the immediate payment of all funds owed and due to Plaintiffs and other USAID and State Department implementing partners." ECF No. 29 at 1. The motion is denied without prejudice as moot in light of the Court's order yesterday that Defendants are to "immediately cease [the blanket suspension of funds] and to take all necessary steps to honor the terms of contracts, grants, cooperative agreements, loans, and other federal foreign assistance awards that were in existence as of January 19, 2025, including but not limited to disbursing all funds payable under those terms." ECF No. 28 at 5.<br><br>The parties in this case and No. 25-cv-00400 shall meet and confer and file a consolidated joint status report by February 26, 2025, at 12:00 p.m., addressing Defendants' "prompt compliance with the order." Defendants' Br., *AIDS Vaccine*, ECF No. 28 at 8. Signed by Judge Amir H. Ali on 2/21/2025. (lcaha2) (Entered: 02/21/2025) |
| 02/21/2025 | 32 | STANDING ORDER. The parties are ordered to comply with the directives set forth in the attached standing order. See document for details. Signed by Judge Amir H. Ali on 2/21/2025. (lcaha2) (Entered: 02/21/2025) |
| 02/21/2025 | 33 | MOTION to Clarify re 21 Order on Motion for TRO,, Set/Reset Deadlines, 28 Order , MOTION to Stay by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP. (Sur, Indraneel) (Entered: 02/21/2025) |
| 02/21/2025 | 34 | Memorandum in opposition to re 4 Motion for TRO,, Motion for Preliminary Injunction, *combined with opposition in No.400* filed by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP. (Sur, Indraneel) (Entered: 02/21/2025) |
| 02/22/2025 | 35 | ORDER. To the extent Defendants' 33 motion to clarify is not mooted by the discussion herein, it is denied, and Defendants' motion to stay the Court's TRO pending an emergency appeal is also denied. See document for details. Signed by Judge Amir H. Ali on 2/22/2025. (lcaha3) (Entered: 02/22/2025) |
| 02/24/2025 | 36 | Emergency MOTION to Enforce *Temporary Restraining Order* by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION. (Attachments: # 1 Declaration of Eric Bjornlund, # 2 Declaration of Zan Northrip, # 3 Declaration of Phillip Green, # 4 Declaration of Elisabeth Sigler, # 5 Text of Proposed Order)(Wirth, Stephen) (Entered: 02/24/2025) |

**App. 273**

USCA Case #25-5047      Document #2102746        Filed: 02/26/2025      Page 276 of 277

| | | |
|---|---|---|
| 02/24/2025 | | MINUTE ORDER. The Court is in receipt of Plaintiffs' 36 emergency motion to enforce. The Court will hold a telephonic motion hearing on February 25, 2025, at 11:00 a.m. The information for the public access line is as follows: the toll-free number is 833-990-9400, and the Meeting ID is 771021014. Signed by Judge Amir H. Ali on 2/24/2025. (lcaha1) Modified on 2/25/2025. (zalh) (Entered: 02/24/2025) |
| 02/25/2025 | 37 | TRANSCRIPT OF MOTION HEARING before Judge Amir H. Ali held on February 25, 2025; Page Numbers: 1-60. Date of Issuance: 2/25/2025. Court Reporter: Bryan A. Wayne. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 3/18/2025. Redacted Transcript Deadline set for 3/28/2025. Release of Transcript Restriction set for 5/26/2025.(Wayne, Bryan) (Entered: 02/25/2025) |
| 02/25/2025 | | Minute Entry and Order for proceedings held via Zoom before Judge Amir H. Ali: Motion Hearing held on 2/25/2025 re 36 Emergency MOTION to Enforce *Temporary Restraining Order* filed by GLOBAL HEALTH COUNCIL, DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, CHEMONICS INTERNATIONAL, INC., MANAGEMENT SCIENCES FOR HEALTH, INC., HIAS. Oral arguments HEARD, motion GRANTED for the reasons stated on the record. The restrained defendants are ordered to comply as discussed by 11:59 p.m. on February 26, 2025. (Court Reporter Bryan Wayne) (znbn) (Entered: 02/25/2025) |
| 02/25/2025 | 38 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to Order on Motion to Enforce,,, Motion Hearing,, by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP. Fee Status: No Fee Paid. Parties have been notified. (Sur, Indraneel) (Entered: 02/25/2025) |
| 02/25/2025 | 39 | MOTION to Stay re Order on Motion to Enforce,,, Motion Hearing,, by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP. (Attachments: # 1 Declaration)(Sur, Indraneel) (Entered: 02/25/2025) |

| PACER Service Center | | |
|---|---|---|
| | **Transaction Receipt** | |
| | 02/25/2025 23:38:16 | |
| **PACER Login:** | sean.janda.doj | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:25-cv-00402-AHA |

**App. 274**

| Billable Pages: | 12 | Cost: | 1.20 |
|---|---|---|---|